Nos. 16-1200 & 16-1201
(consolidated)

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**
_____

**UNITED STATES OF AMERICA**
**Appellant**

v.

**CAROLYN JACKSON and JOHN JACKSON,**

**Appeals from the Final Judgments in a Criminal Case of the United States District Court for the District of New Jersey (Crim. No. 13-290).   Sat Below: Honorable Katharine S. Hayden, U.S.D.J.**

_____

**REDACTED BRIEF AND VOLUME I OF THE APPENDIX (pp. 1-14)
FOR APPELLANT THE UNITED STATES OF AMERICA**

_____

**PAUL J. FISHMAN
United States Attorney
Attorney for Appellant
970 Broad Street
Newark, New Jersey 07102-2535
(973) 645-2700**

On the Brief:

**JOHN F. ROMANO
Assistant U.S. Attorney
(973) 645-2866**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

TABLE OF ABBREVIATIONS ............................................................. xiii

PRELIMINARY STATEMENT ................................................................1

JURISDICTIONAL STATEMENT .............................................................2

STATEMENT OF THE ISSUES ..............................................................3

STATEMENT OF RELATED CASES AND PROCEEDINGS .....................................4

STATEMENT OF THE CASE ................................................................4

    A.    Factual Background ...........................................................4

    B.    Procedural History ..........................................................17

SUMMARY OF ARGUMENT .................................................................21

ARGUMENT   ...........................................................................24

POINT I   THE DISTRICT COURT ERRONEOUSLY FOUND NO SUFFICIENTLY
    ANALOGOUS OFFENSE GUIDELINE, WHERE MULTIPLE COUNTS OF
    CONVICTION CHARGED THAT DEFENDANTS "PHYSICALLY ASSAULT[ED]"
    THEIR ADOPTED CHILDREN AND THEREFORE THE ASSAULT
    GUIDELINES SHOULD HAVE BEEN USED ......................................24

    A.    The Assault Guidelines Are Sufficiently Analogous To Multiple
        Counts Of Conviction And Should Have Been Used To Calculate
        Defendants' Guidelines Ranges. ...........................................27

    B.    The District Court's Bases For Rejecting The Assault Guidelines
        Were Wrong. ...............................................................37

POINT II  THE DISTRICT COURT ERRED BY REFUSING TO FIND AGGRAVATING
    FACTS BY A PREPONDERANCE OF THE EVIDENCE. ...........................42

i

POINT III  THE DISTRICT COURT MISINTERPRETED ACA BY FOCUSING ON STATE
SENTENCING POLICIES AND IGNORING UNWARRANTED FEDERAL
SENTENCING DISPARITIES.............................................................................47

POINT IV  NO REASONABLE SENTENCING COURT WOULD HAVE IMPOSED SUCH
LENIENT SENTENCES ON PARENTS WHO BEAT, STARVED, AND
NEGLECTED THEIR YOUNG AND DEFENSELESS ADOPTED CHILDREN
OVER A FIVE-YEAR PERIOD, CONTRIBUTING TO THE DEATH OF ONE,
ALMOST KILLING ANOTHER TWICE, AND CAUSING PERMANENT
DAMAGE TO THE SURVIVORS.......................................................................54

    A.    The District Court Repeatedly Undermined The Jury's Verdict. ...........57

        1.    The Court improperly trivialized the severity of the abuse. .........57

        2.    The Court downplayed John's role. .............................................62

    B.    The Sentences Do Not Reflect The Seriousness Of These Offenses
          Or Provide Just Punishments.....................................................................64

    C.    The Sentences Do Not Afford Adequate Deterrence ..............................68

    D.    The Sentences Do Not Properly Account For The Nature And
          Circumstances Of The Offense Or The History And Characteristics
          Of Defendants..............................................................................................69

    E.    The Sentences Do Not Account For The Remaining § 3553(a)
          Factors .........................................................................................................73

CONCLUSION ..............................................................................................................76

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

Alleyne v. United States,
    133 S. Ct. 2151 (2013) ........................................................................44

Gall v. United States,
    552 U.S. 38 (2007) .....................................................................53, 56

Lewis v. United States,
    523 U.S. 155 (1998) ........................................................28, 32, 36, 39

Molina-Martinez v. United States,
    136 S. Ct. 1338 (2016) ..................................................................41

State v. Evers,
    175 N.J. 355 (2003) ......................................................................50

State v. Roth,
    95 N.J. 334 (1984) ........................................................................50

State v. Yarbough,
    100 N.J. 627 (1985) ......................................................................46

United States v. Ali,
    508 F.3d 136 (3d Cir. 2007) ...........................................42, 43, 44, 46

United States v. Allard,
    164 F.3d 1146 (8th Cir. 1999) .......................................................28, 35

United States v. Almeida,
    710 F.3d 437 (1st Cir. 2013) .........................................................31, 32

United States v. Alvarado,
    909 F.2d 1443 (10th Cir. 1990) ......................................................66

United States v. Aquino,
    555 F.3d 124 (3d Cir. 2009) ..........................................................25

iii

United States v. Bailey,
    169 Fed. Appx. 815 (5th Cir. 2006) ........................................................36

United States v. Baldrich,
    471 F.3d 1110 (9th Cir. 2006)................................................................66

United States v. Begin,
    696 F.3d 405 (3d Cir. 2012).............................................................48, 52

United States v. Bell,
    993 F.2d 427 (5th Cir. 1993)..................................................................36

United States v. Bergrin,
    599 Fed. Appx. 439 (3d Cir. 2014) ........................................................44

United States v. Bertling,
    611 F.3d 477 (8th Cir. 2010)..................................................................57

United States v. Boggi,
    74 F.3d 470 (3d Cir. 1996).....................................................................57

United States v. Boney,
    769 F.3d 153 (3d Cir. 2014)...........................................................passim

United States v. Branson,
    463 F.3d 1110 (10th Cir. 2006)..............................................................52

United States v. Calbat,
    266 F.3d 358 (5th Cir. 2001)..............................................27, 28, 31, 35

United States v. Campos,
    362 F.3d 1013 (8th Cir. 2004)...............................................................57

United States v. Centner,
    1997 U.S. App. LEXIS 14720 (4th Cir. June 17, 1997) ............29, 31, 36

United States v. Cherry,
    10 F.3d 1003 (3d Cir. 1993)...................................................................35

United States v. Chorin,
    322 F.3d 274 (3d Cir. 2003)...................................................................46

iv

United States v. Coleman,
    38 F.3d 856 (7th Cir. 1994) .......................................................40, 48, 51

United States v. Cothran,
    286 F.3d 173 (3d Cir. 2002) ...............................................24, 25, 28, 35

United States v. Daniels,
    948 F.2d 1033 (6th Cir. 1991) ...............................................................35

United States v. Dansker,
    581 F.2d 69 (3d Cir. 1978) .....................................................................40

United States v. Dautovic,
    763 F.3d 927 (8th Cir. 2014) ..................................................................75

United States v. Delis,
    558 F.3d 177 (2d Cir. 2009) .......................................................31, 35, 39

United States v. Drapeau,
    110 F.3d 618 (8th Cir. 1997) ..................................................................68

United States v. Finley,
    531 F.3d 288 (4th Cir. 2008) ..................................................................53

United States v. Fortier,
    180 F.3d 1217 (10th Cir. 1999) ..............................................................33

United States v. Freeman,
    763 F.3d 322 (3d Cir. 2014) .......................................................24, 44, 46

United States v. Friedman,
    554 F.3d 1301 (10th Cir. 2009) ..............................................................73

United States v. Friedman,
    658 F.3d 342 (3d Cir. 2011) ...................................................................46

United States v. Fumo,
    655 F.3d 288 (3d Cir. 2011) .............................................................41, 44

United States v. Garcia,
    893 F.2d 250 (10th Cir. 1989) ...................................................47, 48, 51, 52

v

United States v. Gaskell,
    134 F.3d 1039 (11th Cir. 1998) ............................................................. 51

United States v. Goff,
    501 F.3d 250 (3d Cir. 2007) ................................................................. 55

United States v. Grier,
    475 F.3d 556 (3d Cir. 2007) ................................................................. 45

United States v. Grimes,
    173 F.3d 634 (7th Cir. 1999) ................................................................ 68

United States v. Hall,
    979 F.2d 320 (3d Cir. 1992) ................................................................. 18

United States v. Hayes,
    762 F.3d 1300 (11th Cir. 2014) ............................................................ 67

United States v. Hooper,
    566 Fed. Appx. 771 (11th Cir. 2014) .................................................... 68

United States v. Hourihan,
    66 F.3d 458 (2d Cir. 1995) ................................................................... 63

United States v. Hunt,
    521 F.3d 636 (6th Cir. 2008) ................................................................ 63

United States v. Hyde,
    977 F.2d 1436 (11th Cir. 1992) ............................................................ 36

United States v. Irey,
    612 F.3d 1160 (11th Cir. 2010) ....................................... 54, 60, 65, 67

United States v. Kane,
    639 F.3d 1121 (8th Cir. 2011) ................................................... passim

United States v. Kononchuk,
    485 F.3d 199 (3d Cir. 2007) ................................................................. 56

United States v. Langford,
    516 F.3d 205 (3d Cir. 2008) ................................................................. 41

United States v. Langley,
    919 F.2d 926 (5th Cir. 1990).....................................................37

United States v. Levinson,
    543 F.3d 190 (3d Cir. 2008)......................................................55

United States v. Lewellyn,
    481 F.3d 695 (9th Cir. 2007).....................................................31

United States v. Lofink,
    564 F.3d 232 (3d Cir. 2009)................................................43, 46

United States v. Loften,
    465 Fed. Appx. 294 (5th Cir. 2010) ........................................40

United States v. Lucero,
    747 F.3d 1242 (10th Cir. 2014)................................................33

United States v. Lychock,
    578 F.3d 214 (3d Cir. 2009)......................................................55

United States v. Marmolejo,
    915 F.2d 981 (5th Cir. 1990).....................................................47

United States v. Martinez,
    274 F.3d 897 (5th Cir. 2001).....................................................53

United States v. McEnry,
    659 F.3d 893 (9th Cir. 2011).....................................................28

United States v. McQueen,
    727 F.3d 1144 (11th Cir. 2013)........................30, 56, 64, 75

United States v. Mellerson,
    145 F.3d 1255 (11th Cir. 1998).................................................32

United States v. Merced,
    603 F.3d 203 (3d Cir. 2010)...............................49, 55, 56, 67

United States v. Morgan,
    635 Fed. Appx. 423 (10th Cir. 2015) ...............................passim

United States v. Musgrave,
    761 F.3d 602 (6th Cir. 2014)........................................................................67

United States v. Napolitan,
    762 F.3d 297 (3d Cir. 2014)........................................................................43

United States v. Negroni,
    638 F.3d 434 (3d Cir. 2011)..................................................................55, 56

United States v. Nichols,
    169 F.3d 1255 (10th Cir. 1999)............................................................31, 35

United States v. Norquay,
    905 F.2d 1157 (8th Cir. 1990)........................................................47, 48, 51

United States v. Olhovsky,
    562 F.3d 530 (3d Cir. 2009)........................................................................62

United States v. Osborne,
    164 F.3d 434 (8th Cir. 1999)......................................................................32

United States v. Padilla,
    961 F.2d 322 (2d Cir. 1992)........................................................................26

United States v. Pate,
    321 F.3d 1373 (11th Cir. 2003)....................................................................51

United States v. Pierce,
    75 F.3d 173 (4th Cir. 1996)........................................................................47

United States v. Queensborough,
    227 F.3d 149 (3d Cir. 2000)........................................................47, 51, 53

United States v. Rakes,
    510 F.3d 1280 (10th Cir. 2007)...........................................................passim

United States v. Ressam,
    679 F.3d 1069 (9th Cir. 2012)........................................................54, 60, 67, 73

United States v. Robinson,
    778 F.3d 515 (6th Cir. 2015)......................................................................65

viii

United States v. Schneider,
    801 F.3d 186 (3d Cir. 2015) ...............................................................26, 39

United States v. Smith,
    574 F.2d 988 (9th Cir. 1978) ......................................................................51

United States v. Smith,
    751 F.3d 107 (3d Cir. 2014) ..................................................................39, 44

United States v. Smith,
    811 F.3d 907 (7th Cir. 2016) ......................................................................74

United States v. Terry,
    86 F.3d 353 (4th Cir. 1996) ........................................................28, 29, 35

United States v. Thornhill,
    759 F.3d 299 (3d Cir. 2014) ......................................................................47

United States v. Tidwell,
    521 F.3d 236 (3d Cir. 2008) ......................................................................44

United States v. Tomko,
    562 F.3d 558 (3d Cir. 2009) ......................................................................54

United States v. Truax,
    69 Fed. Appx. 219 (6th Cir. 2003) ...........................................................36

United States v. Vaughan,
    682 F.2d 290 (2d Cir. 1982) ......................................................................52

United States v. Watts,
    519 U.S. 148 (1997) ....................................................................................44

United States v. Weston,
    960 F.2d 212 (1st Cir. 1992) ......................................................................57

United States v. Woronowicz,
    744 F.3d 848 (3d Cir. 2014) ......................................................................54

United States v. Wright,
    373 F.3d 935 (9th Cir. 2004) ......................................................................68

United States v. Young,
  916 F.2d 147 (4th Cir. 1990) ................................................................. 52

## **Statutes**

18 U.S.C. § 13 ............................................................................... 18, 47

18 U.S.C. § 32 ......................................................................................... 34

18 U.S.C. § 33 ......................................................................................... 34

18 U.S.C. § 37 ......................................................................................... 34

18 U.S.C. § 111 ....................................................................................... 34

18 U.S.C. § 113 ................................................................................. 18, 34

18 U.S.C. § 114 ....................................................................................... 34

18 U.S.C. § 115 ....................................................................................... 34

18 U.S.C. § 1389 ..................................................................................... 34

18 U.S.C. § 1512 ..................................................................................... 34

18 U.S.C. § 1992 ..................................................................................... 34

18 U.S.C. § 2199 ..................................................................................... 34

18 U.S.C. § 2231 ..................................................................................... 34

18 U.S.C. § 2280 ..................................................................................... 34

18 U.S.C. § 2281 ................................................................................... 134

18 U.S.C. § 2291 ..................................................................................... 34

18 U.S.C. § 2332 ..................................................................................... 34

18 U.S.C. § 3231 ....................................................................................... 2

18 U.S.C. § 3551 ......................................................................... 48, 52, 53

x

18 U.S.C. § 3553 ............................................................................passim

18 U.S.C. § 3742(b) ................................................................................2

42 U.S.C. § 2283(b) ..............................................................................34

N.J.S.A. 2C:24-4a ......................................................................18, 33, 39

N.J.S.A. 2C:43-6(a)(2) ......................................................................46, 48

N.J.S.A. 2C:44-1 ...................................................................................50

N.J.S.A. 2C:44-5 ...................................................................................46

N.J.S.A. 2C:5-2 .....................................................................................18

N.J.S.A. 9:6-8.21(c)(1) ..........................................................................39

## Rules and Sentencing Guidelines

Fed. R. App. P. 4(b)(1)(B) ......................................................................2

Fed. R. Crim. P. 32 ..........................................................................44, 66

Fed. R. Evid. 403 ..................................................................................18

U.S.S.G. § 1B1.1 ...................................................................................24

U.S.S.G. § 1B1.2 ............................................................................passim

U.S.S.G. § 1B1.3 ..............................................................................26, 39

U.S.S.G. § 2A2.2 ..............................................................................26, 34

U.S.S.G. § 2A2.3 ............................................................................passim

U.S.S.G. § 2A2.3(c)(1) ...........................................................................26

U.S.S.G. § 2E1.1 ...................................................................................32

U.S.S.G. § 2E1.2 ...................................................................................32

U.S.S.G. § 2E1.3 ...................................................................................32

U.S.S.G. § 2E1.4 ..................................................................................32

U.S.S.G. § 2X1.1 .................................................................................30

U.S.S.G. § 2X5.1 ............................................................................passim

U.S.S.G. § 3D1.2 .................................................................................67

U.S.S.G. § 5G1.2 .................................................................................46

U.S.S.G. § 5H1.11 ..........................................................................63, 64

U.S.S.G. § 5K2.3 .................................................................................65

U.S.S.G. § 6A1.3 .................................................................................44

## **Other Authorities**

Pub. L. No. 101-647 .............................................................................48

## TABLE OF ABBREVIATIONS

"A"                         refers to the Sealed Appendix supplied by the United States.

"CJPSR" & "JJPSR"           refers to the Pre-Sentence Reports of Carolyn Jackson and John Jackson, respectively.   For sake of simplicity, where material applies equally to both Defendants, the Government will cite solely to CJPSR.

"CJStR" & "JJStR"           refers to the Statements of Reasons of Carolyn Jackson and John Jackson, respectively.

## PRELIMINARY STATEMENT

Defendants Carolyn and John Jackson "torture[d]" three young adopted children over a five-year period. A6360.   They hit them daily, causing bruises, marks, and serious injuries.   They starved and neglected them, stunting their growth and development for years.   They punished them in horrific ways, forcing them to consume hot sauce and red pepper flakes.

One child died before his third birthday.   Another almost died, twice, by age two.   And the last survived by stealing food and drinking from the toilet.

After hearing a mountain of evidence, a jury convicted Defendants of a five-year-long conspiracy and multiple counts of child endangerment.   At sentencing, Defendants' oldest biological son, J█████—who had offered firsthand testimony about the abuse at trial—asked that they "receive the maximum amount of jail time allowed." A6426.   The Government sought sentences of 235 months' imprisonment for Carolyn and 188 months' imprisonment for John.   Instead, the Court sentenced Carolyn to just 24 months' imprisonment, and allowed John to walk free, sentenced only to probation.

Significantly, the Court arrived at those unreasonably lenient sentences after committing several procedural errors: finding that the assault Guidelines were not sufficiently analogous to counts of conviction for offenses alleging "physical[] assault[];" refusing to find facts by a preponderance; and conducting this federal

sentencing as if it were a state-court proceeding.    Questioning the propriety of this federal prosecution, and casting these offenses as merely "mistaken" parenting, A6731, the Court then imposed sentences more than *15½ years below* those recommended by the Government, and even further below the properly calculated Guidelines range.    But pictures paint a thousand words, and the photographs here show the effects of Defendants' years of abuse and neglect of their adopted children. A6747-71.    No reasonable sentencing court faced with this conduct would have imposed such lenient sentences for the reasons the Court provided.

## JURISDICTIONAL STATEMENT

These consolidated appeals are from the judgments the United States District Court for the District of New Jersey imposed in a criminal case.    The District Court had subject matter jurisdiction under 18 U.S.C. § 3231.    The judgments of sentence were entered on December 28, 2015, and the United States filed timely Notices of Appeal on January 26, 2016. A1-4; see Fed. R. App. P. 4(b)(1)(B).[1]    This Court has jurisdiction over the challenges to the sentences under 18 U.S.C. § 3742(b), and the Solicitor General personally has authorized these appeals.

---

[1]  An amended Judgment was entered as to Carolyn on January 8, 2016.

2

## STATEMENT OF THE ISSUES

1.      Whether the District Court legally erred by finding no sufficiently analogous offense Guideline, see U.S.S.G. § 2X5.1, where multiple counts of the Superseding Indictment charged that Defendants "physically assault[ed]" their adopted children and therefore the assault Guidelines should have been used. (Preserved: A6231-47, 6350-54, 6462-96, 6545-52, 6591, 6737-38).

2.      Whether the District Court erred by refusing to find aggravating facts by a preponderance of the evidence. (Preserved: A6226-31, 6456-62, 6468-81, 6484, 6487-92, 6495, 6526, 6537-40, 6549-50, 6564-68).

3.      Whether the District Court misinterpreted the Assimilative Crimes Act by focusing on state sentencing policies and ignoring unwarranted federal sentencing disparities. (Preserved: A6228-29, 6247-48, 6512-14, 6568-69, 6597-602, 6672-84).

4.      Whether sentences of probation and 24 months are substantively unreasonable for parents who beat, starved, and neglected their young and defenseless adopted children over a five-year period, contributing to the death of one, almost killing another twice, and causing permanent damage to the survivors. (Preserved: A6287-93, 6309-54, 6545-52, 6634-86).

3

<u>**S**TATEMENT **O**F **R**ELATED **C**ASES **A**ND **P**ROCEEDINGS</u>

Aside from state family court proceedings, CJPSR ¶¶ 133-38; A6363-418, the

United States knows of no other related cases or proceedings.

<u>**S**TATEMENT **O**F **T**HE **C**ASE</u>

**A.    Factual Background**

John and Carolyn Jackson were college-educated biological parents of three

healthy children. A721-24, 1227-33, 1320-21, 1812-15.   John was a Major in the

U.S. Army. A128.   Carolyn briefly worked as a teacher, having earned a degree in

Individual and Family Studies, which included classes in child development and

nutrition. A1818-19, 3997-4003, 4833.

In August 2005, while stationed in Oklahoma, and after receiving extensive

training, Defendants became foster parents of three-month-old Joshua. A461,

1580-664, 3194-305.   They legally adopted him on September 26, 2006. A461.

Although Joshua apparently had a seizure disorder at birth, A3423-24, and was born

prematurely, A4240-41, he was otherwise "healthy," A1664-72, 1719, 4271-73,

5279, 5295-96, 6747-49, growing to 21½ lbs. by eleven months (60th percentile),

which exceeded normal expected growth for a baby in his first year, A2858, 4240-41

("He was a grower."), 4273-75, 6776, 6781.

Despite Joshua's early growth, things changed after his first birthday.

A4277-96, 6775-76, 6781-83.   Defendants began "training" Joshua, hitting him

4

with numerous objects, including the "rod of correction"—at various times, a paddle, a ruler, a spoon, and a belt—for innocuous shortcomings, such as failing to walk or climb into his car seat fast enough, not eating properly, or drooling. A1877-79, 1952-87.   Joshua would "cry and scream" from "the pain," A1956, his teeth broke, and his body became covered in linear scars, marks, and bruises, A222, 332-33, 1765-66, 1937-52, 2645, 2653-54, 2803-04, 3401, 3562-69, 4342-47, 4792-93, 6750-55.

Joshua also suffered unexplained, "very rare," "very painful," and very serious injuries. A3414, 3434, 3442, 3446, 3457-58, 3472-73, 3482, 3543, 3556, 3813, 4312, 4317, 4335-37, 4362, 5008; see A4364 (child abuse expert: "[Y]ou just wouldn't expect to ever see [these conditions] in any human being, that is an amazing collection of things to happen to a person.").   Before turning three, Joshua suffered: a life-threatening fracture of his common bile duct; a life-threatening brain injury; a fractured skull; a fractured right arm; a fractured spine; and a gangrenous finger that required partial amputation—all of which two medical experts determined were caused by "trauma" and medical neglect, and some of which typified injuries from child abuse. A3399-402, 3410-90, 3502-62, 3812-17, 4296-337, 4362-67; see A356, 2640-87, 3400.

At an age where "explosive growth" is expected and required for brain development, A3812-13, 3816-19, Joshua also stopped growing, A1751-52,

1922-23, 4273-95, 6775-76, 6781-83.   By April 2007, Joshua weighed only 20½ lbs. (well below the 5th percentile)—*less* than he weighed one year earlier. A6775-76, 6782.

When questioned about these issues, Defendants lied to treating physicians about his medical history and the true reasons for his ailments, causing doctors to scramble in search of obscure explanations. A2640-87, 2701-05, 2724-60; see also A311-33, 354-65, 1757-73, 2794-806, 2836-60, 3652, 4365, 6355-57; cf. A410, 1777, 1797 ("He was two and a half years old at the time . . . and he can't speak for himself.   So we have to rely on the mother to tell us what is going on.").   One of Joshua's treating physicians nonetheless suspected abuse and informed child welfare authorities. A2645-55, 2687.   Another reported a case of potential abuse. A5337.   After conducting only cursory investigations, however, which relied primarily on Carolyn's representations, Oklahoma authorities found no abuse. A2657, 2687-88, 3432-33, 4462-528.

Shortly thereafter, in Summer 2007, Defendants moved to Picatinny Arsenal, an Army installation in New Jersey. A1838-39, 2680, 3910; CJPSR ¶ 60.   There, despite the injuries that Joshua had sustained previously, and the placement of a shunt in his skull, A2681, 4980-82, Defendants intensified their abuse, A1990-92. They also neglected him, essentially "starv[ing]" him, resulting in developmental delays, such as inability to talk, failure to grow or gain weight, and "unusual" and

6

"severe" failure to thrive. A3402-03, 3581, 4295-96; see A305, 2734-40, 2794, 2848-50, 2856-60, 3045-54, 3568-69, 4275-96, 4340-41.   Defendants also failed to provide prompt and necessary medical care for his conditions, despite requests by concerned physicians that Joshua receive additional care. A2805-60, 2884-85, 4438-39; see A3878-92, 3946-61.

In March 2008, Joshua was admitted to the hospital with an "extensive" case of scalded skin syndrome, an uncommon and potentially "life-threatening" "severe skin condition" which causes skin to peel off. A303-12, 417; cf. A159 (malnourishment leaves body "predisposed to infection"), 1471-72, 4084.   When he arrived, Joshua was in "critical condition" and "severe pain," as 15-20% of his skin, from his legs to buttocks, had peeled off, leaving "very raw exposed dermis." A303-11.   Joshua was treated by Dr. Juan Gutierrez, who further described him as "very small," failing to thrive, and non-verbal. A303-40.

By April 21, 2008, roughly three weeks before his third birthday, Joshua weighed only 19.58 lbs., *less* than he weighed at 11 months. A6781-83.   On May 8, 2008, Joshua died at Defendants' home, at the age of 2 years and 11 months.   He weighed only as much as an 8½-month-old baby. A4275, 6212-14, 6776; CJPSR ¶¶ 68-75.[2]

---

    [2] Defendants were not charged with Joshua's death, and the Court excluded all references to his death at trial.   Although the County Medical Examiner initially

Six weeks later, in June 2008, Defendants took custody of the two children of

Carolyn's cousin, Brittany Woods. A461, 499-501.   Brittany had received prenatal

care, and both children were in good health and had no medical issues. A502-05,

775-89, 842, 1032-33, 1085-92, 1489-97, 2003, 2028, 3571, 3579, 3825-26,

3963-97, 4059-70, 4181-86, 6758.   The older child, whom they renamed J█████, was

born in April 2006.   The younger child, whom they renamed C█████, was born in

April 2008. A461.[3]   After lying to New Jersey authorities about their disciplinary

methods and history of child abuse investigations, A485-93, 522-45, 1165-67; see

A508-21, 2106-07, Defendants fostered both children and ultimately adopted them

on July 23, 2009, A461.

As with Joshua, Defendants abused and neglected J███ and C████.   The

sisters were hit "daily" with the "rod of correction" and other objects, such as a piece

of Army memorabilia, for mundane things, such as not chewing or walking fast

enough, and not climbing into their car seats. A1874-75, 1878-80, 1976-77, 1985,

2059-74, 2091-94, 2426-27.   Additional strikes were delivered if they screamed in

---

determined that Joshua died of "natural causes," that determination was riddled with
errors and relied largely on Defendants' lies. CJPSR ¶¶ 68-74.   Subsequently, long
after Joshua's body was cremated but before the jury's findings of guilt, the former
New Jersey Medical Examiner conceded that "we likely did miss a case of child
abuse" and that "an autopsy should have been performed." CJPSR ¶ 75.   Joshua's
treating pediatrician also suspected abuse and neglect. CJPSR ¶ 73; A2774.

[3] Neither J████ nor C████ was genetically related to Joshua. A222-23.

pain or displayed excessive emotion—a "frequent occurrence." A1974-77, 1987.

While the children cried from the pain, Carolyn would "smile or grin" as she hit

them. A1956-57, 1977, 2066-68.   The beatings left marks, bruises, and scars on

their bodies, especially on C███, whose body was covered "everywhere" in

"multiple lesions and excoriations" in "different stages of healing." A158-59,

177-79, 1242 (treating pediatrician: "There were too many to even begin to count.");

see A218-19, 222, 242-45, 266, 284-87, 414-15, 432-40, 580, 794, 927-28, 938-41,

1224, 1241-42, 1478, 2049, 2542-48, 3174-82, 3341-42, 3576-78, 4117-48,

4188-94, 6756-71.

Although both Defendants endorsed this abuse, A482-93, 531-43, 1154-57,

1628-31, 1877-78, 1955-56, 1960-62, 1982-85, 1992-93, 2055, 2070, 2074-80,

2092-94, 2427-28, 4860-61, 5068, 5093, it upset the oldest of Defendants' three

biological children, J███, who raised concerns with his father, A2075-82.

Defendants proposed a solution—J███ could place his hand on his mother's

shoulder if the beatings became too severe. A2082-85.   J███, who was not even

a teenager at the time, tried this technique, but was beaten himself as a result.

A2085-89.   On another occasion, while staying with a family friend, J███

confided in that individual and relayed the many ways that Defendants had been

abusing and neglecting J██ and C███. A1870-81.   When that friend informed

John, John (then stationed in Iraq) in turn told Carolyn, who drove hours to pick up

J█████ immediately, curtailing the length of his planned visit by nearly a week. A1870-72, 1882-85.   Carolyn severely beat J█████ with a belt, and Defendants admonished him never to disclose what was going on inside the house. A1886-89. Defendants then also began a campaign to convince J█████ that he was lying about how his siblings were treated. A1869-70, 1886-1900, 1918-22, 2456-58.

As with Joshua, Defendants failed to provide J███ and C███ with medical care and sufficient food. A181, 267, 580-82, 3357-58, 3362, 3403-08, 3575-80, 3763-65, 3827, 3851.[4]   Instead, Defendants punished them by "pry[ing] [their] mouth[s] open" and forcing them to ingest sodium-laden hot sauce, red pepper flakes, and whole raw onions (in the case of J███), causing them to cry and turn red. A1874-75, 2016-31, 2053-57, 2091; <u>see</u> A240, 3738-39, 3855-56, 4075-76; <u>see also</u> A692, 4140-41, 4147-48 (hot sauce burns mouth and can cause damage).   And Defendants would not allow the girls to drink water. A2006-09, 2019-20, 2056-57, 2193.

J███, who was between two and four years old, resorted to drinking from the toilet and stealing food—for which she received additional punishments. A2006-19,

---

[4] Despite expressing concerns to others about J███'s health and development, Defendants took her to the doctor only once, A1292-93, 1515-20, 5038, and they waited to treat C███ until she was near death, A157-58, 181.   Meanwhile, Defendants' biological children frequently saw doctors, A1227-29, and Carolyn visited the doctor for such mundane ailments as an "itchy belly button," A1483-84.

2024-27, 2103-06.   But C████, who was between two months and two years old, could not similarly cope. A3404-05, 4354.   In January 2010, she was hospitalized in Indiana with hypernatremia, a "life-threatening" condition of high sodium levels, and dehydration. A920-22; <u>see</u> A171.   C████'s sodium level—181—was so high that doctors were "surprised she was still alive and functioning in the emergency department." A922-23 (sodium level was "the highest I had ever seen on any patient I ever had").[5]   During that hospitalization, Carolyn repeatedly lied about the cause of C████'s condition and the source of her numerous scars, marks, and oral ulcerations. A923-77; <u>see</u> A3858-63, 4059-85, 6357, 6759-65.

Around the same time, an anonymous caller reported Defendants' abuse to the hospital where C████ was being treated. A978-79.   The hospital conducted a cursory investigation, which relied largely on Carolyn's misrepresentations and did not involve a treating physician who was concerned that C████'s conditions might have been caused by abuse and neglect.   No abuse was found. A979-83, 994-95, 1006-13; <u>see</u> A3690 (child abuse expert: "I don't know what Indiana, what the people in Indiana were thinking."), 4404-05.   C████ was discharged when her sodium count returned to normal levels. A632-33, 985.

---

[5] Normal sodium levels are generally "between 133 to 143." A171.   Levels become "dangerous" when they are "10 points above or below" normal. A171; <u>see</u> A576-77, 700.

11

Upon the family's return to New Jersey, C███ went to a new doctor, where, in February 2010, she weighed just 14.44 lbs.—the weight of a 4½-month-old baby and *less* than she had weighed at nine months, A3835-36, 6773, 6786-87.   She was diagnosed with failure to thrive and developmental delays. A1234-48, 1263-70. The new doctor was shocked at C███'s appearance, which included marks and lesions all over her body and injuries inside her mouth and lips. A1224-25, 1241-71, 1333, 1438-40; see A1244 (lip was so damaged, it "had the clef[t] appearance"). To assuage the doctor's fears, Carolyn told more lies, including that C███ was drug-dependent at birth, that Defendants recently had received custody of C███ from her birth mother, and that C███ already had her numerous injuries, suggesting that the birth mother was the cause. A1248-71, 1333, 1395-96, 1438-40, 1453-56; see A1857-59, 6358.

In April 2010, C███ still weighed just 14.31 lbs. A1282-90, 6787.   And on April 15, 2010, C███ was again hospitalized—at the same hospital that had treated Joshua in 2008—with even more severe hypernatremia and dehydration, after Defendants continued to punish her with hot sauce. A154-59, 2091; see A4116-17 (having two episodes of such high sodium levels is "like two lightning strikes"). Although that condition takes days to advance to critical stages, A172, 181, 3407-08, 3860-63, 4074, 4089, C███ was brought to the hospital "moribund," at "death's door," and with a "dead fish eye look," A157, 160, 168.   C███'s sodium

12

level—195—was the highest that multiple doctors had ever seen, was "rare for any living person," and was "at the margins of what you can survive." A572, 3405; see A171-73, 218, 572, 3338, 3802-03, 4086 ("[Y]ou think somebody will die before they get to 195."). Along with C████'s hypernatremia, doctors noted that she was covered in marks in various stages of healing, had wounds to her mouth, and had a "striking injury" to her lips. A158-61, 177-80, 218-19, 240-66, 284-87, 580, 3340-42; see A432-36, 794-96, 6766-71.[6] Doctors also noted that she looked like, and weighed as much as, a "four month old" baby, and had significant developmental delays, including the inability to speak. A156, 161, 175-76, 181, 218-19, 225, 267-68, 580, 3345; see A794-96.

Once again, Defendants lied about C████'s medical history, falsely claiming, among other things, that C████ had a portion of her lip surgically removed in Indiana. A162-68, 180-82, 186, 223-29, 236-40, 246-90, 373, 412-14, 579-85, 605-06, 628, 638-43, 3339, 4111-17; see A935, 4085, 6358-59. As a result of Defendants' lies, which the doctors were inclined to credit, A162, 402, 409-10, 593,

---

[6] Although there are photographs of C████ from the hospital stay, they were taken days after her admission, when she looked "much more hydrated." A160-61; see A436, 3340. Moreover, a witness explained that the photographs did not capture all her injuries—in her presence, "we could see a lot more injuries on the skin." A287.

608, the doctors looked for increasingly unlikely explanations for C████'s recurring hypernatremia, A608-09.

That mystery was finally solved when Dr. Gutierrez saw C████.  He explained that, of the thousands of patients he had ever seen, C████—who was "a very small child with remarkable scars on the skin"—reminded him of only one other patient, a "child that I treated two years earlier"—Joshua. A222; see A214-15, 299, 333, 372-73.  "And at some point I realized that it was the same mother for this child too." A222.  Alarmed, Dr. Gutierrez ordered further tests, which revealed a previously undiagnosed fracture of C████'s arm, A233-34, 288-90, 295—an unusual and painful type of fracture, consistent with a "very aggressive" "yank," that was identical to the one suffered by Joshua, A4151, 4156; see A3410-45, 4149-64. The doctors further determined that C████'s hypernatremia was caused by sodium poisoning. A610-33; see A3575, 3855-63, 4072-76, 4106-07.

Based on everything he saw, Dr. Gutierrez called child welfare authorities. A297-99.  On April 16, 2010, all five children were removed from Defendants' custody. A421-41, 792-812, 1813, 3089-95.  John later admitted hitting his adopted children with objects. A3100-01.  Carolyn also admitted that, and conceded that she disciplined C████ and J████ using red pepper flakes. A3101-05.

Outside of Defendants' care, all three adopted children showed a desire to eat—sometimes "ravenous[ly]"—and an ability to gain weight, including during

14

hospital stays and while being watched by family friends. A636-37, 2966-73; see A271-73, 283, 301-02, 984, 1272-79, 2108-09, 2551-57, 3027-28, 3052-54, 3094-95, 3513, 3579, 4283-84, 5072-77.[7]   Indeed, following their removal, the children, in particular C████, grew "very quickly"—a result that was caused by nothing more than "a change in [their] caregivers" and giving them food to eat. A645, 843, 1318-19, 3357-58; see A818, 843, 1226-27, 1311-16, 1336, 1445, 2551-57, 3407, 3570, 3579-80, 3763-64, 3849-51, 4236, 6784-87.   In fact, C████ doubled her weight in just six months, A1314-15, and the girls' growth charts showed an explosion in growth that literally "transform[ed]" them, A3350-62; see A3827-49, 4177-78, 4209-36, 6772, 6779.   For example, as the chart below shows, C████ (whose growth is represented by the purple line) essentially did not grow for over a year while in Defendants' custody, only to flourish immediately after being removed—a growth "curve" that is easily contrasted with typical growth curves for girls her age (represented by the black lines). E.g., A3353-62, 3843-49.

---

[7]   In February-March 2010, over a one-month period during which she stayed with friends for several days, C████ gained over a pound. A1272-79, 5072-77, 6787.   By the following month, in the care of Defendants, C████ lost that weight and more, an amount that would be similar to an adult "dropping 50 pounds or so in a month." A1285-90, 6787.



A6772.

16

After leaving Defendants' custody, C███ suffered no additional bouts of
hypernatremia or dehydration, and her skin lesions healed with no recurrences
despite Defendants' assertions that they were the result of eczema. A643-46,
843-45, 1226-27, 1295-99, 1322-25, 2557-58, 3742-43, 4116-17, 4177; see A109,
178-80, 244, 285, 332, 414, 803, 935, 1012, 2559, 2574, 2629-30, 3342, 4077-80,
5080, 6357-59.   She does suffer from suicidal ideation, however, A2624; CJPSR
¶¶ 232-33(a), and both children continue to suffer the consequences of their abuse,
including permanent scars, developmental delays, and emotional and behavioral
problems—all of which could have "lifelong" effects, A3807; see A1226, 1295-96,
2108-09, 2548-49, 2562-85, 2632-33, 3404, 3409, 3574, 3580, 3685, 3803-07, 3828,
4118-19, 4172-75, 4178-79, 4207-09, 4357-58, 6361-62, 6427-32.   J███ suffers
from the emotional toll of having watched Defendants beat his adopted siblings, and
continues to express regret that he did not do more to intervene, despite being only a
child himself at the time. A1900, 1993, 2109-10, 6423-26; CJPSR ¶¶ 232-33(a).

## B.    Procedural History

Defendants were charged in a fifteen-count Superseding Indictment. A34-53.[8]
As set forth below, Counts 1-12 and 15 charged offenses under New Jersey

---

[8] Defendants were tried on the initial Indictment starting in September 2014.
That trial, however, ended in a mistrial when the Government inadvertently asked a
question suggesting Joshua was no longer alive.   Over the Government's objection,

law—conspiracy, N.J.S.A. 2C:5-2, and endangering the welfare of a child, N.J.S.A.

2C:24-4a—assimilated into federal law under 18 U.S.C. § 13, the Assimilative

Crimes Act ("ACA").[9]   Counts 13-14 charged federal assaults under 18 U.S.C.

§ 113.   Specifically, the Superseding Indictment charged Defendants with:

- Conspiring, from August 2005 through April 2010, to endanger the welfare of Joshua, C███, and J███, through cruel and neglectful practices, including assaulting them, failing to seek medical attention for them, withholding sufficient nourishment from them, and forcing them to ingest sodium-laden substances, all while covering up their abuse by lying to treating doctors and child welfare authorities (Count 1);

- Endangering Joshua (Count 2) and C███ (Count 7) by "withholding sufficient nourishment and food;"

- Endangering Joshua (Count 3), J███ (Count 6), and C███ (Count 12) by "physically assaulting [them] with various objects and with their hands;"

- Endangering J███ (Count 4) and C███ (Count 8) by "withholding adequate water from [them] and prohibiting [them] from drinking water;"

---

the Court had excluded that fact under Fed. R. Evid. 403, even though it was highly probative of Defendants' knowledge, which was the focus of their defense.

[9] That statute provides for the assimilation of state criminal laws into federal law for areas within federal jurisdiction where conduct has not been "made punishable by any enactment of Congress" but "would be punishable if committed or omitted within the jurisdiction of the State." 18 U.S.C. § 13(a); see United States v. Hall, 979 F.2d 320, 322 (3d Cir. 1992).   If convicted, the defendant "shall be guilty of a like offense and subject to like punishment." § 13(a); see **Point III**.   N.J.S.A. 2C:24-4a has since been restructured.   The pertinent section is now 2C:24-4a(2).

- Endangering J███ (Count 5) and C███ (Count 9) by "forcing [them] to ingest hot sauce, red pepper flakes," and, in the case of J███, "raw onion;"

- Endangering C███ by "causing [her] to ingest excessive sodium and a sodium-laden substance while restricting [her] fluid intake, causing [her] to suffer hypernatremia and dehydration, a life-threatening condition" (Count 10);

- Endangering C███ by "withholding prompt and proper medical care for [her] dehydration and elevated sodium levels" (Count 11), and for her "fractured humerus" (Count 15); and

- Assaulting C███ "with a dangerous weapon" (Count 13), and causing "serious bodily injury" (Count 14).

Trial commenced on April 13, 2015, and lasted 39 days.   The jury heard from 45 witnesses, including J███, numerous treating physicians, and two experts on child abuse, who both opined that Joshua, J███, and C███ had been severely abused and neglected over a lengthy period of time and had been victims of battered child syndrome. E.g., A3399-409, 3581-82, 3801-24, 4352-67, 4435.   The jury also saw numerous photographs showing the terrible transformation of Defendants' adopted children. See A6747-71.   On July 8, 2015, the jury returned guilty verdicts on Counts 1-12 as to Carolyn, and on Counts 1, 3-9, and 11-12 as to John. A6054-61.[10]

Because "no guideline expressly has been promulgated" for "assimilative crimes," the Probation Department used the assault and aggravated assault

---

[10] At the close of the Government's case, the Court granted judgments of acquittal on the two federal assault charges. A5439-44.

Guidelines as "the most analogous offense guideline[s]." U.S.S.G. § 2X5.1 &

background; see CJPSR ¶ 143.   It calculated both Defendants' Guidelines ranges as

210-262 months, which included numerous enhancements, such as for more than

minimal planning, degree of injury, use of a weapon, vulnerable victim, abuse of

trust, and obstruction of justice. See CJPSR ¶¶ 144-230, 241-325, 393.   The

Government disagreed with certain aspects of the calculation, but concurred that the

aggravated assault Guidelines should be used for most counts of conviction.   It

calculated Guidelines ranges of 292-365 months, A6287-93, 6350-54, 6545-52, and

sought sentences of 235 months for Carolyn and 188 months for John, A6309-49,

6566-67.

A 10½-hour sentencing hearing was held on December 15, 2015. A32, # 407;

see A6419-746.   J████ urged the Court to give Defendants "the maximum

amount of jail time allowed," given the "almost 20 years of misery" they collectively

caused, the effects of which "will last the rest of our lives." A6424-26.   He also

reiterated that Joshua's "brief life was marked by pain and suffering," J██ and

C███ were "abused and neglected," and Defendants pressured him for years to

change his story. A6424-26.   Kate Rinaldi, the foster mother of J█████, J██, and

C███, recounted the effects of the abuse on those three children, explaining, for

example, that C███'s "little body is covered with scars which constantly remind her

of the pain she experienced." A6427-32.   She "implore[d] the Court to impose the

20

highest sentence possible on" Defendants "so that our children will one day know that their suffering was heard and that those responsible were brought to justice." A6432.

After extensive argument about application of the Guidelines, the Court refused to calculate a Guidelines range, finding that there was no sufficiently analogous offense Guideline. A6432-591.   Following additional argument, A6592-686, the Court imposed sentences of: 24 months' imprisonment for Carolyn; and 3 years' probation, 400 hours of community service, and a $15,000 fine for John, A6, 11, 6687-746.   Those sentences, which the Court called "heartbreaking," A6734, prompted murmurs of outrage from members of the public in the gallery, A6703, 6720, and led the press to report that the Court had "essentially negated the jury's guilty verdict."[11]

## SUMMARY OF ARGUMENT

At the respective ages of 3 months, 2 months, and 2 years, Joshua, C███, and J██ were taken in by Defendants when they could not be raised by their birth parents.   Rather than loving and caring for these three defenseless children, Defendants systematically abused and neglected them.   Sadly, Joshua did not survive to see a better life.   C███ almost died twice—saved by the happenstance of

---

[11]  See http://www.northjersey.com/news/prison-for-wife-probation-for-husband-in-n-j-child-abuse-case-1.1473838.

a doctor who saw her condition and was reminded of Joshua—and J███ resorted to drinking from the toilet and having to steal food from her own kitchen.   Although C███ and J██ survived, they will be affected forever, and J█████ continues to be haunted by memories of what happened to his siblings.   Yet, faced with overwhelming evidence of these heinous offenses, the Court decided that slaps on the wrist were appropriate—probation and community service for John, and 24 months' imprisonment for Carolyn.   Those sentences are procedurally and substantively unreasonable.

*First*, the Court jettisoned the Guidelines, finding no sufficiently analogous offense Guideline.   But there are Guidelines for assault, and Defendants were convicted of charges alleging that they "physically assault[ed]" their adopted children and "forc[ed]" them to ingest hot sauce.   Because those Guidelines are sufficiently analogous to multiple counts of conviction, the Court erred by rejecting the recommendation of Probation and refusing to apply them.

*Second*, the Court refused to make findings of fact that had not been enumerated on the verdict sheet or proven beyond a reasonable doubt.   That ignores this Court's precedents, which require courts to make factual findings at sentencing by a preponderance of the evidence.

*Third*, the Court treated this federal sentencing as if it were occurring in state court—imposing a sentence, including factoring in the effects of a hypothetical

22

parole release, that it theoretically might have imposed had it been a New Jersey state court.   But that is not how sentencing works under ACA, which requires consideration of the *federal* sentencing Guidelines and *federal* sentencing policies.

*Finally*, the lenient sentences imposed are substantively unreasonable.   No reasonable court, considering the § 3553(a) factors and the serious conduct here, would impose such lenient sentences on these Defendants for the reasons the Court provided.

<u>**ARGUMENT**</u>

**POINT I**

**THE DISTRICT COURT ERRONEOUSLY FOUND NO SUFFICIENTLY ANALOGOUS OFFENSE GUIDELINE, WHERE MULTIPLE COUNTS OF CONVICTION CHARGED THAT DEFENDANTS "PHYSICALLY ASSAULT[ED]" THEIR ADOPTED CHILDREN AND THEREFORE THE ASSAULT GUIDELINES SHOULD HAVE BEEN USED.**

<u>**Standard of Review**</u>:    Plenary. <u>United States v. Cothran</u>, 286 F.3d 173, 176-77 (3d Cir. 2002).

The Court erred by jettisoning the Guidelines at step one of the sentencing process, finding that there was no offense Guideline sufficiently analogous to the counts of conviction.   To the contrary, the Court should have used the assault and aggravated assault Guidelines.   Indeed, several counts of conviction charged that Defendants "physically assault[ed]" their adopted children.   The Court's error at step one, which resulted in the wholesale disregard of the Guidelines, affected substantial rights and must be reversed.

In reviewing a sentence, this Court first determines whether the district court committed any procedural error, <u>United States v. Freeman</u>, 763 F.3d 322, 335 (3d Cir. 2014), such as by failing "to calculate accurately the applicable guideline range," <u>United States v. Boney</u>, 769 F.3d 153, 159 (3d Cir. 2014).   In making that calculation, sentencing courts must "[d]etermine, pursuant to § 1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction." <u>Boney</u>, 769 F.3d at 160 (quoting U.S.S.G.

24

§ 1B1.1(a)(1)).    That step generally requires courts to find the "most appropriate" Guideline listed in the Statutory Index "for the offense conduct charged in the count of which the defendant was convicted."    But where the statute of conviction is "not listed in the Statutory Index," as is the case for offenses assimilated under ACA, the Guidelines direct sentencing courts to § 2X5.1. U.S.S.G. § 1B1.2 cmt. n.1.    That section requires courts to "apply the most analogous offense guideline." U.S.S.G. § 2X5.1.    If, however, "there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control." Id.    Whether there is a sufficiently analogous offense Guideline is a legal question subject to plenary review. Cothran, 286 F.3d at 176-77; cf. United States v. Aquino, 555 F.3d 124, 127 (3d Cir. 2009).

Here, the Government divided the crimes of conviction into two categories: crimes of commission (i.e., abusive conduct) and crimes of omission (i.e., neglectful conduct).    Counts 1, 3, 5, 6, 9, 10, and 12 constituted crimes of commission, because they alleged that Defendants: "physically assault[ed]" their adopted children "with various objects and with their hands" (Counts 1, 3, 6, 12); and "forc[ed]" their adopted children to ingest foods that caused pain, such as hot sauce and red pepper flakes (Counts 1, 5, 9, 10). A34-52.    The remaining counts were considered crimes of omission, because they alleged that Defendants withheld sufficient food, water, and medical attention. A34-52.    The Government argued there was no sufficiently analogous offense Guideline for the crimes of omission,

but that the aggravated assault (§ 2A2.2) or assault (§ 2A2.3) Guidelines were

sufficiently analogous to the crimes of commission that they should be used to

calculate Defendants' Guidelines ranges for those counts.[12]    Using those Guidelines

and the applicable enhancements and adjustments, the Government calculated

Defendants' Guidelines range as 292-365 months. A6231-47, 6350-54, 6462-91,

6545-52.    Using a different calculation, but also applying the assault Guidelines,

the Probation Department arrived at a Guidelines range of 210-262 months. CJPSR

¶ 393; JJPSR ¶ 378.

The Court, however, held that there was no sufficiently analogous offense

Guideline for any count of conviction. A6572-91.    It explained that: the jury was

not asked to make the findings contained in the assault Guidelines; it would not be

"justice" for the Court to make findings that the jury was not asked to make; the

Government had rejected an instruction asking the jury to find the amount of harm

caused by Defendants; the state's endangering statute was based on *parens patriae*

---

[12]  Even if the assault Guideline were initially selected, the aggravated assault
Guideline ultimately would apply by operation of the cross-reference in U.S.S.G.
§ 2A2.3(c)(1). A6233-34, 6480-81.    That cross-reference mandates use of § 2A2.2
where "the *conduct* constituted aggravated assault," U.S.S.G. § 2A2.3(c)(1)
(emphasis added), as defined in U.S.S.G. § 2A2.2 cmt. n.1, including all relevant
conduct, see U.S.S.G. § 1B1.3; United States v. Schneider, 801 F.3d 186, 204-05 (3d
Cir. 2015); United States v. Padilla, 961 F.2d 322, 326-27 (2d Cir. 1992).    The
conduct here constituted aggravated assault, A6226-47, and Defendants *conceded*
that "for some counts there is enough evidence" to support use of that Guideline,
A6483.

jurisdiction and therefore did not fit with the assault Guidelines; it was unclear why the federal government was involved in this case; it would be unfair to allow the Government to charge one statute and seek punishment for another; and the Government's arguments were "silly." A6572-91, 6688, 6703.   The Court, therefore, refused to calculate any Guidelines range and moved immediately to step three of the sentencing analysis.

The Court's ruling was wrong and must be reversed.   The assault Guidelines are sufficiently analogous to the crimes of commission to have been used to calculate Defendants' Guidelines ranges.   The Court's rationales were wrong and its error affected the sentences imposed.

## A.    The Assault Guidelines Are Sufficiently Analogous To Multiple Counts Of Conviction And Should Have Been Used To Calculate Defendants' Guidelines Ranges.

Under U.S.S.G. § 2X5.1, "[t]he court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous." § 2X5.1 background.   As the background further explains, "the specific guidelines that have been promulgated cover the type of criminal behavior that most [assimilated] crimes proscribe." Id.   Because the Guidelines direct that a sufficiently analogous offense Guideline need merely cover the " 'type of criminal behavior' of which the defendant was convicted," United States v. Calbat, 266 F.3d 358, 363 (5th Cir. 2001) (quoting § 2X5.1 background), the sentencing court is

tasked with determining whether there is a Guideline "within the ballpark" of the crime of conviction, United States v. Rakes, 510 F.3d 1280, 1287 (10th Cir. 2007). "[B]y definition, analogous guidelines do not and need not perfectly match the defendant's crime." United States v. Allard, 164 F.3d 1146, 1149 (8th Cir. 1999); see United States v. Terry, 86 F.3d 353, 358 (4th Cir. 1996).[13]

Courts have used two different methods to determine whether there is a sufficiently analogous offense Guideline: (1) comparing various Guidelines to "the facts alleged in the indictment;" or (2) comparing the elements of the crime of conviction to the elements of the federal offenses listed in the Statutory Index. United States v. McEnry, 659 F.3d 893, 899-901 (9th Cir. 2011); compare Terry, 86 F.3d at 357-58, with Calbat, 266 F.3d at 363.   Although this Court has yet to expressly adopt either approach, see Cothran, 286 F.3d at 177-78, under both the assault Guidelines "cover the type of criminal behavior" in this case.

The first method used by courts is the one for which the Guidelines explicitly provide.   Section 1B1.2(a) directs courts to determine the "offense guideline . . . applicable to the offense of conviction," which is defined as "the offense conduct charged in the count of the indictment or information of which the defendant was

---

[13]  If the Guidelines required a perfect match, then § 2X5.1's discussion of assimilative crimes likely would be superfluous.   After all, if the offense of conviction perfectly matched a federal offense, then assimilation under ACA would be improper. See Lewis v. United States, 523 U.S. 155, 164-72 (1998).

convicted." U.S.S.G. § 1B1.2(a); see Boney, 769 F.3d at 159-63.   Referring to

§ 2X5.1, § 1B1.2(a) further provides that the most analogous such Guideline should

be used in cases where the Statutory Index does not list the relevant statutory

provision.   Because § 2X5.1 directs courts to the "specific guidelines that have

been promulgated," which "cover the type of criminal behavior that most [ACA]

offenses proscribe," § 2X5.1 background, this method compares the offense conduct

charged in the indictment with the Chapter 2 offense Guidelines, in search of those

"within the ballpark" of the crime of conviction, Rakes, 510 F.3d at 1287.

The Fourth Circuit uses this approach.   In Terry, it held that the sentencing

court properly looked to the conduct charged in the indictment—that the defendant

shot at an occupied car—in determining that the aggravated assault Guideline should

be used. Terry, 86 F.3d at 357-58.   Similarly, in United States v. Centner, No.

95-5685, 1997 U.S. App. LEXIS 14720, at *6-10 (4th Cir. June 17, 1997)

(unpublished), a case where a state child abuse statute was assimilated, the court

looked to the conduct charged in the indictment—that the defendant placed her

children in a situation where they were abused and physically injured—in holding

that the aggravated assault Guideline was properly applied.

Here, the offense conduct charged in the counts of conviction sounded in

"assault."   Counts 1, 3, 6, and 12 alleged that Defendants "physically assault[ed]"

29

their adopted children "with various objects and with their hands." A36, 40, 43, 49.[14]

Counts 1, 5, 9, and 10 alleged that Defendants "forc[ed]" and "caus[ed]" their

adopted children to ingest foods that caused pain, such as hot sauce and red pepper

flakes. A37, 42, 46, 47.   Count 1 further alleged that Defendants "caused" Joshua

and C███ "to sustain fractured bones" and "beat[]" J███ "multiple times with a

belt." A36-37.   The jury instructions repeated those allegations as to each of the

substantive counts, A6000-01, 6021, 6023-24, 6027-28, 6030, and the verdict sheet

summarized those counts using that charging language, A6054-61.   Indeed, when

announcing its verdict, the jury repeatedly answered "guilty" when asked if

Defendants "physically assault[ed]" their adopted children and "forc[ed]" them to

ingest hot sauce. A5963-67.

Not only do the assault Guidelines clearly fall "within the ballpark" of the

offense conduct charged in the counts of conviction, Rakes, 510 F.3d at 1287, they

reach the same exact conduct as that charged in "the plain language of the

[superseding] indictment," Boney, 769 F.3d at 162; see United States v. McQueen,

727 F.3d 1144, 1150 (11th Cir. 2013) (aggravated assault Guideline used in civil

---

[14] Count 1 charged conspiracy, which incorporated all of the conduct alleged in the substantive counts.   For conspiracy, the Guidelines direct that the sentencing court look to § 2X1.1.   Where, as here, the object of the conspiracy was achieved, that provision directs courts to apply the same offense level as for the substantive offenses plus enhancements for conduct that was intended or actually occurred. § 2X1.1 & cmt. n.2.

rights case where defendant hit inmates with broomsticks); <u>Centner</u>, 1997 U.S. App.

LEXIS 14720, at *6-10.   The allegations in the Superseding Indictment—that

Defendants "physically assault[ed]" their adopted children "with various objects and

with their hands," "forc[ed]" their adopted children to ingest foods that caused pain,

"caused" "fractured bones," and "beat[]" J█████ "multiple times with a

belt"—comfortably fit within the concept of "assault."   After all, "assault" requires

nothing more than: an attempted battery, <u>i.e.</u>, the placing of the victim in reasonable

apprehension of physical harm; or a completed battery, <u>i.e.</u>, " 'the unlawful

application of force to the person of another,' including an offensive touching."

<u>United States v. Delis</u>, 558 F.3d 177, 179-84 (2d Cir. 2009) (listing cases); <u>see</u>

<u>United States v. Lewellyn</u>, 481 F.3d 695, 696-99 (9th Cir. 2007); <u>see also</u> <u>United</u>

<u>States v. Almeida</u>, 710 F.3d 437, 442-43 (1st Cir. 2013) (using common

understanding of crime where undefined by the Guidelines).   Nor does the assault

Guideline require "physical contact" or "bodily injury." U.S.S.G. § 2A2.3.   Simply

put, assault was "the offense conduct charged in the count[s] of the [superseding]

indictment . . . of which [Defendants were] convicted." U.S.S.G. § 1B1.2(a).

The second method used by courts compares the elements of the crime of

conviction with the elements of the federal offenses listed in the Statutory Index.

<u>E.g.</u>, <u>Calbat</u>, 266 F.3d at 363; <u>United States v. Nichols</u>, 169 F.3d 1255, 1270 (10th

Cir. 1999).   This method has drawbacks.   For example, simply comparing the

elements of state crimes with federal ones runs the risk that means of committing the offense not actually charged in the indictment will be considered. Cf. Almeida, 710 F.3d at 441-42.   Applied too stringently, it also risks excluding sufficiently analogous Guidelines.   That is because offenses, including those charged here, can be committed in multiple ways, frequently prompting the Commission to assign multiple offense Guidelines based on the various ways that offenses can be committed. E.g., U.S.S.G. § 1B1.2 cmt. n.1; U.S.S.G. app. A.   And assimilated crimes, by definition, have no perfect matches amongst federal offenses. Lewis, 523 U.S. at 164-72.

Courts applying this method point to no support in the Guidelines. E.g., United States v. Osborne, 164 F.3d 434, 437 (8th Cir. 1999) (stating, without authority, that "the issue *most generally* will involve comparing the elements of federal offenses to the elements of the crime of conviction" (emphasis added)). There is none.   In provisions applicable to convictions under RICO (which, like ACA, often refer to state offenses), the Commission directed courts to compare state crimes with "analogous federal offense[s]." U.S.S.G. §§ 2E1.1 cmt. n.2, 2E1.2 cmt. n.2, 2E1.3 cmt. n.1, 2E1.4 cmt. n.1.   Yet the Commission issued no such direction in § 2X5.1.   That "indicates that the Sentencing Commission knew how to" mandate comparisons between state and federal crimes when it intended that to be done, United States v. Mellerson, 145 F.3d 1255, 1258 (11th Cir. 1998), and that its

decision not to do so in § 2X5.1 "was deliberate," <u>United States v. Lucero</u>, 747 F.3d 1242, 1249 (10th Cir. 2014).   Thus, rather than look to "the most analogous offense statute," in § 2X5.1 the Commission directed sentencing courts to "apply the most analogous offense guideline." <u>United States v. Fortier</u>, 180 F.3d 1217, 1229 (10th Cir. 1999) (interpreting § 2K2.1(c)(1)).   For all these reasons, the first method is preferable.

Regardless, even under the second method, the assault Guidelines are sufficiently analogous offense Guidelines.   In order to find Defendants guilty of N.J.S.A. 2C:24-4a as to the particular counts at issue here, the jury had to find that: (1) the victim "was a child;" (2) the defendant "knowingly committed an act of cruelty against the child;" (3) the defendant "knew that such conduct would cause the child harm or would inflict cruelty upon the child;" and (4) the defendant "had a legal duty for the care of the child or had assumed responsibility for the care of the child." A6009; <u>see</u> A6008-13, 6021-30.[15]   The jury was instructed that "cruelty" meant: "inflicting unnecessarily severe corporal punishment;" inflicting "unnecessary suffering or pain, either mental or physical;" "habitually tormenting, vexing or afflicting a child;" "any act of omission or commission whereby

---

[15]  As with the omission counts, the jury could also convict on Count 10 if Defendants "knowingly caused the child harm that would make the child neglected." A6009, 6028.

unnecessary pain and suffering, whether mental or physical, is caused or permitted

to be inflicted;" or "exposing a child to unnecessary hardship, fatigue or mental or

physical strains that may tend to injure the health or physical well-being of such

child." A6010; see A5908.

The Statutory Index lists no less than *41* different statutory sections to which

§§ 2A2.2 and 2A2.3 apply.   Those sections include a wide array of assault statutes,

including: assault by striking, beating, or wounding, 18 U.S.C. § 113(a)(4); simple

assault, § 113(a)(5); assault resulting in serious bodily injury, § 113(a)(6); assault

resulting in substantial bodily injury to a child, § 113(a)(7); simple assault of certain

Government officials, §§ 115(b)(1), 1389; and assaults of various others, §§ 111,

2231.   But the assault Guidelines are not limited to "assault" statutes. See Rakes,

510 F.3d at 1289 ("titles of statutes and guidelines" do not "limit the plain meaning

of the provisions themselves").   They also reach numerous other statutes in Title 18

proscribing: acts of violence in certain situations or directed at certain individuals,

e.g., §§ 32(a), 37, 2280, 2281, 2291, 2332(c); certain acts with the intent to cause

serious bodily injury, e.g., §§ 114, 1992(a)(7), 2199; resisting, impeding,

intimidating, or interfering with various officials, §§ 111, 2231; see 42 U.S.C.

§ 2283(b), and use of physical force against certain individuals, e.g., §§ 33, 1512(a),

1513.

Keeping in mind that "a perfect match is not required," <u>Nichols</u>, 169 F.3d at 1271 (quoting <u>Terry</u>, 86 F.3d at 358), "the statutory provisions" covered by the assault Guidelines "aim at the heart of [Defendants'] crime[s]," <u>Cothran</u>, 286 F.3d at 178.   Those provisions largely reach inflicting, or threatening to inflict, injury on another, or using force against another.   They also reach common law simple assaults, such as spitting, unwanted touching, and shoving. <u>Delis</u>, 558 F.3d at 181-83.   Under the New Jersey statute incorporated into Counts 1, 3, 5, 6, 9, 10, and 12, the jury had to find that Defendants inflicted harm and acted cruelly, which involved beating a child, causing a child pain, or threatening a child.   This relationship is "sufficiently analogous," because the Guideline reaches offenses covering the same "type of criminal behavior." U.S.S.G. § 2X5.1 background; <u>e.g.</u>, <u>Calbat</u>, 266 F.3d at 363-64 (finding that aggravated assault Guideline should be used because the federal assault statute "contain[s] a provision which closely matches the crime of intoxication assault").

Courts have found Guidelines provisions to be sufficiently analogous even in more attenuated cases, where they provided only a "rather weak analogy" to the crime of conviction. <u>United States v. Cherry</u>, 10 F.3d 1003, 1008-09 (3d Cir. 1993). For example, in <u>Allard</u>, the Eighth Circuit held that the involuntary manslaughter Guideline was properly used in a vehicular battery case where the victim survived. <u>Allard</u>, 164 F.3d at 1147-49.   In <u>United States v. Daniels</u>, 948 F.2d 1033, 1035-36

35

(6th Cir. 1991), the Sixth Circuit held that the aggravated assault Guideline was properly used where the defendant shot at an occupied bus.   And in United States v. Hyde, 977 F.2d 1436, 1438-41 (11th Cir. 1992), the Eleventh Circuit held that the attempt Guideline should have been used where the defendant actually possessed a listed chemical.

Moreover, the relationship between child abuse statutes and assault is hardly a stretch.   The Supreme Court linked the two in Lewis, 523 U.S. at 171, asking, without deciding, whether state child abuse statutes can even be assimilated under ACA in light of "the presence of federal assault law."   And courts have regularly applied the assault Guidelines in cases assimilating state child abuse statutes. E.g., United States v. Bailey, 169 Fed. Appx. 815 (5th Cir. 2006) (unpublished); United States v. Truax, 69 Fed. Appx. 219 (6th Cir. 2003) (unpublished); Centner, 1997 U.S. App. LEXIS 14720; United States v. Bell, 993 F.2d 427 (5th Cir. 1993).

The District Court and Defendants linked the two as well, repeatedly describing these crimes as "assaults." A5369-70, 5372-73, 5398, 5408, 5435-37, 5455-56, 5489-90, 5771, 5776, 6104, 6509, 6575.   Defendants even argued that the federal assault counts should be dismissed because the "same conduct" was "covered" by the endangering counts and "they couldn't be sentenced on both of them," A5377-78, and later argued that the "minor assault" Guideline should apply, A6083-84.   Defendants further conceded that "if the jury had been charged that

36

substantial injury is required, then you could consider this to be an analogous

offense to aggravated assault." A6438.   But, as explained below, the degree of

injury was an issue for the *Court* to resolve at sentencing—not at trial by the jury.

And the assault Guideline does not require that "substantial injury" be shown,

because that Guideline applies even where there is no injury or physical contact. See

U.S.S.G. § 2A2.3(a), (b)(1).

Simply put, the "analogous provisions" covered by the assault Guidelines

were certainly "within the ballpark" of Defendants' crimes of conviction. Rakes,

510 F.3d at 1287.   Indeed, the whole point of the Guidelines is to "direct[] the

sentencing authority to the appropriate sentence within the statutory range

applicable to the offense of conviction." United States v. Langley, 919 F.2d 926, 930

(5th Cir. 1990).   Here, the assault Guidelines provide enhancements—such as for

use of a weapon and degree of bodily injury—which make perfect sense in the

context of the crimes of conviction, thereby channeling discretion based on the

severity of Defendants' conduct.   The Court erred in failing to apply them.

**B.    The District Court's Bases For Rejecting The Assault Guidelines Were Wrong.**

The Court's explanations for not finding a sufficiently analogous offense

Guideline do not withstand scrutiny.   For example, the Court protested that: the jury

was not asked to make the findings contained in the assault Guidelines; it would not

be "justice" to allow the Court to make those findings under the lower standard of

37

proof that governs all federal sentencings; and it would be unfair to allow the Government to charge one statute and seek punishment for another. A6468-72, 6477, 6484, 6491, 6558, 6573-78, 6584-90, 6703.   Those concerns are misplaced, because they essentially attack the factfinding role of courts at sentencing, A6573-78, 6588-89, and improperly ignore the sentencing procedure established by this Court, <u>see</u> **Point II**.   Moreover, the Court's concerns have little to do with finding a sufficiently analogous offense Guideline, which requires no factfinding whatsoever.

Similarly mistaken was the Court's invocation of a dispute over the jury instructions.   According to the Court, the Government essentially asked for this result (<u>i.e.</u>, a finding of no sufficiently analogous offense Guideline) by rejecting a proposed charge as to the amount of harm that needed to be shown in order secure convictions. A6576.   But as the Court had correctly found, the degree of injury was not an element of the offenses, and the Government properly opposed Defendants' request to have it so charged. A5457-78.   Contrary to the Court's statement, the Government (in an effort to avoid this very issue) proposed that the jury be given special interrogatories on the harm caused. A5460, 5467.   Defendants rejected that proposal. A5469.

Moreover, the Court could not explain why not requiring the jury to find more harm than necessary meant that the assault Guidelines were not analogous offense

Guidelines.   After all, the requested instruction required "substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ," A5454; <u>see</u> N.J.S.A. 9:6-8.21(c)(1), while the assault Guideline applies even in situations where there is neither injury nor physical contact, <u>see</u> U.S.S.G. § 2A2.3(a), (b)(1); <u>Delis</u>, 558 F.3d at 179-84.   In other words, no finding of injury or contact is necessary for the assault Guideline to apply.   And the degree of harm caused was for the *judge* to decide at sentencing, looking not just to facts proven at trial, but also to relevant conduct and other facts proven by a preponderance. <u>See</u> U.S.S.G. §§ 1B1.3, 2A2.3(c)(1) (cross-reference); <u>Schneider</u>, 801 F.3d at 204-05; <u>United States v. Smith</u>, 751 F.3d 107, 117 (3d Cir. 2014).

Likewise, the Court's discussion of *parens patriae* jurisdiction is beside the point. A6581-82, 6588.   Regardless of the underlying justification for its decision, the New Jersey legislature decided that endangering the welfare of a child is a serious offense, grading it as a second-degree felony. N.J.S.A. 2C:24-4a.   Because the offense occurred on a military installation with exclusive federal jurisdiction and no federal statute "indicate[s] an intent to punish [that] conduct . . . to the exclusion of" the New Jersey endangering statute, <u>Lewis</u>, 523 U.S. at 166, it was assimilated under ACA.   The question at sentencing was whether there was a sufficiently

analogous offense Guideline.   The interest of the federal government, or the state's jurisdiction over children, plays no role in that determination.[16]

Last, in its Statement of Reasons, the Court cited United States v. Loften, 465 Fed. Appx. 294 (5th Cir. 2010) (unpublished), to support its holding that there was no sufficiently analogous offense Guideline. JJStR.   In Loften, a Fifth Circuit panel affirmed the sentencing court's ruling that there was no Guideline sufficiently analogous to the Texas child abuse statute charged in that case.   But the defendant in that case had not properly preserved his objection, and therefore the Court applied plain error review.   In any event, the panel provided almost no analysis to support its ruling, which was likely wrong. Loften, 465 Fed. Appx. at 295.[17]   This Court should decline to follow that non-precedential opinion.

---

[16] The Court's comments further reveal what was clear all along—it did not think Defendants belonged in federal court in a criminal prosecution, and it did not think they had committed "real federal offenses.   Real ones." A6731 ("[L]et's get real and talk about what would happen in Family Court.").   That sentiment was wrong, because convictions under ACA are for "federal crime[s]." United States v. Coleman, 38 F.3d 856, 859 (7th Cir. 1994).

[17] Nor does it matter that the Government's position is allegedly "360 degrees different [sic] from the government's position" in Loften. A6688-89.   That office's mistaken view of how the Guidelines applied to a Texas statute cannot bind the Government's position on how the Guidelines apply to the New Jersey statute at issue here. Cf. United States v. Dansker, 581 F.2d 69, 74 (3d Cir. 1978).

40

* * *

The Court's reasoning for finding no sufficiently analogous offense Guideline was wrong.   The assault Guidelines should have been used.   That error led to no Guidelines calculation at all and no consideration of any of the applicable enhancements, unquestionably affecting the outcome of sentencing. See Molina-Martinez v. United States, 136 S. Ct. 1338, 1345-49 (2016).   Indeed, the sentences imposed are *15½+ years* shorter than the lower Guidelines range calculated by Probation. United States v. Langford, 516 F.3d 205, 215 (3d Cir. 2008).   This Court should vacate the sentences and remand for resentencing. See Boney, 769 F.3d at 159; United States v. Fumo, 655 F.3d 288, 309-17 (3d Cir. 2011).

**POINT II**

**THE DISTRICT COURT ERRED BY REFUSING TO FIND AGGRAVATING FACTS BY A PREPONDERANCE OF THE EVIDENCE.**

<u>Standard of Review</u>:    Plenary. <u>United States v. Ali</u>, 508 F.3d 136, 143-45 (3d Cir. 2007).

Besides erroneously jettisoning the Guidelines at step one, the Court erred throughout the sentencing proceeding by refusing to make factual findings by a preponderance.    It repeatedly explained that it would not make any findings of fact that were not necessarily found by the jury, A6468-72, 6475-77, 6484, 6489-91, 6540, 6574-78, 6584-88, 6690, 6695, 6700-01, 6714, 6719, 6739, or "shown beyond a reasonable doubt," A6701; <u>see</u> A6578, 6715.[18]    The Court suggested that making findings by a preponderance was "[un]fair," A6714, and that potential constitutional concerns were animating its decision, A6442, 6573, 6589-90, 6703.    It further explained that factfinding at sentencing might result in Guidelines enhancements for facts not found by the jury and "if that's the way the guidelines work, I don't buy that the justice that the guidelines will achieve is justice that I want to see for these

---

[18]  <u>See</u> <u>generally</u> A6491 ("And it doesn't matter that your burden of proof beyond a reasonable doubt is blown out the window and all you've got to do is prove by the preponderance to one person.    The jury of the Jacksons' peers never had a shot at that."); A6714 ("They didn't ask a jury to find it and I'm not going to do it for them.").

42

defendants." A6573-76, 6703.   The Court's concerns were without merit and its refusal to make findings was erroneous.[19]

Although the District Court might think that the federal sentencing regime "offend[s]" "plain fairness" and does not produce "justice," A6576-77, 6703, district courts are "not permit[ted] . . . to establish sentencing practices that conflict with our now well-established sentencing precedents," United States v. Lofink, 564 F.3d 232, 240 (3d Cir. 2009).   Although "Booker afforded judges broad discretion to enter appropriate sentences in consideration of § 3553(a) factors," it "is not within a sentencing judge's discretion to diverge from applying the preponderance-of-the-evidence standard in the initial sentencing calculation at step one." Ali, 508 F.3d at 155-56.   Nor may the sentencing judge "refuse to apply" a Guidelines enhancement "based solely on a policy concern." United States v. Napolitan, 762 F.3d 297, 312 (3d Cir. 2014).

Contrary to the Court's concerns, there is nothing improper about finding facts that have not been found by the jury, even where those findings "may lead judges to select sentences that are more severe than the ones they would have

---

[19] Consistent with its refusal to find facts, in its statements of reasons, the Court struck all the PSR paragraphs discussing the offenses. See JJStR (striking most of ¶ 21, ¶¶ 22-229, and "239-219(c) [sic]."); CJStR (striking most of ¶ 21, ¶¶ 22-230, and 241-334(a)).   At sentencing, the Government objected to this wholesale striking of facts, and the Court ruled that it would allow the parties to work out a resolution. A6739-41.   Apparently, the Court shifted course.

selected without those facts." <u>Alleyne v. United States</u>, 133 S. Ct. 2151, 2161 n.2, 2163 (2013).   Indeed, as long as the findings are not elements of the offense, <u>i.e.</u>, "those facts that increase the maximum [or minimum] statutory punishment to which the defendant is exposed," <u>Smith</u>, 751 F.3d at 117, then sentencing courts *must* make the necessary findings by a preponderance at each step of the sentencing process, <u>Ali</u>, 508 F.3d at 144-56; <u>see</u> U.S.S.G. § 6A1.3 cmt.[20]

The Court's obligation to find facts necessarily includes those that were not elements of the charged offenses, as the Guidelines and § 3553(a) factors include considerations that are not required to be found by the jury. <u>See</u> <u>Freeman</u>, 763 F.3d at 335-36; <u>United States v. Tidwell</u>, 521 F.3d 236, 250 n.9 (3d Cir. 2008) ("[F]acts that only enhance sentences within the range allowed by the jury's verdict (or guilty plea) need not be charged in an indictment or proven beyond a reasonable doubt."). Indeed, courts may even include facts that might have formed the basis for acquitted counts, as well as entirely separate uncharged offenses. <u>United States v. Watts</u>, 519

---

[20] Rule 32 permits sentencing courts to elide certain controverted issues where "the matter will not affect sentencing" or "the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B).   But it does not give courts license to refuse to calculate the Guidelines. <u>Fumo</u>, 655 F.3d at 310-12.   In any event, contrary to the Court's suggestion, A6691, it did not need additional hearings to make findings of fact—the 39-day trial and 10½-hour sentencing proceeding should have sufficed. <u>Cf.</u> <u>United States v. Bergrin</u>, 599 Fed. Appx. 439, 442-43 (3d Cir. 2014) (not precedential).

U.S. 148, 149 (1997); <u>United States v. Grier</u>, 475 F.3d 556, 565-68 (3d Cir. 2007)

(en banc).

By refusing to make any findings beyond those it thought necessarily were

found by the jury, the Court ignored many provable facts highly relevant to

sentencing, such as:

- the degree of harm suffered by the victims, including the children's serious injuries and J███'s and C███'s rapid growth after leaving Defendants' custody;

- the victims' vulnerability, including their developmental delays and Defendants' insistence on punishing them even after they suffered serious injuries and failed to grow properly;

- Defendants' use of dangerous weapons and their abuse of trust; and

- the lies Defendants told to cover up their conduct and to continue the abuse.

The Court also refused to consider Joshua's death. A6695.   But Defendants

contributed to his death, A6212-14, 6641-42, and their insistence on applying their

parenting "philosophy" to J███ and C███ after his death showed that their conduct

was not "mistaken," A6731—it was serious criminal conduct.

Because these facts were not elements of the offenses, none had to be proven

beyond a reasonable doubt to the jury, and none needed to be reflected on the verdict

sheets. A6700.   These were issues for the *Court* to decide at sentencing using the

preponderance standard.   And as long as the sentence on each count of conviction

did not exceed 10 years—for a potential total sentence of 120 years for Carolyn and

45

100 years for John—then such factfinding implicated no constitutional concerns.

See <u>Freeman</u>, 763 F.3d at 335-36.[21]

By contrast, the Court had no reluctance to find facts it thought supported

mitigation: Defendants' demeanor, manner of dress (not "sloppily"), behavior (not

"lollygagging"), and the respect the Court believed they showed their attorneys,

from which it drew sweeping conclusions about how that showed they could not

have committed "monstrosities." A6722-24.   As explained in **Point IV**, these

conclusions largely undermined the jury's verdict.   And, obviously, the jury did not

weigh in on any of those trivial matters, which the Court believed were significant

enough to warrant the lenient sentences it imposed.   By refusing to make findings

of fact by a preponderance on matters that would support sterner sentences, the

Court established its own sentencing process, rather than applying the one required

by this Court. See <u>United States v. Friedman</u>, 658 F.3d 342, 361-63 (3d Cir. 2011);

<u>Lofink</u>, 564 F.3d at 240; <u>Ali</u>, 508 F.3d at 144-56.   Because that error infected all

aspects of sentencing, resentencing is required.

---

[21] Although the maximum sentence for each count of conviction is ten years,
N.J.S.A. 2C:43-6(a)(2), New Jersey law permits those sentences to run
consecutively to one another, N.J.S.A. 2C:44-5 ("There shall be no overall outer
limit on the cumulation of consecutive sentences for multiple offenses."); <u>see</u> <u>State</u>
<u>v. Yarbough</u>, 100 N.J. 627 (1985).   Similarly, the Guidelines instruct courts to run
sentences on multiple counts consecutively in order to achieve the "total
punishment." U.S.S.G. § 5G1.2(d); <u>see</u> A6457.   This raises no constitutional
concerns. See <u>United States v. Chorin</u>, 322 F.3d 274, 278 (3d Cir. 2003).

**POINT III**

**THE DISTRICT COURT MISINTERPRETED ACA BY FOCUSING ON STATE SENTENCING POLICIES AND IGNORING UNWARRANTED FEDERAL SENTENCING DISPARITIES.**

**<u>Standard of Review</u>:** Plenary. **<u>United States v. Thornhill</u>, 759 F.3d 299, 307 n.9 (3d Cir. 2014).**

The District Court also misinterpreted ACA by focusing on state sentencing policies and ignoring the risk of unwarranted federal sentencing disparities. Because the Court's view of the law was wrong, this Court should vacate the sentences and instruct the Court to correctly apply ACA on remand.

When a defendant is convicted of a state offense which has been assimilated under federal law, he "shall be . . . subject to a like punishment." 18 U.S.C. § 13(a). By providing for "like punishment," "ACA does not require federal and state sentences to be identical." <u>United States v. Marmolejo</u>, 915 F.2d 981, 984 (5th Cir. 1990). Rather, because "it is impossible to determine with certainty the sentence that a state judge would impose," <u>United States v. Garcia</u>, 893 F.2d 250, 254 (10th Cir. 1989), ACA incorporates into federal law only the "state law which establishes the elements of the offense and the range of punishment," <u>United States v. Norquay</u>, 905 F.2d 1157, 1162 (8th Cir. 1990). Thus, "state law sets the minimum and maximum punishment while the federal sentencing guidelines should be used to determine the actual sentence within that range." <u>United States v. Queensborough</u>, 227 F.3d 149, 160 (3d Cir. 2000); <u>see</u> <u>United States v. Pierce</u>, 75 F.3d 173, 176 (4th

47

Cir. 1996); <u>Coleman</u>, 38 F.3d at 861; <u>Norquay</u>, 905 F.2d at 1161-62; <u>Garcia</u>, 893 F.2d at 253-54.    Indeed, in 1990, Congress definitively "resolved this issue" by explicitly referencing ACA in 18 U.S.C. § 3551. U.S.S.G. app. C, amend. 412 (Nov. 1, 1991); <u>see</u> Pub. L. No. 101-647, § 1602, 104 Stat. 4789, 4843 (1990).    And because ACA sentences are based on federal sentencing law and the federal sentencing guidelines, courts must remain cognizant of the risk of unwarranted sentencing disparities among similarly situated federal defendants. <u>See</u> <u>Norquay</u>, 905 F.2d at 1161; <u>see also</u> 18 U.S.C. § 3553(a)(6); <u>cf.</u> <u>United States v. Begin</u>, 696 F.3d 405, 412-14 (3d Cir. 2012).

Here, the Government argued that each count of conviction carried a statutory sentence of "between five years and 10 years," N.J.S.A. 2C:43-6(a)(2), and that the Court should use the Guidelines to reach an appropriate sentence, including by running sentences on multiple counts consecutively to achieve the "total punishment," U.S.S.G. § 5G1.2(d); <u>see</u> A6312, 6512-14, 6568-69, 6597-602, 6674-84.    It provided the Court with examples of sentences imposed on other federal defendants convicted of child abuse under ACA, explaining that those sentences showed what comparable defendants received under the Guidelines, thereby providing a benchmark for sentences under § 3553(a)(6). A6672-84.    The Court rejected these arguments based on its erroneous interpretation of ACA.

48

*First*, ignoring § 3553(a)(6), the Court rejected any consideration of sentences imposed on other federal defendants.   When the Government suggested that the comparison was both apt and required, the Court interrupted, asking if its job was to "clean up the Army" and, if so, "I don't know why you even bother with the Guidelines.   Why didn't you just have an Army base based presentation, if that's what I have to do here?" A6672-80.   The Court then incorrectly emphasized that its focus had to be on "intrastate uniformity," A6679; see A6673-75, 6702, and to impose a sentence similar to one that would be imposed on "West Market Street," i.e., in the Newark courthouse of the New Jersey Superior Court, A6675; see A6731-32 ("I do believe it captures what would go on in the State.").   The Court, therefore, did not consider federal sentencing disparities at all in imposing its sentences.   That was error, especially given the Government's emphasis on that factor. See United States v. Merced, 603 F.3d 203, 222-25 (3d Cir. 2010).

*Second*, besides ignoring the risk of disparities between federal defendants, the Court erroneously focused on state sentencing policies, all but importing them wholesale into this federal sentencing proceeding.[22]   The Court's sentence for John was apparently based on a state provision allowing courts to downgrade offenses

---

[22]  To be sure, the Court mentioned the § 3553(a) factors. E.g., A6716-17, 6725. But that discussion was overwhelmed by its consideration of the theoretical state sentencing outcome.   And, as discussed in **Point IV**, its consideration of the factors missed the mark.

49

and therefore impose a sentence below the 5-year minimum. A6701-03.[23]

Meanwhile, its sentence for Carolyn imported her take on state parole practices.

The Court explained, "I would, in fact, sentence [Carolyn] to five but not ten years if

I were a State court judge," which, apparently assuming a very generous parole

release date, would amount to just a 24-month sentence. A6732; see A6704,

6729-32, 6735 ("The way New Jersey sentencing law works is respected insofar as

nobody else got five years and we go from there."). The Court even said that it

"really wish[ed] that there was more familiarity with State sentencing because I

think this case probably could have resolved pretty quickly," criticizing the

Government for getting "too excited about Guidelines and federal sentences."

A6730.

   All of this commentary by the Court reflects a fundamental error: this was a

*federal* crime, it was charged in *federal* court, and Defendants should have been

sentenced using the *federal* sentencing guidelines and based on *federal* sentencing

---

   [23] It is not clear that a state judge could impose the same probationary sentence on
John. Even where a court downgrades a second-degree felony, there is still a
presumption of imprisonment. That presumption is overcome only where the judge
finds that "imprisonment would be a serious injustice which overrides the need to
deter such conduct by others." N.J.S.A. 2C:44-1d; see State v. Evers, 175 N.J. 355,
387-400 (2003) (recognizing only one case where this standard was met). Thus, a
probationary sentence for a second-degree felony is available only in "truly
extraordinary and unanticipated circumstances," State v. Roth, 95 N.J. 334, 358
(1984), which were not present here.

policies. See Queensborough, 227 F.3d at 160; United States v. Gaskell, 134 F.3d 1039, 1042 (11th Cir. 1998) ("Prosecution under the ACA is for enforcement of federal law assimilating a state statute, not for enforcement of state law."); Coleman, 38 F.3d at 859; see also A6582-87.   The Court's erroneous preoccupation with the sentences that Defendants possibly could have received in *state* court played out in multiple ways.   Indeed, the Court pretended to be a *state* court judge, applied *state* sentencing guidelines, assumed when Carolyn would be eligible for *state* parole, and guessed that she would be granted that relief immediately.   This is exactly what sentencing courts are not supposed to do in ACA cases. See Garcia, 893 F.2d at 254.

Moreover, that New Jersey allows convicted defendants to serve just a small fraction of their sentences should not have driven the Court's approach, because ACA does not "require adherence to state policy with reference to parole eligibility," United States v. Smith, 574 F.2d 988, 992 (9th Cir. 1978), and "the federal government does not have to adopt the same provisions for computing when a sentence is satisfied," Coleman, 38 F.3d at 861 (rejecting defendant's argument that sentence was unfair because he would have served less time if sentenced by the state); see United States v. Pate, 321 F.3d 1373, 1375-76 (11th Cir. 2003) (same); Norquay, 905 F.2d at 1159-63 (reversing sentence where court used state sentencing guidelines and state's calculation of good-time credit).   Rather, the Court was required to impose a sentence that satisfied "the purposes set forth in subparagraphs

51

(A) through (D) of section 3553(a)(2)," 18 U.S.C. § 3551(a), not the generous parole

policies of the state of New Jersey, see United States v. Vaughan, 682 F.2d 290, 294

(2d Cir. 1982).

To be sure, following Booker, a sentencing court likely can consider what a

state defendant would receive if he had been prosecuted in state court.   But that

does not justify the massive variances here.   "Adjusting federal sentences to

conform to those imposed by the states where the offenses occurred would not serve

the purposes of § 3553(a)(6), but, rather, would create disparities within the federal

system, which is what § 3553(a)(6) is designed to discourage." Begin, 696 F.3d at

412-13 (quoting United States v. Branson, 463 F.3d 1110, 1112 (10th Cir. 2006)).

Although intra-state consistency might be more important in ACA cases, courts

have explained that imposing sentences within the statutory range advances that

goal. See United States v. Young, 916 F.2d 147, 150 (4th Cir. 1990); Garcia, 893

F.2d at 254.

Rather than focusing on the type of sentence that might pass muster on "West

Market Street," the Court was required to impose a sentence that satisfied the § 3553

factors—including consideration of the Guidelines, § 3553(a)(4), and other federal

sentences, § 3553(a)(6)—or, assuming that the Court properly found no sufficiently

analogous offense Guideline, one that took into account "sentences prescribed by

guidelines applicable to similar offenses and offenders" and "the applicable policy

statements of the Sentencing Commission," § 3553(b)(1); see 18 U.S.C. § 3551(a). In other words, the "strike zone" the Court was "*required*" to use was "the federal sentencing guidelines," comparable *federal* sentences, and *federal* sentencing goals, Queensborough, 227 F.3d at 160 (emphasis added)—not speculation about what would have happened in *state* court, A6679-80; see Gall v. United States, 552 U.S. 38, 49 (2007) (in federal sentencings, "the Guidelines should be the starting point and the initial benchmark").   The Court erred by ignoring or downplaying these aspects of federal sentencing and conforming its sentence to its understanding of New Jersey sentencing practices. See United States v. Finley, 531 F.3d 288, 295 (4th Cir. 2008) (rejecting defendant's argument that the court inadequately considered state sentencing law in ACA case—"Within [the statutory] range, federal courts have discretion in imposing sentences *as regulated by federal law*." (emphasis added)).[24]

---

[24]  At sentencing, A6681, Defendants relied heavily on United States v. Martinez, 274 F.3d 897 (5th Cir. 2001).   But Martinez held only that the sentencing court erred by imposing consecutive sentences where Texas law would have required concurrent ones. Id. at 909.   In other words, Martinez stands for the unremarkable proposition, espoused in all ACA cases, that federal courts cannot impose sentences longer than those that can legally be imposed in state court.   That is not an issue here. See note 21.

### POINT IV

**NO REASONABLE SENTENCING COURT WOULD HAVE IMPOSED SUCH LENIENT SENTENCES ON PARENTS WHO BEAT, STARVED, AND NEGLECTED THEIR YOUNG AND DEFENSELESS ADOPTED CHILDREN OVER A FIVE-YEAR PERIOD, CONTRIBUTING TO THE DEATH OF ONE, ALMOST KILLING ANOTHER TWICE, AND CAUSING PERMANENT DAMAGE TO THE SURVIVORS.**

**Standard of Review:**    Abuse of discretion. **United States v. Woronowicz, 744 F.3d 848, 851-52 (3d Cir. 2014).**

Besides being procedurally unreasonable, the lenient sentences here are substantively unreasonable.   In imposing such light sentences, the Court failed to grapple with the seriousness of these offenses, essentially undermined large portions of the jury's verdicts, interposed its view that the prosecution was misguided, and imposed sentences that did not adequately account for several § 3553(a) factors. This Court, therefore, should vacate these sentences as unreasonably low.

This Court will reverse a sentence as substantively unreasonable where "no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." United States v. Tomko, 562 F.3d 558, 568 (3d Cir. 2009) (en banc).   Although that standard is high, it is "not an exercise in self-abnegation." Id. at 575; see United States v. Ressam, 679 F.3d 1069, 1087 (9th Cir. 2012) (en banc) ("The abuse of discretion standard is deferential, but it does not mean anything goes."); United States v. Irey, 612 F.3d 1160, 1191 (11th Cir. 2010) (en banc) ("Looking at sentencing decisions through the

54

prism of discretion is not the same thing as turning a blind eye to unreasonable ones.").

Although this Court's "preferred course" upon finding "procedural error" is to "remand the case for re-sentencing, without going any further," Merced, 603 F.3d at 214, it has not always done that, e.g., United States v. Lychock, 578 F.3d 214, 220-21 (3d Cir. 2009). Rather, "procedural problems may lead to substantive problems, so there are times when a discussion of procedural error will necessarily raise questions about the substantive reasonableness of a sentence." United States v. Levinson, 543 F.3d 190, 195 (3d Cir. 2008). This is one of those times, given the pervasive procedural errors, the Court's jaundiced view of the prosecution, the lenient sentences imposed, and the seriousness of Defendants' conduct. See Lychock, 578 F.3d at 220-21; United States v. Goff, 501 F.3d 250, 256-62 (3d Cir. 2007).[25]

Proper consideration of the facts and relevant Guidelines should have resulted in lengthy advisory ranges: 210-262 months as calculated by Probation, CJPSR ¶¶ 241-325, 393; JJPSR ¶¶ 239-309, 378, and 292-365 months (with recommendations of 235 months for Carolyn and 188 months for John) as calculated

---

[25] If this Court does not reach this claim, the Government preserves its objection to the substantive reasonableness of these sentences. See United States v. Negroni, 638 F.3d 434, 440 n.4 (3d Cir. 2011).

by the Government, A6309-54, 6634-86.   Using any of these calculations, the

sentences imposed—probation for John and 24 months for Carolyn—constituted

enormous downward variances (on the magnitude of 88%+), which would have

required correspondingly robust explanations for why such lenience was warranted.

See Gall, 552 U.S. at 50; Merced, 603 F.3d at 216.[26]

But the Court's rationales were weak, and it significantly understated the

seriousness of these offenses.   Moreover, it impermissibly undermined the jury's

verdict in numerous ways. See United States v. Morgan, 635 Fed. Appx. 423,

443-44 (10th Cir. 2015) (unpublished) (citing cases).   Thus, it did not satisfy the

"fuller explanation" needed for such "significant" variances and "extraordinarily

lenient" sentences. United States v. Kononchuk, 485 F.3d 199, 204, 206 (3d Cir.

2007).   And putting aside the Guidelines calculations, the sentences imposed were

"patently unreasonable," United States v. Kane, 639 F.3d 1121, 1137 (8th Cir.

2011), and "wholly insufficient to achieve the purposes of sentencing set forth by

Congress in § 3553(a)," McQueen, 727 F.3d at 1157.

---

[26] In Negroni, this Court noted that the "parties have not identified any case, and
we have not found one, in which an appellate court upheld a probationary sentence
that so significantly varied from the Guidelines range"—in that case, 70-87 months.
Negroni, 638 F.3d at 446.

## A.    The District Court Repeatedly Undermined The Jury's Verdict.

*Initially*, the Court "substitut[ed] its view of the evidence . . . for the jury's verdict." United States v. Bertling, 611 F.3d 477, 480-82 (8th Cir. 2010).   But "a district court 'err[s] as a matter of law' if it imposes a sentence based on a finding that contradicts the jury's verdict," id. at 481 (quoting United States v. Campos, 362 F.3d 1013, 1015-16 (8th Cir. 2004)), because "a guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict," United States v. Boggi, 74 F.3d 470, 478-79 (3d Cir. 1996) (quoting United States v. Weston, 960 F.2d 212, 218 (1st Cir. 1992)).   The Court violated that rule several times, causing it to downplay the severity of Defendants' conduct and John's participation.

### 1.    The Court improperly trivialized the severity of the abuse.

The Court openly questioned the jury's verdict, explaining that it was not "comfortable saying each of these children was the victim of a second degree crime," A6697, and then repeatedly trivialized the severity of the abuse.   For example, based on its "own perceptions of what proofs demonstrated in this case," A6689, the Court deemed it "very powerful" that treating doctors had not diagnosed the numerous injuries as abuse and that "everybody has to cope with [that] fact," A6690-92, 6700; and variously characterized the offense as merely misguided "corporal punishment," A6719-22, or "mistaken" or "bad parenting," A6727, 6731;

see A6727 (suggesting Defendants' "motives were pure").   But those were defense

theories at trial, which the Government rebutted and the jury rejected. E.g.,

A116-22, 124-26, 132-34, 5754-80.[27]

    Specifically, the Government explained why *some* treating physicians did not

find abuse: Defendants lied to doctors, who were inclined to believe them for

various reasons; Defendants hid their abusive conduct; and only one doctor ever saw

both Joshua and C█████, the two children who sustained the greatest abuse. E.g.,

A5556-60, 5649-67, 5681-82, 5689-90, 5821-22, 5880-81.   Indeed, after seeing

C████, that doctor recognized the abuse and ended it by notifying the authorities.

Nor was it true that other treating physicians did not suspect abuse—at least *four*

others testified at trial that they suspected abuse and neglect, including one who

contemporaneously reported the suspected abuse. A180, 212 (Dr. Forestine),

1006-07 (Dr. Hole), 1395-96 (Dr. Sweinhart), 2645-55, 2687 (Dr. Lees).   And

another doctor testified that he was so concerned about Joshua's condition that he

---

[27] The Court repeated still other defense theories.   It rejected the expert
testimony that Defendants caused Joshua's fractured bile duct, A3487, 3512, by
seizing on the expert's testimony that the injury could have been caused by a "pool
cue," remarking, "I didn't see any pool tables around," A6693.   This echoed
Carolyn's sarcastic closing: "What is that Minnesota Fats in Jackson household?
Was there any evidence of a pool table?" A5718.   That ignored the expert's actual
testimony: the injury was caused by "[s]omething that is fairly narrow," which
"could be poked in," *such as* a "broom stick," a "pool cue," a "stick," or "a handle of
a utensil." A3487, 3512.   Defendants had a floor to sweep and ready access to
utensils and sticks, which the evidence (including John's own admission) showed
they used to beat their adopted children. A1878-80, 1955, 1962, 1979-80, 3101.

took extraordinary steps in an effort to help. A2821-25, 2840-43 (Dr. Vergano).

Presented with this evidence, the jury rejected Defendants' theory that this

prosecution was just a case of "Monday morning quarterbacking," A116, and

instead found them guilty of a five-year conspiracy to endanger their adopted

children and numerous substantive counts—all second-degree crimes.   The Court

failed to "cope" with the jury's rejection of that argument, A6691, and its

resuscitation of that discredited theory was improper.

Similarly, the jury found there was nothing "mistaken" or merely "foolish"

about Defendants' conduct. A6713.   Rather, it found that Defendants agreed to

endanger their adopted children; knew that their conduct was causing harm; caused

such harm over and over again; and did not use lawful corporal punishment. See

A6004-36.   Indeed, Defendants continued to use the same forms of

discipline—and, in fact, added more heinous forms—*after* Joshua's numerous

ailments and, unbeknownst to the jury, *after* Joshua *died*.   And the evidence showed

that Defendants achieved something that is nearly impossible and hardly

accidental—keeping infants and toddlers from growing. A6361; see A269, 3045,

3817-54, 4211-17, 4229-36, 4273-96, 6642-43, 6772-88.   The idea that

Defendants' conduct amounted to merely "poor parenting choices," A6708, was, at

a minimum, inconsistent with the jury's findings.

Besides recycling failed defense theories, the Court also manufactured a new one—that Defendants could not have committed the "monstrosities that the government would suggest were committed upon these little girls" because the Court perceived that they showed "respect" to "their lawyers" and to "the court personnel and to me," and had "friends," who were "God-fearing serious people." A6697, 6723.   But the Government did not merely "suggest" that "monstrosities" occurred—it produced evidence to the jury, which, following a 39-day trial that included testimony from Defendants' friends, determined beyond a reasonable doubt that they *did* occur.

In any event, Defendants' "respect" in court and their "friends" certainly could not undo the overwhelming evidence of their guilt.   Such "reasoning is like saying that other than the fact he had an 'illness' that made him want to kill young women, Ted Bundy was a pretty nice guy and a valuable member of his community." Irey, 612 F.3d at 1203-05; see Ressam, 679 F.3d at 1094.[28]

The Court also opined that it could not find that the terrible injuries suffered by the children and depicted in the photographs were actually caused by Defendants,

---

[28] Moreover, as with the treating doctors (except one), none of Defendants' friends who testified at trial ever saw both Joshua and C███, and they were fed lies similar to those given to the treating doctors in order to explain issues with those children. A4781-82, 5080, 5238-39.   Regardless, one of Defendants' friends expressed "alarm" at a picture of Joshua covered in marks, and another testified that the adopted children were too young to be physically disciplined. A4793, 4975.

60

because the verdict sheet did not show that the jury actually made those connections. A6577-78, 6584-85, 6690-92, 6697-701, 6714-15, 6719; <u>see</u> A6708 ("I'm not going to say that . . . hitting resulted in the skin conditions."). Indeed, the Court suggested that the abuse and neglect boiled down to making the children "uncomfortable" and causing them to unnecessarily "cry." A6693. That turns the evidence on its head.

It defies logic to believe that the jury found that Defendants "physically assault[ed]" their adopted children, withheld "sufficient nourishment and food" from them, and forced them to "ingest hot sauce, red pepper flakes, and raw onion," A6054-61, but that such conduct did not cause the marks, bruises, and cuts depicted in the photographs, or the malnourishment and other serious injuries sustained by the children, especially considering the children "immediately" grew, and "very quickly" showed "marked[] improve[ment]," simply by leaving Defendants' care and being fed, A644-45, 1323-25; <u>e.g.</u>, A302, 843-45, 1226-27, 1294-99, 2548-69, 3357-62, 6750-57, 6759-72, 6779. Unsurprisingly, two experts at trial easily drew that connection, testifying that the abuse was "crystal clear" and there was an "infinitesimal chance" that these were all coincidences, A3581-82, 4435; <u>e.g.</u>, A3399-409, 3801-17, 4355-67, and Defendants provided no contrary expert testimony or rational explanation.[29] Indeed, Count 10, on which Carolyn was

---

[29] The Court discounted the experts' opinion as not "entirely unbelievable," suggesting they were paid shills who always "find child abuse" and only "come in in

convicted, explicitly charged that Defendants "caused harm to [C███] by causing [her] to ingest excessive sodium and a sodium-laden substance while restricting [her] fluid intake, *causing* [her] to suffer hypernatremia and dehydration, a life-threatening condition." A47 (emphasis added).   Any suggestion, therefore, that the jury did not link Defendants' abuse to the children's conditions is an improper invalidation of the jury's verdict.

## 2.    The Court downplayed John's role.

The Court also improperly downplayed John's participation, claiming that he did not commit any abuse or neglect, but merely "watched" and "tolerated it." A6708.   Again, the jury found otherwise, concluding he conspired with Carolyn over a five-year period to endanger his adopted children and was criminally liable for nine substantive counts.   With good reason: the evidence, including John's own admission, showed that he personally struck his adopted children and participated in their abuse. A1973, 1983, 2008-09, 2016, 2074, 3100-01.   Overwhelming evidence, including from defense witnesses, showed he agreed with Carolyn to the disciplining of the children. A482-93, 531-43, 1154-57, 1628-31, 1877-78, 1955-56, 1960, 1962, 1982-85, 1992-93, 2055, 2070, 2074, 2076-80, 2092-94, 2427-28,

_____

cases where child abuse is extracted from the records." A6690.   There was no basis for the Court's conclusion or its decision to ignore the experts. See United States v. Olhovsky, 562 F.3d 530, 553 (3d Cir. 2009) (finding sentence substantively unreasonable where court ignored expert testimony).

4860-61, 5068, 5093.    And the evidence showed that J▓▓▓▓ repeatedly expressed

his concerns about the abuse to his father, "to no avail." A2075-82, 6425.

Unsurprisingly, given the Court's statements, the press reported the next day

that the Court "essentially negated the jury's guilty verdict on the top count in the

indictment, that the couple had engaged in a conspiracy to abuse their children over

a span of several years." See note 11.    But as one Court of Appeals has explained,

"Words are important.    We have no doubt 'a reasonable observer, hearing or

reading the quoted remarks, might infer, [even if] incorrectly,' that the court's

estimation of the evidence, contrary to the jury's, played a role in [the] sentence."

Morgan, 635 Fed. Appx. at 444; see United States v. Hunt, 521 F.3d 636, 649-50

(6th Cir. 2008); United States v. Hourihan, 66 F.3d 458, 465 (2d Cir. 1995).    The

same is true here: the Court's comments improperly undermined the jury's verdict

and showed that it chose to ignore the severity of John's role in these offenses.

To be sure, John was marginally less culpable, so he deserved a shorter

sentence than Carolyn should have received.    But less culpable does not mean not

culpable.    Although John's military service might have been mitigating, too,

U.S.S.G. § 5H1.11, it did not warrant a sentence of probation.    Nor did that he had

an "impressive uniform." A6706.    Moreover, while the Court relied on U.S.S.G.

§ 2X5.1 cmt. n.1's reference to "Chapter Five, Part H" as a basis for considering

John's military service, A6704-05, it completely ignored the "Chapter Five, Part K"

bases for harsher sentences, see § 2X5.1 cmt. n.1, which the Government

extensively briefed, A6293-303.[30]

## B.     The Sentences Do Not Reflect The Seriousness Of These Offenses Or Provide Just Punishments.

Besides resting on a view of the evidence opposed to the jury's, "the sentences

of [Defendants] completely fail to 'reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense.' " McQueen, 727

F.3d at 1157 (quoting 18 U.S.C. § 3553(a)(2)(A)).   That much is evident from the

Court's comments trivializing the severity of Defendants' conduct.

The Court stated that it was necessary to "get real and talk about what would

happen in Family Court with this family, with this kind of offense, with this kind of

mistaken, head str[o]ng, stupid plan of parenting," and explained that "society as a

whole was not harmed by these people.   They were not running around crossing

State lines, finding people, committing real federal offenses.   Real ones." A6731.

The Court also mocked the Government's sentencing recommendations: "Nineteen

years for Carolyn Jackson for this?   Are you kidding me?   Fifteen years for Mr.

Jackson for this?   Are you kidding me?   Why can't people think clearly[?]   This is

---

[30]   Indeed, Carolyn received lenience for "unusual degree" of "military service" as well, § 5H1.11, for her service as a "military wife," CJStR.   The Government is unaware of any cases discussing that as a basis for a departure under this section.

not a game.    This is not the Giants versus Miami.    This is not how many

touchdowns do we win by. . . .    [G]ive everybody a break and let's get real." A6729.

But "this" case was hardly about a little "bad parenting." A6727; see **Factual**

**Background**; A6747-88.    Society as a whole certainly is affected when multiple

states entrust foster (and later adoptive) families with young children, only to have:

all three abused and neglected; one die; one almost die twice; and the two surviving

children (and J██████) suffer from lifelong physical, emotional, and developmental

issues. A1226, 1295-96, 1900, 2108-10, 2548-49, 2562-85, 2624, 2632-33, 3404,

3409, 3574, 3580, 3685, 3803-07, 3828, 4118-19, 4172-75, 4178-79, 4207-09,

4357-58, 6361-62, 6423-32; CJPSR ¶¶ 232-33(a); see Kane, 639 F.3d at 1136

(defendant "not only totally abdicated her parental responsibilities but also inflicted

untold long-term suffering upon the child"); Irey, 612 F.3d at 1209 (defendant

"sentenced the children . . . to a lifetime of harm"); cf. U.S.S.G. § 5K2.3.    Sentences

of 24 months and probation do not reflect the seriousness of these offenses, which

one of the experts unsurprisingly described as "a torture case of 3 children" and "one

of the most significant cases of the thousands I have been involved with." A6360;

see United States v. Robinson, 778 F.3d 515, 519-20 (6th Cir. 2015) ("We think it

clear that the district court's unwillingness to directly confront the nature of

Defendant's individual conduct, and hold him responsible for such conduct . . .

resulted in a substantively unreasonable sentence.").

65

Rather than consider the seriousness of these offenses, the Court "myopically dwell[ed]" on the collateral consequences, <u>Morgan</u>, 635 Fed. Appx. at 445 n.32, stressing over and over again that Defendants "wrongly" lost custody of their biological children, that lengthier sentences would further remove them from two of the biological children's lives, and that they were "dead to" J███. A6691, 6699, 6709-13, 6718, 6720, 6728; CJStR; JJStR.[31]    But loss of their children was not a collateral consequence of unrelated wrongdoing—it flowed directly from the numerous offenses they committed as parents against their very own children and for which they were convicted. <u>Morgan</u>, 635 Fed. Appx. at 444-47 ("Morgan received a lenient sentence because of damage to his privileged status.    But his crime was a corrupt misuse of that very status.").    And that J███ is "dead" to Defendants is hardly surprising, nor a basis for lenience, given the "20 years of misery" they have collectively inflicted on him and his adopted siblings. A6426. Noticeably absent from the Court's consideration (and from Defendants' statements at sentencing) was any concern about the actual victims in this case, who are either dead or will continue to be haunted by this abuse for the rest of their lives.

---

[31]  In its discussion of this issue, the Court said that it was relying on materials that had never been disclosed to the parties, A6712, 6714, 6723, which violated Fed. R. Crim. P. 32(i)(1)(B), <u>see</u> <u>United States v. Baldrich</u>, 471 F.3d 1110, 1113-15 (9th Cir. 2006); <u>United States v. Alvarado</u>, 909 F.2d 1443, 1445-46 (10th Cir. 1990).

The Court also focused on John's loss of his military career, berating the
Government for arguing that John was "hid[ing] behind" his service in Iraq.
A6706-07, 6725; JJStR.   But that was a large part of John's defense—that he was
"halfway around the world" and did not know what was happening. A5794-805.
And as the Government explained at sentencing, being an allegedly "stellar soldier,"
A6705, did little to mitigate his five-year conspiracy to abuse and neglect
defenseless children living in his own home, A6654-58.

Entrusted to care for these three young children, Defendants instead abused
and neglected them, subjecting them to a combined 75 months of "pain and
suffering" over a five-year period, the effects of which will last a "lifetime." A6362,
6424.   Yet John was sentenced to no jail time and Carolyn received just 24 months,
see Kane, 639 F.3d at 1136; Irey, 612 F.3d at 1208-09, sentences they *might* have
received had they committed one act of abuse or neglect "on a single occasion"
toward one victim, Irey, 612 F.3d at 1209; see Merced, 603 F.3d at 224 n.15;
U.S.S.G. § 3D1.2 background.   Simply put, these sentences are plainly insufficient
and "did not properly account for" the seriousness of these offenses, the need to
promote respect for the law, and the need to provide just punishment. Ressam, 679
F.3d at 1090; see United States v. Hayes, 762 F.3d 1300, 1309 (11th Cir. 2014)
(rejecting sentence as substantively unreasonable where conduct lasted four
years—"there are bribes, and then there are bribes"); United States v. Musgrave, 761

67

F.3d 602, 608-09 (6th Cir. 2014) (one-day sentence was substantively unreasonable where court downplayed seriousness of offense by focusing on collateral consequences).

## C.    The Sentences Do Not Afford Adequate Deterrence.

Nor do these sentences "afford adequate" specific or general "deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).

In rejecting any consideration of other federal sentences, the Court proclaimed that "Army base cleanup" would play no role "in terms of the deterrence." A6725-26.   Even were that proper, abusive parents must be deterred generally, particularly because small and developmentally delayed children are "especially vulnerable" and cannot defend themselves or ask for help. United States v. Wright, 373 F.3d 935, 941-44 (9th Cir. 2004); see United States v. Drapeau, 110 F.3d 618, 620 (8th Cir. 1997); cf. United States v. Hooper, 566 Fed. Appx. 771, 773 (11th Cir. 2014) (unpublished) (reversing probationary sentence where court refused to consider deterrent effect on police officers who harm vulnerable victims); United States v. Grimes, 173 F.3d 634, 637 (7th Cir. 1999) ("Because criminals incur reduced risks and costs in victimizing [vulnerable] people, a higher than average punishment is necessary to deter the crimes against them.").

Nor was the need for specific deterrence "plain silly," as if the only issue was whether Defendants might someday "harm their own grandchildren." A6671, 6728.

Even if it were, the jury here found that Defendants had abused and neglected *their own three children* "over and over again," which severely undermines the Court's belief that Defendants posed no risk of recidivism. Kane, 639 F.3d at 1131-32. Indeed, Carolyn inquired about adopting another child, A791, and J███ was convinced that his parents "would do this all again if they were given the chance," A6425.   Thus, sentences of probation and 24 months do not further these § 3553(a)(2) goals either.   In fact, the Court's rebuke of the Government's concerns and its imposition of unreasonably light sentences can only convey to Defendants (and others who may share their parenting "philosophy") that their conduct might not have been so terrible after all. See Morgan, 635 Fed. Appx. at 450-51.

**D.    The Sentences Do Not Properly Account For The Nature And Circumstances Of The Offense Or The History And Characteristics Of Defendants.**

Nor do these sentences properly account for the "nature and circumstances of the offense and the history and characteristics of the defendant[s]." 18 U.S.C. § 3553(a)(1).   The history and characteristics of Defendants warranted far more significant sentences, not slaps on the wrists.   Both Defendants: were well-educated; were capable of taking care of children; and had received extensive training about parenting and child welfare prior to the adoptions.   Yet the Court emphasized that what Defendants were attempting to do was "brave"—"Just

remember that everybody.   If it had worked out, that would have been called brave." A6734.

Once again, that turns the evidence on its head.   Far from best-laid plans going awry, this was a five-year-long conspiracy, resulting in serious injuries, developmental delays, death, near-death, and permanent injuries.   The Court's comments ignored irrefutable evidence that Defendants repeatedly and brazenly misrepresented facts to state welfare workers to obtain and maintain custody of the children and repeatedly and purposefully misled doctors in order to hide their abuse. There is nothing "brave" about lying in order to obtain custody of young children, abusing them to the point of death and near-death, hiding a systematic campaign of abuse, and hindering their medical treatment through additional lies.

Similarly, there was nothing in Defendants' treatment of J▮▮▮▮ that deserved lenience either.   The Court noted "the pain in [their] faces" and credited them for how they "conducted themselves" during J▮▮▮▮'s testimony, claiming that this proved that they did not mount a smear campaign against him. A6722-24.[32] But "[i]nstead of accepting responsibility for [their] crimes, [Defendants] challenged the truthfulness of [J▮▮▮s] testimony at trial, calling [him] a liar, as

---

[32] The Court even blamed J▮▮▮ for hurting Defendants' feelings, remarking that he would need to "live with" the pain he caused them. A6723-24.

[he] mustered the courage to confront [his parents]." <u>Kane</u>, 639 F.3d at 1136; <u>see</u>

A2442 (J█████ explains difficulty of testifying and confronting his parents).

Indeed, Defendants' attacks on J█████ were merciless.   Defendants called

their eldest son a "liar," A2173-75, 2189, 2382, 2894, a "habitual liar," A5742,

5744, a "pathological" liar, A2486, a "disruptive" kid, A2245-46, 2252, "a

marionette," A5747-48; <u>see</u> A2894, and "lazy," A5747, and they called character

witnesses to further tarnish his reputation, A4917, 5059.   Even worse, they did all

this while essentially conceding that much of the conduct had occurred but was not

done "knowingly." <u>E.g.</u>, A5757-58, 5762-66, 5768-77.   The jury obviously rejected

that argument as well as their gratuitous attacks on J█████.[33]

Likewise, Defendants' statements at sentencing were unworthy of lenience.

Although Carolyn asked for lenience for John because she was the "primary

caretaker," the remainder of her statement heaped blame on her cousin, while

---

[33] The Court found that J█████ was "not credible" in "a lot of areas." A6694.
But if the jury did not credit J█████'s firsthand account of the abuse, and also did
not connect Defendants' actions to the injuries suffered by Defendants' adopted
children, as the Court claimed, <u>see</u> **Point IV.A.1**, then there would have been no
basis for the jury's guilty verdicts.   Indeed, Defendants all but dared the jury to
credit J█████'s testimony, claiming that it was the only evidence as to several
counts. A5765, 5768, 5776.   The jury accepted the invitation.   And the jury was
not the only one who found J█████ to be credible.   In the state family court
proceedings, Judge Mary Gibbons Whipple found that J█████ "was an entirely
credible witness . . . . He was sincere, forthright, clear, made eye contact, and
expressed appropriate emotion." A6399-400.

mourning the loss of her family. A6630-32.   She never apologized to any of her

adopted children, or J███████, and mentioned Joshua only to remonstrate that things

"may have been different" had she stood trial "after Joshua died." A6631.

Although John "extend[ed] a sincere apology to all of my children," he

simultaneously claimed, despite the jury's verdict, that "[w]ith all my heart I

believed that I was rearing all of my children with lawful discipline." A6632-33; see

JJPSR ¶ 239(a) (claiming that discipline was "lawful" but "frowned upon by

others").

        The *only* member of the family who expressed any remorse for Joshua's death

was J██████, who "still feel[s] guilty for not calling 911 or standing up and telling

someone sooner about what was happening because I think it might have saved his

life. . . .   I miss him everyday.   He is always in my thoughts." A6424-25.[34]   J███

███ was only *ten* when Joshua died.   The Court somehow took J██████'s statement

to mean that the whole family was "mourning" for Joshua and that C█████ and J██

"were coming into a house of mourning." A6694-95.   That had no support in

---

[34] That Defendants showed no remorse for Joshua was hardly surprising given the
trial testimony.   J██████ recounted the time in Spring 2008 that the two-year-old
Joshua fell down the stairs. A1994-2002.   Rather than comfort the crying child,
Carolyn expressed frustration that J██████ tried to comfort him, remarking that J███
███ "do[esn't] always have to come to his rescue." A1996, 2002.   As it turns out,
Joshua died the next day, A1810—neglected by his adoptive parents for the final
time, CJPSR ¶¶ 68-69.

Defendants' statements at sentencing.   Nor would J████ agree with the Court's

characterization: "The worst thing I could remember is that Joshua didn't just get hit

or beaten, he wasn't loved by them to any degree. . . . Now that I'm older I can see

things more clearly and I realize that he had no reason to keep living because he

didn't receive any emotional or physical nourishment." A6424-25.[35]

Simply put, the history and characteristics of Defendants were unworthy of

lenience where, among other things, they "denied [their] guilt, accused [their] child

of lying, [and] forced [their] child to relive [his] nightmare by testifying at trial."

Kane, 639 F.3d at 1137.   Far from showing "sincere regret," Defendants merely

"desire[d] to make the best of a bad situation." Ressam, 679 F.3d at 1092; see United

States v. Friedman, 554 F.3d 1301, 1309-10 (10th Cir. 2009) (lenience unwarranted

where defendant failed to accept responsibility or grasp the harm he had caused).

## E.   The Sentences Do Not Account For The Remaining § 3553(a) Factors.

Nor do these sentences properly account for the remaining § 3553(a)

factors—the Guidelines, § 3553(a)(4), and the need to avoid unwarranted

sentencing disparities, § 3553(a)(6).   The Court did not calculate the Guidelines,

---

[35] Nor did the Court's statement make any sense in the context of the trial
evidence, which showed that the Jackson household was running very smoothly
when J███ and C████ were taken in and that the girls looked healthy for months
thereafter. E.g., A775-89, 870-79, 1032-47, 1085-92.   In any event, "mourning"
seems unlikely to cause the selective abuse, neglect, and starving of only the adopted
children, as well as repeated lies to cover up that abuse.

did not seriously consider the facts which would have supported numerous

enhancements, and therefore did not explain why sentences so far below the

recommended Guidelines ranges were justified.

And these sentences do not avoid unwarranted sentencing disparities among

federal defendants, § 3553(a)(6), because the Court ignored other federal cases

charging child abuse, focusing instead on state sentencing policy and hypothetical

state sentences.   The only mention the Court made of federal sentences was to say

the Government was "satisfied" with a 20-year sentence for a defendant who

pleaded guilty to having sex with teenagers. A6728-31.   That a 20-year sentence

was imposed after a plea in that case, however, says nothing about whether the

probationary and 24-month sentences in this case, imposed after two lengthy trials,

created unwarranted sentencing disparities with other federal defendants convicted

of similar crimes. See United States v. Smith, 811 F.3d 907, 910-11 (7th Cir. 2016)

("Were Smith's crimes so slight a fraction of theirs?   In short, does the judge's

review of these cases provide *any* basis for thinking 14 months a proper sentence for

Smith?").

* * *

No reasonable sentencing court would have imposed sentences of probation

and 24 months for the reasons provided by the District Court.   By imposing such

lenient sentences, the Court trivialized these offenses, which involved: the abuse,

74

neglect, and starvation of *three defenseless victims* over a *five-year period*; repeated lies to get custody of the children and to cover up their abuse, which hindered proper medical care; the death of one toddler after he suffered a dizzying array of unusual and painful injuries; the repeated near-death of another toddler who was sodium-poisoned and denied water; and the specter of a toddler's being forced to steal food and drink from the toilet just to survive.   The Court also granted mercy where none was deserved—to experienced and educated parents who knew how to successfully raise children; showed no remorse for their actions; and smeared their son, who was courageous enough to testify at two separate trials.   Contrary to the Court's belief, expressed throughout trial and at sentencing, this was a real offense with real consequences—ones that will last lifetimes.   "Consequences count and probation [and 24 months] do[n]'t count enough in this case." Morgan, 635 Fed. Appx. at 451.   Because the sentences here do not satisfy the goals of sentencing and are unreasonably low, they must be reversed. E.g., United States v. Dautovic, 763 F.3d 927, 935 (8th Cir. 2014) ("When the totality of the circumstances is considered, a variance from the Guidelines range of 135 to 168 months' imprisonment to a 20-month sentence is unreasonably lenient."); McQueen, 727 F.3d at 1161 ("We simply hold that downward variances of more than 90% where one corrections officer brutalized more than five young prisoners and then lied about it, and another intentionally sought to conceal these serious crimes are unreasonable.").

<u>**CONCLUSION**</u>

For all of these reasons, this Court should vacate the judgments and remand

for resentencing.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney


By:  s/ JOHN F. ROMANO
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ   07102-2535
(973) 645-2866


Date:   June 16, 2016

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that I am an Assistant United States Attorney for the District of New Jersey, that I am filing the attached Brief for Appellant, and:

(1)  this brief contains 17,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and thus does not exceed the 17,500-word limit granted in this case;

(2)  this brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because it has been prepared using a Microsoft WORD 2010 word-processing system and it is in a proportionally-spaced typeface, namely Times New Roman, that is at least 14 points;

(3)  the text of the electronic PDF brief and appendix is identical to the text of the paper copies of the brief and appendix; and

(4)  The electronic PDF brief and appendix have been prepared on a computer that is automatically protected by a virus detection program, namely a continuously-updated version of Trend Micro OfficeScan, and no virus was detected.

_____

By: s/ John F. Romano
Assistant U.S. Attorney

Dated:   June 16, 2016

## CERTIFICATION OF FILING AND SERVICE

I hereby certify that on June 16, 2016, I caused the Brief and Appendix for Appellant to be filed with the Clerk of this Court by (a) electronic filing in the PDF form using the Circuit's electronic filing system, and (b) paper filing of an original and six paper copies of the Brief and four copies of the Appendix using postage-prepaid first-class mail.

I also certify that on June 16, 2016, I caused the Brief and Appendix for Appellant to be served:

[X] by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, on the following Filing Users:

Rubin M. Sinins, Esq.
rsinins@jawjw.com

Carol Gillen, AFPD
Carol_Gillen@fd.org

[X] by service of one paper copy by hand, on:

Rubin M. Sinis, Esq.
Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C.
505 Morris Avenue
Springfield, NJ 07081

Carol Gillen, AFPD
Federal Public Defenders Office
1002 Broad Street
Newark, NJ 07103

_____
s/ John F. Romano
Assistant U.S. Attorney

Dated: June 16, 2016