Nos. 16-1200 & 16-1201
(consolidated)

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

———————————

**UNITED STATES OF AMERICA**
**Appellant**

v.

**CAROLYN JACKSON and JOHN JACKSON,**
**Appellees**

Appeals from the Final Judgments in a Criminal
Case of the United States District Court for
the District of New Jersey (Crim. No. 13-290).
Sat Below: Honorable Katharine S. Hayden, U.S.D.J.

———————————

**CORRECTED REDACTED BRIEF FOR APPELLEE CAROLYN JACKSON**

———————————

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.
505 Morris Avenue
Springfield, New Jersey 07081
(973) 379-4200
*Attorneys for Appellee Carolyn Jackson*

**On the Brief:**

**Rubin M. Sinins, Esq.**
**Herbert I. Waldman, Esq.**

# TABLE OF CONTENTS

STATEMENT OF ISSUES                                                      1

STATEMENT OF THE CASE                                                    2

    A.    A Word About the Government's "Facts"                    2

    B.    Context of the Sentencing                                8

        1.    The Trial Judge Considered A Wealth of Material
            Far Beyond What Was Presented During the Trial        8

        2.    Understanding New Jersey Law Is Essential to
            Understanding The Sentence                           12

            a.    Definition of the Crime                         12

            b.    The relationship between the statute under
               which the defendant was charged and Title 9    13

            c.    New Jersey Sentencing Law                       14

        3.    Deliberate Strategic Choices Made by the Government
            Made It Impossible to Determine Which Injuries the
            Jury Found Had Been Inflicted by the Defendant       18

    C.    History and Characteristics of Carolyn Jackson           22

SUMMARY OF ARGUMENT                                                      24

LEGAL ARGUMENT                                                          26

I.    The District Court Correctly Determined That There Is No Federal
    Offense Sufficiently Analogous To Child Endangerment                 26

A.   The Court Considered The Parens Patriae Basis Of The New Jersey Statute                                                          27

B.   The Elements Of Child Endangerment Differ Significantly From Those Of Aggravated Assault                                        30

C.   The Court Recognized that Use of the Sentencing Guidelines Would Require Impermissible Judicial Fact Finding                     36

D.   The Court Recognized That Using The Guidelines Would Not Result In "Like Punishment" Required by the ACA                         41

II.   Even If The Court Erred In Finding That There Was No Analogous Sentencing Guideline, Any Error Was Harmless                     49

III.  The Trial Court Gave Appropriate Consideration to the §3553(a) Factors Resulting In A Sentence That Is Not Plainly Unreasonable  50

CONCLUSION                                                                                                                           62

# TABLE OF AUTHORITIES

## Cases

Apprendi v. New Jersey, 530 U.S. 466 (2000)      37, 38, 39

Blakeley v. United States, 542 U.S. 296 (2004)      38

Commonwealth v. Dorvil, 32 N.E. 3d. 861 (Mass. 2015)      29

Gall v. United States, 552 U.S. 38 (2007)      51

In re Winship, 397 U.S. 358 (1970)      39

Jones v. United States, 526 U.S. 227 (1999)      37, 38

Mullaney v. Wilbur, 421 U.S. 684 (1975)      39

N.J.Div. of Child Prot. & Permanency v. C.J., 2014 WL 3881311      9
(App.Div. 2014)

N.J. Div. Of Child Prot. & Permanency v. C.J., 2016 WL 4608231      54
(App.Div.2016)

N.J. Div. of Youth & Family Servs. v. P.C., 439 N.J. Super. 404,      27
109 A.3d. 235 (App. Div. 2015)

New Jersey Parole Bd. v. Byrne, 93 N.J. 192, 460 A.2d. 103 (1983)      16

State v. Cooper , 402 N.J.Super. 110, 952 A.2d. 1122 (App.Div. 2008)      15

State v. D.A.V., 176 N.J. 338, 823 A.2d. 34 (2003)      13

State v. Johnson, 166 N.J. 523, 766 A.2d.1126 (2001)      15

State v. Mosley, 335 N.J.Super. 144, 761 A. 2d. 130 (App.Div. 2000)      15

State v. N.I., 349 N.J.Super. 299, 793 A. 2d. 760 (App. Div.2002)     12

State v. Richardson, 208 N.J.Super. 399, 506 A.2d. 43 (App.Div. 1986)     15

State v. T.C., 347 N.J.Super. 219, 789 A.2d. 173 (App.Div. 2002)     18, 19

State v. Wilder, 748 A.2d. 444 (Me. 2000)     29

United States v. Bailey, 169 Fed. Appx. 815 (5th Cir. 2006)     32

United States v. Begin, 696 F.3d. 405 (3rd Cir. 2012)     42, 43

United States v. Bell, 993 F.2d 427 (5th Cir. 1993)     32

United States v. Boney, 769 F.3d. 159 (3rd Cir. 2014)     34

United States v. Boney, 2013 WL 1909404 (D.Del. 2013)     34

United States v. Booker, 543 U.S. 220 (2005)     38, 43, 47

United States v. Bungar, 478 F.3d 540 (3rd Cir. 2007)     51

United States v. Calbat, 266 F.3d 358 (5th Cir. 2001)     33

United States v. Centner, 116 F.3d. 473 (4th Cir. 1997)     32

United States v. Cothran, 286 F.3d 173 (3rd Cir. 2002)     33

United States v Dotson, 615 F.3d 1162 (9th Cir. 2010)     45

United States v. Garcia, 893 F.2d 250 (10th Cir. 1989)     42, 43, 45, 49

United States v. Gaskell, 134 F.3d. 1039 (11th Cir. 1998)     47

United States v. Grier, 475 F.3d 556 (3rd Cir. 2007)     37, 50

United States v. Irey, 612 F.3d 1160 (11th Cir. 2010)     60

United States v. Jones, 531 F.3d 163 (2nd Cir. 2008)                    62

United States v. Kane, 639 F.3d. 1121 (8th Cir. 2011)                53, 60

United States v. Kelly, 989 F.2d 162 (4th Cir. 1993)                    42

United States v King, 824 F.3d 313 (4th Cir. 1987)                     45

United States v. Lewis, 802 F.3d. 449 (3rd Cir. 2015 (en banc)   18, 20, 39

United States v. Loften, 465 Fed.Appx. 294 (5th Cir. 2010)             31

United States v. Maryces, 557 F.2d 1361 (9th Cir. 1977)                46

United States v Martinez, 274 F.3d 897 (5th Cir. 2001)              42, 45

United States v. McEnry, 659 F.3d 893 (9th Cir. 2011)                  33

United States v. Nappi, 243 F.3d 758 (3rd Cir. 2001)                   11

United States v. Norquay, 905 F.2d. 1157 (8th Cir. 1990)              47

United States v. Osborne, 164 F.3d 434 (8th Cir. 1999)                33

United States v. Pinto, 755 F.2d. 150 (10th Cir. 1985)             46, 47

United States v. Press Publishing Co., 219 U.S. 1 (1911)              15

United States v. Rakes, 510 F.3d 1280 (10th Cir. 2007)               33

United States v. Reed, 734 F.3d 881 (9th Cir. 2013)                   42

United States v Sharpnack, 355 U.S. 286 (1958)                       45

United States v. Smith, 574 F.2d. 988 (9th Cir. 1978)                46

United States v. Truax, 69 Fed. Appx. 219 (6th Cir. 2003)            32

United States v. Vaughan, 682 F.2d. 290 (2nd Cir. 1982)        46, 47

Washington v. Recuenco, 548 U.S. 212 (2006)        38

**Statutes**

11 Del.C. §1102        59

11 Del.C. §4205(b)(7)        59

N.J.S.A. 2C:3-8        18

N.J.S.A. 2C:5-2        24

N.J.S.A. 2C:24-4        *passim*

N.J.S.A. 2C:24-4a        *passim*

N.J.S.A. 2C:43-6a(3)        18

N.J.S.A. 2C:43-6a(4)        14

N.J.S.A. 2C:44-1a        50

N.J.S.A. 2C:44-1f(2)        17

N.J.S.A. 9:6-3        13, 14

N.J.S.A. 9:6-8.10a        8

N.J.S.A. 9:6-8.21        18, 19, 20

18 Pa.C.S.A. §4304        59

101 Pa.Code §15.66(a)(4)        59

18 U.S.C. § 13(a)        24

18 U.S.C. § 113                                   31, 35

18 U.S.C. § 113(a)(5)                                  28

18 U.S.C. § 113(a)(6)                                  36

18 U.S.C. § 113(a)(7)                                  36

18 U.S.C. § 1513(a)(1)(B)                              34

18 U.S.C. § 3553                  25, 26, 31, 43, 49, 50, 58

18 U.S.C. § 3553(a)                          50, 51, 58, 62

18 U.S.C. § 3553(a)(1)                                 51

18 U.S.C. § 3553(a)(2)(B)                              56

18 U.S.C. § 3553(a)(2)(C)                              56

18 U.S.C. § 3553(a)(4)(A)(i)                           49

18 U.S.C. § 3553(a)(5)(A)                              57

18 U.S.C. § 3624(b)(1)                                 42

18 U.S.C. § 3661                                       53

18 U.S.C. § 3742(b)(4)                                 25

**Court Rules**

Fed. R. Crim Proc. 32(i)(1)(B)                         11

**Sentencing Guidelines**

U.S.S.G. § 2A 2.2(b)(3)                                36

U.S.S.G. § 2X 5.1                                                                          26

U.S.S.G. § 5H 1.11                                                                         57

U.S.S.G. § 6A 1.3                                                                          21

U.S.S.G. § 1.3(a)                                                                          21

**Other Authorities**

Government's Brief, <u>U.S. v. Loften</u>, 2010 WL 6190563                                 32

Model Penal Code, Section 3.08(1) (1985)                                                  18

New Jersey Constitution, Article V, § II, par. 2                                          16

*Pressler & Veniero*, Current N.J. Court Rules, (Gann) 2017                               15

## TABLE OF ABBREVIATIONS

"CJSA"      refers to the Supplemental Appendix filed on behalf of Carolyn Jackson

"Gb"        Refers to the brief filed for Appellant the United States of America

## STATEMENT OF ISSUES

1.  Did the District Court err by finding there was no federal offense analogous to child endangerment?

2.  If so, was the error harmless?

3.  Did the District Court err by refusing to find facts which were elements of the offenses which the Government argued were analogous offenses after the charge to the jury, at the Government's request and over the defendants' objection, failed to submit those facts for the jury's consideration?

4.  Did the District Court err by interpreting the "like punishment" provision of the Assimilative Crimes Act so as to minimize intrastate sentence disparity?

5.  Does the record as a whole reflect that the District Court gave rational and meaningful consideration to the 18 U.S.C. § 3553 factors?

6.  Is the sentence imposed by the District Court plainly unreasonable?

## STATEMENT OF THE CASE

### A.    A WORD ABOUT THE GOVERNMENT'S "FACTS"

From the outset of its brief, the Government presents inflammatory allegations as "facts" upon which it asks this Court to review the sentence imposed below. As Judge Hayden stated, many of those "facts" are merely the Government's contentions as to what the evidence showed. These contentions are untenable because the Government resisted defendants' attempts to have the jury decide whether it believed its narrative of events.

Judge Hayden clearly rejected that narrative.[1] After presiding over the trial of the matter twice and reviewing thousands of pages of documents, Judge Hayden did "not accept the government's narrative", A6697, noting that the doctors who treated the children while they were in the Jacksons' care had found no abuse. A6691.

Without re-trying the entire case, it should be noted, **by way of example**:

•While the Government's expert opined that J█████'s bile duct perforation was caused by having been struck with a sharp object (Gb58), Dr. Mantor, who performed the surgery to repair the perforation, explained that for a blow to the abdomen to strike the common bile duct, force would have to be transmitted through

---

[1] It is based largely on testimony of J████████ Judge Hayden noted "there are a lot of areas in which J█████ is not credible and has his own very high personal stake in this situation." A6694.

other organs, which would have sustained injury. He saw no evidence of such injury and concluded that the perforation was "spontaneous". A4642-4648.

•The Government sought to blame J██████'s fractured skull on defendants Gb5. J██████ was taken to OU Hospital after falling. While the Government's expert opined that the fall could not have caused the fracture and it was at least three weeks old when J██████ was admitted to the hospital, A3519-3521, Dr. Naina Gross, the pediatric neurosurgeon who attended J██████, testified that the fracture was consistent with a fall as described. A4994, and the presence of a subcutaneous hematoma indicated that the injury could not have occurred three weeks earlier. A4982-83. Furthermore, J██████'s pediatrician testified that he examined J██████ one week before his admission, found no evidence of a skull fracture and had no concern regarding abuse. A2765-2769.

•The Government claims that J██████ had a fractured spine. Gb5. Dr. Mark Fergerson, an attending physician at OU Hospital, explained that neurosurgeons concluded that there was no spine fracture, but rather spina bifida occulta. He attributed the fracture diagnosis to "some motion artifact...some movement which made the studies more difficult to interpret". A5200-5201. Neither J██████'s pediatrician, nor Cheryl Stover, who made home visits for the Sooner Start program, A4709, reported a spine injury.

3

• The Government claims that C███'s pediatrician in New Jersey, Dr. Marty Sweinhart, was "shocked" at the condition of C███'s skin when she first saw her, immediately after returning from Indiana. Gb12. However, Dr. Courtney Demetris, a pediatrician and Medical Director of the Child Protection Team at the hospital in Indiana where C███ was treated for her first hypernatremic episode, testified at the first trial[2] that marks on C███'s body were consistent with eczema. CJSA027. When child welfare workers asked for her input after C███ was hospitalized for the second hypernatremic episode, Dr. Sweinhart wrote a letter indicating that she had seen no evidence of abuse. A1326-1331.

• The Government's expert claimed that, when C███ was admitted to a New Jersey hospital on April 15, 2010, an x-ray determined that she had suffered a fractured arm six weeks to three months earlier. A3436. This was described as a painful injury which would have caused her to cry when the arm was moved. A4152. In dating the fracture, the Government's expert offered that it could not have been a "birth fracture". Although he did not testify at trial, Judge Hayden knew that DYFS[3] had sent x-rays of C███'s humerus to Dr. Mark Finkelstein, a physician at

---

[2] She did not testify at the second trial.

[3] DYFS, the Division of Youth and Family Services, investigates child abuse allegations in New Jersey. It is now known as the Division of Child Protection and Permanency.

Nemours/Alfred I. DuPont Hospital for Children in Wilmington, Delaware. He concluded that the humerus fracture was considerably older than the dating provided by the Government's expert. CJSA052-053. It may, indeed, have been a birth fracture. Moreover, during part of the relevant period, C▮ was hospitalized in Indiana. For the remainder of the time, she was regularly seen by Dr. Sweinhart. A1392. There was no mention of this injury. Furthermore, upon John Jackson's return from Iraq in late February 2010, the Jackson children stayed with the Stahrs, family friends, for several days. Sandra Stahr recalled that C▮ seemed to have no difficulty moving her arm. Contemporaneous photographs showed her engaging in typical childhood activities. A5044-5046.

·C▮ was a small child. In an effort to supplement her diet, defendant mixed her formula with cow's milk instead of water. According Dr. Howard Corey, the pediatric nephrologist who treated C▮ in New Jersey, the effect would be to introduce four times the amount of sodium into the child's system. A660-664.[4] Until cross-examined at trial, that doctor was unaware that C▮'s discharge summary from the Indiana hospital showed the presence of granular casts, a possible indication of a kidney injury. A702. The symptoms C▮ exhibited in Indiana were consistent

---

[4] The Government refers to "sodium-laden hot sauce", Gb10, in an apparent attempt to imply that it was the cause of C▮'s hypernatremia. In fact, Dr. Corey testified that he had "no idea" how much sodium was in hot sauce, A676.

with acute tubular necrosis, A679, a condition the doctor never considered when making his diagnosis. A685-686. Once she returned to New Jersey, a test to see whether her kidney had recovered from its condition in Indiana was never run. A1393.

The jury was never asked to resolve these conflicting narratives.[5] Judge Hayden did not find the Government's experts "entirely unbelievable", but was clearly more impressed with the "very powerful part of this case" that the children's treating doctors had found no abuse. A6690-92.

This is not the first time the Government has tried to pass off allegations as "facts". The Government admitted that it wrote the statement of facts contained in the Presentence Report (PSR), A6072, and did so for an improper purpose. It acknowledged that this court would view the PSR "as a summary of what happened" and "would look at it for sentencing purposes primarily." A6073.

Judge Hayden found that the section addressing "the offense conduct was admittedly written by the government and that's inappropriate." A6738. Judge Hayden stated that she would not rely on the facts contained in the PSR, A6090, and ultimately struck over 300 paragraphs which were found to be "an inappropriate

---

[5] Considering the foregoing, the Government's contention that "[d]efendants provided no contrary expert testimony or rational explanation" for the children's conditions (Gb61) is, as Judge Hayden found, simply wrong.

narrative" regarding the offense because "[i]t was argument", not facts. A6739. While acknowledging Judge Hayden's ruling, Gb43, n.19, the Government disregards it and repeatedly cites some of the very paragraphs that were stricken. Gb6-8, 72 n.34.

Included in the Government's "facts" are its allegations about J████'s death. Although the Government twice notes that the Court excluded all references to his death.[6] Gb7 n.2; Gb17 n.8. At sentencing, Judge Hayden admonished the Government ("I do not believe that the government has a right to ask me to sentence as if the parents contributed to the death of J████...[T]he government walked away from proving a death case and couldn't get an expert to opine that they caused his death and rather backdoor that into this case", A6695, those stricken allegations are presented as "facts" to this Court. The Government has the audacity to argue, in the face of Judge Hayden's ruling, that the "Defendants contributed to his death" .Gb45, 54, 75.[7]

When striking the Government's narrative from the PSR, Judge Hayden opined that "there's a real problem saying that this is what was proven without judicial factfinding nailing it down because that's not what a jury found." A6738-39. In

---

[6] Reference by the Government to J████'s death had previously caused a mistrial.

[7] As the Government acknowledges, the County Medical Examiner determined that J████ died of natural causes. The body could not be exhumed or re-examination since it had been cremated. Gb7-8 n.2.

evaluating the legal issues presented by this appeal, this Court cannot rely upon the government's "facts" any more than Judge Hayden could.

## B.     CONTEXT OF THE SENTENCING

To understand the sentence imposed by Judge Hayden, it is necessary to understand the context within which certain Guidelines, Sixth Amendment and factual issues arose.

### 1.     The Trial Judge Considered A Wealth of Material Far Beyond What Was Presented During the Trial

Judge Hayden said, "I sure as shooting know a lot about this case. I presided over two jury voir dires, both accompanying trials, a mistrial." A6715. She referred to the fact that she had reviewed "a ton of material in this case." A6111-12. Although a trial judge always has a unique perspective on the facts of a case, that perspective was enhanced here for several reasons.

**First**, because the Government's case was based largely on materials generated by DYFS, much of the potential discovery was protected by statute, N.J.S.A. 9:6-8.10a, and could be released only after in camera review.[8] The Government "provided to the Court...all of the materials that we had received from the New Jersey Attorney General's Office that were generated during the litigation in this civil matter in the

---

[8] Judge Hayden referred to having received "four disks that the government had prepared." A6110.

8

family court." A6110. They included medical records, psychological interviews, social work interviews, school records, records from the New Jersey child welfare agency (including case worker notes), and legal briefs, CJSA006-010, "a record exceeding 9000 pages of documentary evidence and transcripts." N.J. Div. Of Child Prot. & Permanency v. C.J., 2014 WL 3881311*1 (App.Div.2014).

Judge Hayden noted that she had issued 79 orders in connection with the case including "the release of records held by schools, therapists, and child protective services of multiple states". A6713-14. This process not only immersed the Court in the facts of the case at an early stage, but also enhanced its ability to understand the trial proofs as they unfolded.

Additionally, the Court had the benefit of the lengthy decision of the Superior Court, Appellate Division which affirmed the termination of the defendants' parental rights as to three of their children, but reversed the termination of parental rights as to two others. N.J.Div. of Child Prot. & Permanency v. C.J., supra.

**Second**, because there was a mistrial, the Government presented most of its case twice. But, there were some witnesses from the first trial who did not testify at the re-trial. Judge Hayden heard testimony from two DYFS workers at the first trial, one of whom did not testify at the second trial. After observing the demeanor of these witnesses during the first trial, Judge Hayden remarked that "we may be dealing with

witnesses who have a bias" and ordered the witnesses' personnel files be turned over for *in camera* inspection. CJSA032.[9]

Judge Hayden also heard the testimony of Dr. Demetris, the pediatrician from Indiana, and Margaret Surbey, of the Indiana DCS, who testified regarding C██, J██, and their mother, Brittany Woods.[10] Neither of these witnesses testified at the second trial.

**Third**, the Court reviewed extensive psychological reports regarding the defendants and their children which had been generated during the Family Court proceedings. A6109-6111. Furthermore, before the first trial, the Government unsuccessfully sought to close the courtroom during J█████'s testimony based upon a report from his therapist. CJSA055-057. These reports gave the Court a unique understanding of the defendant.

---

[9] The disciplinary history of the witness was turned over to the defense. CJSA033. Judge Hayden outlined the three mistrial motions that were made during the testimony of DYFS witnesses. CJSA31-32.

[10] Surbey testified about J██'s placement with Allesha Collins, a relative of Carolyn's, for two years before she was placed with the Jacksons. CJSA020. After C██ was removed from the Jackson home in April 2010, she lived with Collins and her fiancee who, at first unknown to Indiana DCS, was a convicted child molester. CJSA024. While in that home, C██ was the victim of improper sexual contact by Collins' adopted son, CJSA025, and physical abuse by Collins. CJSA034-035. She was eventually removed from that home. While J██ and C██ showed signs of emotional trauma, Judge Hayden found that this was "not just attributable to the Jacksons." A6711-12.

**Fourth,** because the victims were minors, the Court reviewed much of the evidence subpoenaed during both trials <u>in camera</u>. It was clear from the outset that not everything the Court reviewed <u>in camera</u> would be turned over to the parties. Therefore, the Court was necessarily aware of some facts about which the parties were unaware.[11] However to claim that the "Court said it was relying on materials that had never been disclosed to the parties", Gb66 n.31, is a stretch (e.g. "I have reviewed records...that I have not turned over", A6712). After <u>United States v. Nappi</u>, 243 F.3d 758 (3rd Cir.2001), Judge Hayden was undoubtedly aware that reliance on undisclosed material is not permitted. The Court's statement merely emphasizes the fact that it possessed an extraordinary amount of material relevant to defendants and their family.

**Fifth,** Judge Hayden had not only heard the Government's experts testify, but also had their full reports. The Court was not favorably impressed with the Government's experts.

Despite the extensive briefs in this case, it is virtually impossible for an appellate court to replicate Judge Hayden's understanding of the issues relevant to sentencing without reviewing the materials which she had reviewed.

---

[11] Neither party objected to such statements. 243 F.3d at 761. It is not claimed that the alleged violation of Fed. R. Crim. P. 32(i)(1)(B) was prejudicial to either party.

**2.    Understanding New Jersey Law Is Essential to Understanding The Sentence**

**a.    Definition of the Crime**

The fact that New Jersey does not have a stand-alone child endangerment statute[12] caused significant problems during trial and at sentencing. A major issue which arose in the context of both the jury instructions and at sentencing, arises from the failure of Title 2C to provide adequate guidance as to the elements of the offense of child endangerment. Judge Hayden recognized "that we are dealing with a less than clear statute" A6688, one that is "very unsatisfactory...really a morass" A6580. As discussed infra, a central question was what degree of harm is necessary to sustain a charge of child endangerment.[13]

In State v. N.I., 349 N.J.Super. 299, 316, 793 A.2d. 760, 770 (App.Div. 2002), the court observed that,

> The imprecision of the Title 9 definitions incorporated into *N.J.S.A.* 2C:24-4a, which caused the [Criminal Law Revision] Commission to be "not happy" and to recommend the statute only "[w]ith hesitancy," has come home to roost in this case. It would, of course, be best if *N.J.S.A.* 2C:24-4a was self-contained with its own appropriate and precise definitions.

---

[12] It incorporates definitions from Title 9 of the New Jersey statutes.

[13] The history of the problems associated with the statute was discussed in the defendant's Sentencing Memorandum. A6152-54.

12

The imprecision of the definitions caused problems related to the jury instructions which later reappeared at sentencing.

### b.    The relationship between the statute under which the defendant was charged and Title 9

New Jersey has, in effect, a duplicate child endangerment statute. When Judge Hayden referred to N.J.S.A. 2C:24-4a as "unsatisfactory, not only to us who struggled with it, but, to the Supreme Court in the person of Justice Albin..." A6580, she referred to Justice Albin's concurring opinion in State v. D.A.V., 176 N.J. 338, 823 A.2d. 34 (2003). Justice Albin explained New Jersey has "two identical criminal statutes" under which an abusive parent can be charged. One is a second degree offense and one a fourth degree offense.

> [T]he same conduct is proscribed in the same language; however, when prosecuted pursuant to N.J.S.A. 2C:24-4a, a defendant is exposed to a five- to ten-year state prison term, and when prosecuted pursuant to N.J.S.A. 9:6-3, a defendant is exposed only to an eighteen-month prison term. In that respect, it appears that those provisions are unique in the New Jersey Statutes Annotated.

Justice Albin noted that the statutory structure invites "suffering widely disparate sentences under those two identical statutes". 176 N.J. at 339, 823 A.2d at 34, when prosecutors are permitted "at their whim [to choose] whether to charge between identical child abuse and neglect statutes."176 N.J. at 342, 823 A.2d. at 36.

13

The anomaly which troubled Justice Albin was considered when the defendant was sentenced. In a New Jersey court, Carolyn Jackson could just as easily been prosecuted for a fourth degree offense under a statute, N.J.S.A. 9:6-3, with a maximum exposure of eighteen months.[14]

Thus, when the Government argues that "the New Jersey legislature decided that endangering the welfare of a child is a serious offense, grading it as a second degree felony" .Gb 39, it is telling only half the story. Judge Hayden knew the entire story.

c.    **New Jersey Sentencing Law**

Another problem was the Government's lack of familiarity with New Jersey sentencing law and practice, A6730, thus leading to the Court's characterization of the sentence for which the Government advocated as "outrageous". A6728.[15]

Judge Hayden recognized that, in order to give effect to the fundamental principle of the ACA that a crime under that statute is "punishable only **in the way and to the extent** that it would have been punishable" if committed on non-federal

---

[14] There is a presumption of non-incarceration for a first offender convicted of a fourth degree crime. N.J.S.A. 2C:43-6a(4) .

[15] "Nineteen years [the Government's requested sentence] for Carolyn Jackson for this? Are you kidding me?...[G]ive everybody a break and let's get real." A6729. The Government argues that the aggravated assault guideline should have been used in sentencing the defendant.

property, United States v. Press Publishing Co., 219 U.S. 1, 10 (1911) (emphasis added), it was necessary to consider the actual time the defendant will serve. A6730.

In New Jersey, "the basic sentencing issue is always the real time defendant must serve, and we have always recognized that real time is the realistic and practical measure of the punishment imposed". State v. Cooper , 402 N.J.Super. 110, 116, 952 A.2d. 1122, 1126 (App.Div. 2008); State v. Mosley, 335 N.J.Super. 144, 157, 761 A.2d. 130, 136 (App.Div. 2000) . Thus, as Justice (then Judge) Coleman, in language later quoted with approval in State v. Johnson, 166 N.J. 523, 541, 766 A.2d. 1126, 1137 (2001), explained, "the period of actual imprisonment before being released on parole is the **real sentence**." State v. Richardson, 208 N.J.Super. 399, 413-414, 506 A.2d. 43, 51 (App.Div. 1986) (emphasis added).

The "real sentence" is found in the State Parole Board Parole Eligibility Tables[16] which provide "a fair and practical indicator of the likely actual custodial time for those defendants who get full credit for good time, work time, and minimum custody time." *Pressler & Veniero*, Current N.J. Court Rules, Comment R. 3:21-4[10] (Gann 2017). Thus, when a judge sentences a defendant to a five year term, no one expects the defendant to serve five years. Referring to her time as a State court judge,

---

[16] The relevant Parole Eligibility Table was submitted as part of the defendant's objections to the PSR. CJSA149.

Judge Hayden recalled, "...I sat there and I gave sentences and I said five years of which you will do X before your parole eligibility date comes." A6730.

This analysis is the result of the interplay between the New Jersey Constitution and significant legislative changes adopted in the late 1970's which were discussed at sentencing. A6594-96. Unlike the federal government, New Jersey could not abolish parole because it has a "State-guaranteed 'system for the granting of parole'" under Article V, § II, par. 2 of the New Jersey Constitution. New Jersey Parole Bd. v. Byrne, 93 N.J. 192, 204, 460 A.2d. 103, 109 (1983). Parole reform in New Jersey made "setting the parole eligibility date...a judicial responsibility to be exercised at the time of sentencing..." 93 N.J. at 204-205, 460 A.2d at 109. It "eliminated the conventional parole discretion relating to adequacy of punishment, and transferred it substantially to the judiciary as a function of its sentencing authority." 93 N.J. at 205, 460 A.2d. at 110.

Thus, the Government's reference to the Court's "take on state parole practices", a "very generous release date", Gb50, a "hypothetical parole release", Gb22-23, and a date when Judge Hayden "assumed" the defendant would be eligible for parole and "guessed" that she "would be granted that relief", Gb51, displays an unfamiliarity with New Jersey law. Judge Hayden understood how New Jersey law views the "real sentence" and applied that concept.

16

Judge Hayden was particularly well-qualified to implement the ACA's requirement of "like punishment" because, as she noted, in federal courts, child abuse cases are "a rarity here...because we just haven't had a case like this." A6687.[17] Judge Hayden is not only an experienced federal judge and former federal prosecutor, but also served as a state court judge, including many years of service in the Family Court. A6579-80. She had not only sentenced defendants under the New Jersey Code of Criminal Justice, A6716; A6730, but had developed expertise in adjudicating cases under Title 9, the statute concerning abuse and neglect of children. Judge Hayden drew upon this experience when fashioning an appropriate sentence in which the defendant would serve a roughly equivalent amount of time as she would have had she been convicted in a state court.

Judge Hayden was also familiar with the sentencing options available to a judge under Title 2C. These include N.J.S.A. 2C:44-1f(2) which permits the court, if it is "clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demand", to sentence a defendant "to a term appropriate to a crime one degree lower than that for the crimes for which

---

[17] At defendant's arraignment, the Government characterized this case as presenting "novel issues of law and fact that are very unusual to be in federal court." CJSA003. The Government acknowledged that there had not been a child abuse case prosecuted under the ACA in New Jersey. A6680.

[s]he was convicted". In this case, as a third degree offense. The term for a third

degree offense is between three and five years. <u>N.J.S.A.</u> 2C:43-6a(3). For a first

offender, the translates to a period of incarceration for about nine to twelve months.[18]

### 3. Deliberate Strategic Choices Made By The Government Made It Impossible To Determine Which Injuries The Jury Found Had Been Inflicted By The Defendant

As this Court recognized in <u>United States v. Lewis</u>, 802 F.3d 449 (3rd Cir.

2015)(en banc), there is an interrelationship between how the jury is charged and how

a defendant may be sentenced. Judge Hayden articulated that interrelationship when

the jury instructions were discussed.

The defendant and the Government had a sharp disagreement as to the type of

harm needed to sustain a conviction for endangering the welfare of a child. The

defendant contended that the use of corporal punishment is a parental choice and that,

while one person may not normally strike another, it is not a crime for a parent to use

force to discipline a child. A parent may do so as long as the punishment does not risk

or cause serious injury. <u>N.J.S.A.</u> 2C:3-8; Model Penal Code, Section 3.08(1) (1985).

Thus, the jury should be advised of the definition of "abused or neglected child"

contained in <u>N.J.S.A.</u> 9:6-8.21 or, alternatively, the language approved in <u>State v.</u>

---

[18] A first offender sentenced for a second degree crime (five to ten years) would serve between twelve and twenty-three months.

T.C., 347 N.J.Super. 219, 239-240, 789 A.2d. 173, 186 (App.Div. 2002) ("Abused or neglected child means a child...whose parent or guardian...inflicts...physical injury...which causes or creates a substantial risk of protracted impairment of physical or emotional health").[19] The defendant even suggested giving the jury special interrogatories on which it would report on the degree of harm it found.[20]

The Government argued that N.J.S.A. 9:6-8.21 is irrelevant because the manner in which N.J.S.A. 2C:24-4a is constructed gives it options regarding how to charge a defendant. The Government's position was that it was within permissible prosecutorial discretion to avoid the language of T.C. and of N.J.S.A. 9:6-8.21 by simply not including reference to that statute in the indictment.

The Court agreed with the Government, finding that "the government in charging had the right to pick and choose among" the various portions of Title 9 which are incorporated into N.J.S.A. 2C:24-4 and not bring a charge under N.J.S.A. 9:6-8.21, which "clearly puts a higher burden" on the Government. The Court determined that "the government came upon these events thoughtfully" and "walked

---

[19] The Government overlooks this suggested alternative language when discussing the defendants' requested instruction. Gb39.

[20] Defense counsel suggested use of a "special interrogatory" which would allow the jury to decide whether the Government had proven that defendants caused substantial harm to any of the children. A5468-5470. The Government's contention the defendant had rejected that proposal is incorrect. Gb 38.

away from [N.J.S.A. 9:6-] 8.21 in its proposed charge." A5475-78. The result was

that jury was never asked to find the extent of the injuries suffered by the children.

That decision "gained constitutional significance when the District Court sentenced"

her. United States v. Lewis, supra, 802 F.3d at 460-461 (concurring opinion).

The impact its position would have on sentencing was anticipated at trial.

> If the government prevails, in terms of not adding this definition of substantial harm to the endangerment that's charged then we may have an issue coming up, should there be a conviction, as to the extent of culpability, but the government will have culpability. So we are talking about liability. We're not talking about sentencing. A5475.

Thus, when the Government asked the Court to sentence the defendant as if the

jury had found her responsible for the most serious conditions of the children, Judge

Hayden explained that "nowhere has the jury told us...how the acts [of defendants]

linked up with a particular medical condition of the children." A6690. The Court said

that "[t]he government rejected a jury charge that would define an abused or

neglected child as suffering the degree of harm that its arguing I should say happened

and that the child did suffer." A6576.

> That jury listened. And because it listened, I really wish I know [sic] what it found....I don't know the extent of harm. And I don't know whether the jury bought that all of these physical conditions that were explained to the satisfaction of medical doctors at the time the children were examined...are the result of massive, horrible, criminal,

sadistic abuse as a result of a five-year conspiracy to do
that. A6700-01

Judge Hayden had her "own perceptions of what proofs demonstrated in this
case" A6689, and she did "not accept the government's narrative" A6697[21]. She
concluded that sentencing must be based upon "what a judge sees and believes what
the evidence showed and what the jury found". A6698.

Judge Hayden was aware of the fact that defendant was prepared to present
experts who would refute those of the Government.[22] Defendant specifically
mentioned Dr. Finkelstein, the physician who reported on C████'s humerus fracture,
and an expert who would corroborate the opinion of Dr. Demetris regarding marks
on C████'s body. CJSA027.

At a post-trial motion on October 13, 2015, the defense, pursuant to USSG §
6A1.3(a) and Rule 32(i), indicated its readiness to produce experts with respect to
the causes of J████'s bile duct perforation and skull fracture. A6070-71. At
sentencing, Judge Hayden noted that the doctors who treated J████ for these injuries
testified that "no abuse occurred when J████ was hospitalized with his fall and with

---

[21] See A6714. The Court made specific reference to the evidence regarding J████
████'s head and bile duct injuries, his broken arm, and his skin condition. A6690-
93.

[22] Defendant had requested a hearing, pursuant to U.S.S.G. § 6A1.3, to present her
proofs. A6559.

his bile duct," A6690-93, and observed that she had "to cope with the fact...that the live doctors who touched these children during the time that the children were in [the Jacksons'] care...did not find what the government is saying was going on." A6691.

Defense experts proved to be unnecessary because, based on the trial testimony, Judge Hayden did not find the Government's theory regarding the cause of these injuries to be credible. "[T]he bottom line is, I do not accept the government's narrative." A6697.

The Government's tactical decisions, both before and during the trial, left uncertainty as to what the jury found defendant had done.

These issues all had implications for sentencing.

## C.    THE HISTORY AND CHARACTERISTICS OF CAROLYN JACKSON

We rely upon, and incorporate by reference, the Sentencing Memorandum submitted on behalf of Carolyn Jackson, A6119-31, with the following additions.

Brittany Wood's background was discussed at length in the first trial by Margaret Surbey, Director of the Indiana Department of Child Services. Her testimony included information regarding Brittany's placement in a residential "mental health and addiction treatment facility", CJSA017, and about Brittany's relationship with a drug user who she was living with when she got pregnant with her

first child, J████, CJSA018, and her prostitution. CJSA023.

With respect to Carolyn's use of cod liver oil, we direct the Court's attention

to the testimony of Dr. Mark Fergerson, a pediatrician who attended J████ at OU

Medical Center. He explained that J████ was diagnosed with having a pseudotumor

cerebri which is associated with hypervitaminosis A, a condition which can be caused

by the excessive intake of cod liver oil. According to OU hospital records, J████ had

been given cod liver oil on a daily basis until shortly before the fall in which his skull

was fractured. A5169-72.

## SUMMARY OF ARGUMENT

Defendant and her husband were charged with multiple counts of child endangerment based upon the Assimilative Crimes Act's ("ACA"), 18 U.S.C. § 13(a), incorporation of New Jersey statutes[23]. After conviction under the ACA, a defendant is "subject to a like punishment" as would be imposed under state law.

At the urging of the Government, and over the defendant's objection, the jury was __not__ charged that, in order to convict, they must find that the defendant inflicted substantial harm on a victim. The Government then argued that the defendant should be sentenced under the guideline for aggravated assault.

The Court rejected the Government's position and found that there was no federal sentencing guideline analogous to the child endangerment statute. The Court correctly reasoned that the elements of child endangerment differ significantly from those of federal assault statutes and the state statute was based on *parens patriae* jurisdiction not contained in federal law. The Court also expressed concern that, to sentence under the Guidelines would raise serious Sixth Amendment concerns given the jury charge. Finally, the Court found that the Guidelines sentence urged by the Government would violate the ACA's mandate of imposing "like punishment".

---

[23] Endangering the welfare of a child, N.J.S.A. 2C:24-4a; conspiracy, N.J.S.A. 2C:5-2.

Accordingly, the Court sentenced the defendant, under 18 U.S.C. § 3553, to imprisonment for 24 months.

Appeals of sentences "imposed for an offense for which there is no sentencing guideline" may only be taken by the Government when the sentence "is plainly unreasonable." 18 U.S.C. § 3742(b)(4). The sentence imposed by the Court, after considering the § 3553 factors, was not plainly unreasonable.

## LEGAL ARGUMENT[24]

### I. THE DISTRICT COURT CORRECTLY DETERMINED THAT THERE IS NO FEDERAL OFFENSE SUFFICIENTLY ANALOGOUS TO CHILD ENDANGERMENT

USSG §2X5.1 instructs sentencing courts,

> If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control...

It is undisputed that there is no express guideline addressing child endangerment. Judge Hayden articulated four reasons which supported the conclusion that there is no "sufficiently analogous" guideline to apply to a conviction for child endangerment.

1. There is no federal analog to the *parens patriae* jurisdiction which forms the foundation for the underlying state statute;

2. Elements of child endangerment are significantly different from those of assault under federal law;

3. Applying the Guidelines would require the Court to engage in impermissible fact-finding;

4. Application of the Guidelines would lead to an unjust result by resulting in a sentence which would not be "like punishment" as required by the ACA.

---

[24] Defendant adopts the arguments of co-defendant John Jackson.

26

**A.    The Court Correctly Considered The Parens Patriae Basis Of The New Jersey Statute**

Early in the case, the Government acknowledged that child abuse cases are rarely brought in federal court and none had been brought in the District of New Jersey.[25] As a result, the jurisprudence associated with such cases has been given little attention in federal courts.

Judge Hayden's careful and thoughtful analysis was informed by her experience as a Family Court judge. The Court began its analysis by recognizing that there is no federal analog to Title 9. That statutory section "is there to protect the children", A6580, and, in applying it, the Family Court exercises "parens patriae jurisdiction" A6581. The endangerment statute "incorporates that parens patriae jurisdiction in the rubric and the meaning of the definitions and the state crime we are trying to move." A6581. Judge Hayden's understanding of New Jersey law is sound.

In N.J.Div. Of Youth & Family Servs. v. P.C., 439 N.J.Super. 404, 412, 109 A.3d 235, 240-41 (App.Div. 2015), the court noted that a parent's "fundamental constitutional right to raise their children without undue interference from the State".... is tempered by the State's parens patiae responsibility to protect children

---

[25] Thus, the Government's concern about sentencing uniformity between Judge Hayden and a judge "down the hall", A6677, is fanciful. The judge down the hall will likely never preside over an ACA child endangerment case. As Judge Hayden observed, "This is one of a kind." A6729.

from serious physical and psychological harm...."The federal government has no parens patiae jurisdiction. That is why "this statute doesn't really fit with assault". A6583. Moreover, despite the fact that four counts in the indictment[26] contained allegations that the defendant "physically assaulted" a child, "assault" was never explained to the jury because it is not an element of child endangerment.

Title 9 balances "the rights of parents to discipline their kids with the outcome of the execution of that right to discipline their kids." A6582, by providing that conduct, which in another context would be an assault, is permissible under some circumstances. The Government ignores the profound differences between typical assaults and parental discipline.

An " 'assault' requires nothing more than...placing of the victim in reasonable apprehension of physical harm...." (Gb31). No injury is required (Gb39). When the victim of an assault is under 16 years old, an assault is punishable by imprisonment for up to one year. 18 U.S.C. § 113(a)(5). We daresay that parents commit this offense every day of the week in every state in the union.

"[A] privilege to use reasonable force in disciplining a minor child has long been recognized at common law" and "all American jurisdictions allow parents to use at least moderate or reasonable physical force when they reasonably believe that such

---

[26] Counts 1 (conspiracy), 3, 6 and 12. Gb25.

force is necessary to control their children." <u>Commonwealth v. Dorvil</u>, 32 N.E.3d 861, 867 (Mass. 2015), quoting <u>State v. Wilder</u>, 748 A.2d 444, 455 (Me. 2000). Thus, what would otherwise be criminal conduct is universally considered non-criminal when perpetrated by a parent upon a child.

When parents strike their child, the dividing line between what is criminal and what is permissible discipline is whether the amount of force employed was reasonable. That analysis is totally absent in the case of other assaults.

Having extensive experience in Family Court, Judge Hayden's view reflects a deep understanding of the issue of parental discipline which is totally lacking from the Government's analysis.[27] What that analysis lacks is the very heart of <u>N.J.S.A.</u> 2C:24-4, consideration of the parental relationship.

Judge Hayden thoroughly explored the elements of child endangerment. The jury had been instructed to examine "acts of cruelty" A6583. Specifically, "**unnecessarily** severe corporal punishment...inflicting **unnecessary** suffering or pain...habitually tormenting, vexing or afflicting", acts "of omission or commission whereby **unnecessary** pain and suffering is caused or permitted to be inflicted" and

---

[27] The Government's contention that Judge Hayden did not think the matter belonged in federal court is nonsense. Gb40. She recognized that a federal crime had been committed. A6584. She did, however, think that the Government's argument that salt and pepper flakes were "dangerous weapons" was "silly". A6589.

"exposing a child to **unnecessary** hardship, fatigue or [mental] or physical strains that may tend to injure the child's health or well being." A6583-84. The Court emphasized that the repeated use of "unnecessary" was included by the legislature in order to be "consistent with how people raise their kids and people discipline their kids." A6584. The statute "seems to tolerate some amount of pain and suffering" and "to tolerate severe corporal punishment" as long as it is not "unnecessary". A6584.

In the final analysis, the Court opined that "this case is about parental discipline" a concept for which there is no analog in the federal statutes. A6588.

> I don't find that the federal government's laws about assault cover that parental relationship...that infuses and is the basis and is the reason for the state's statute. I find that this is fitting a square peg into a round hole. A6588.

The recognition of the *parens patriae* basis of the child abuse statute was hardly "beside the point". Gb39. It is essential to understanding the nature of the offense that was prosecuted.

## B.    The Elements of Child Endangerment Differ Significantly From Those of Aggravated Assault

The Government's approach to this case is akin to a "bait-and-switch". It asked the jury to find one offense and the Court to sentence for another.

The Court found that utilizing the aggravated assault Guideline "offends fairness to allow the government to charge one thing and [with] a lower standard of

30

proof to prove something much harsher and come away with a sentence much greater than the jury verdict necessarily leads to." A6588. The Government conceded that elements such as the degree of harm to the victims, "are not elements of the crimes for which these defendants were convicted." A6460. Yet, the Government sought to have the Court "try to fit these particular facts and bunches of evidence into a guidelines analysis based upon a federal assault charge that was never charged to the jury and never even charged in the indictment as to J███ and J██." A6577. The alternative to sentencing under the Guidelines, in the Court's view, was to sentence under § 3553, because "I'm going to get there anyway." A6589.

The Court's analysis did not reflect a views on the entire "federal sentencing regime" as the Government contends. Gb43. Rather, it recognized that the Government's approach to sentencing in this case "offends plain fairness and does not produce justice". Id.

The only helpful case cited to the trial court was United States v. Loften, 465 Fed.Appx. 294 (5th Cir. 2010), in which the defendant was convicted of the assimilated crime of injuring a child under the Texas equivalent to N.J.S.A. 2C:24-4. The father argued that his conduct was not incorporated by the ACA because the federal assault statute, 18 U.S.C. § 113, applied to his conduct. The court rejected that argument.

An additional issue was whether the sentencing judge had "erred by failing to consider whether an analogous Guideline existed that could be used in determining [the defendant's] sentencing range." United States v. Loften, supra, at *1. The **Government contended that there was no federal analog** to the state's endangering statute because the elements of the two statutes were too disparate. It argued that "an analysis of relevant provisions of the Sentencing Guidelines reveals that there is no sufficiently analogous guideline for [the defendant's] assimilated offense." , U.S. v. Loften, 2010 WL 6190563 at *30-31. The court agreed that the error was harmless because there was "no analogous Guideline." United States v. Loften, supra, at *1.

Defendant relied upon the Government's position in Loften at sentencing. A6448. The Government took a position that was " 360 degrees different from the government's position in the Fifth Circuit in the Loften case...." A.6688-89.

The Government now says its position in Loften was wrong and places reliance upon two earlier Fifth Circuit decisions, United States v. Bell, 993 F.2d 427 (5th Cir. 1993) and United States v. Bailey, 169 Fed.Appx. 815 (5th Cir. 2006). In those cases, there was no contention that there was no analogous guideline, only that the wrong guideline had been used.[28]

---

[28] The Government also relies upon two other unpublished opinions, neither of which involved a claim that there was no analogous guideline. United States v. Centner, 116 F.3d 473 (4th Cir. 1997); United States v. Truax, 69 Fed.Appx. 219 (6th Cir. 2003).

In <u>United States v. Cothran</u>, 286 F.3d 173 (3rd Cir. 2002), this Court relied upon <u>United States v. Osborne</u>, 164 F.3d 434 (8th Cir. 1999) as to the standard of review of whether there is an analogous offense. <u>Osborne</u> explained that, in determining whether there is a sufficiently analogous offense, they "generally compare the elements of the defendant's crime to the elements of the federal offenses already covered by specific Guidelines to ascertain which plausible analogies exist for sentencing."[29]

The elements of child endangerment and those under the various federal assault statutes simply do not match up.

Child endangerment under <u>N.J.S.A.</u> 2C:24-4 does not require an assault. The Government argues that the indictment contained the term, but not the charge of, "assault".[30] Regardless of what the indictment says, an explanation of "assault" was not given to the jury because assault was not charged in the indictment and the **jury needed to find** neither assault nor battery because neither are required under the New Jersey statute.

---

[29] Other circuits agree. <u>United States v. Rakes</u>, 510 F.3d 1280, 1288 (10th Cir. 2007); <u>United States v. Calbat</u>, 266 F.3d 358, 363 (5th Cir. 2001); <u>United States v. McEnry</u>, 659 F.3d 893, 900 n.11 (9th Cir. 2011).

[30] The Government can only argue that four counts in the Indictment "sounded in 'assault'." Not that the counts charged assault. Gb29.

The Government's reliance on <u>United States v. Boney</u>, 769 F.3d 153 (3rd Cir. 2014), is wholly misplaced. There, defendant was charged with a violation of 18 U.S.C. § 1513(a)(1)(B), which "required the government to prove that the defendant knowingly or intentionally performed an act that constituted a 'substantial step' towards the murder of a government informant." <u>United States v. Boney</u>, 2013 WL 1909404*3 (D.Del. 2013). The jury acquitted Boney of obstruction of justice. However, the court used the guideline for obstruction of justice rather than that for attempted murder, for which he had been convicted. In <u>Boney</u>, both the statute, the indictment and the jury charge advised the jury that a finding of an attempt to murder was required to convict.

The federal assault statute and the New Jersey endangerment statute are different animals. When corporal punishment by a parent is the basis of an endangering charge, the prosecution must prove that it was "unnecessarily" severe or caused "unnecessary" pain. There is no such requirement under the federal assault statute which does not address corporal punishment employed by parents.

Moreover, the New Jersey statute requires that the defendant either have "a legal duty for the care of" the child or have "assumed responsibility" for the child. <u>N.J.S.A.</u> 2C:24-4a. That relationship is what raises the level of the offense to a second

degree crime under New Jersey law. That element is absent from any of the federal assault statutes. 18 U.S.C. § 113.

The Government is incorrect when it contends that, "the jury had to find that Defendants inflicted harm **and** acted cruelly". Gb35. The jury was instructed that one of the elements of child endangerment was that the "conduct would cause the child harm **or** would inflict cruelty upon the child" Gb33.[31] Judge Hayden noted that "cruelty" was defined in a way that was not limited to assaultive conduct. A6583. So, the defendant could have been convicted of "cruelty" by "inflicting...unnecessary suffering or pain, either mental or physical" or "habitually tormenting, vexing or afflicting" a child without causing any physical injury of consequence. A6010. The jury could have convicted based upon a finding that corporal punishment, inflicted upon Joshua for "innocuous shortcomings", Gb5, inflicted unnecessary pain, or was "vexing", without the necessity of finding any significant injury.

By the Government's logic, if a parent washes her child's mouth out with soap, the aggravated assault guideline would apply. A6241-6244[32] If a parent threatens a

---

[31] The "harm" referred to in the jury instructions was "harm that would make the child neglected". A6010.

[32] Such conduct is akin to forcing the ingestion of hot sauce. Even without a finding that any substantial harm was caused, by the Government's analysis, the total offense level would be level 26. A6290. For a first offender, the guideline sentence would be 63-78 months. That would be equivalent to what a defendant sentenced under New Jersey law would serve for a 16-19 year sentence.

child, even without " physical contact or bodily injury", the assault guideline would apply. Gb31, 37. These results defy common sense.

Child endangerment addresses how parents treat their children. It is wholly different than the more generalized harm addressed by federal assault statutes. Judge Hayden correctly found that neither the philosophy, the language, nor the elements of the child endangerment statute match that of the federal assault statute.

## C.    The Court Recognized That Use Of The Sentencing Guidelines Would Require Impermissible Judicial Fact Finding

Bolstering the Court's analysis was the fact that aggravated assault requires findings, the jury never made, of either "serious bodily injury", 18 U.S.C. § 113(a)(6), or "substantial bodily injury", § 113(a)(7). It is not so much that the Court felt that "the Government essentially asked for this result", Gb38, but rather that the Court warned of this result and the Government was satisfied. That is, the Government was satisfied until sentencing.

The Guideline for which the Government advocated[33] includes specific offense characteristics which the **Government argued against permitting** the jury to decide, such as the extent of bodily injury suffered by the victims (§2A2.2(b)(3)), which has traditionally been considered an element of the offense to be decided by the jury.

---

[33] The government conceded that the Guidelines did not apply to the five counts "of omission". (Count Two, Count Four, Count Seven, Count Eight, and Count Eleven). A6545-49; Gb25.

Jones v. United States, 526 U.S. 227, 235 (1999). As Jones explained, the extent of a victim's injuries "has traditionally been treated, both by Congress and by the state legislatures, as defining an element of the offense" of various grades of assault, Jones v. United States, supra. Assaults causing more serious injuries are subject to a greater degree of culpability and are thus "worthy of greater punishment". Apprendi v. New Jersey, 530 U.S. 466, 495. (2000).

Rather than engaging in an "attack [on] the factfinding role of courts at sentencing", Gb38, Judge Hayden recognized, and explained when the jury charge was being discussed, that the way in which the Court, at the Government's urging, structured the jury instructions would impact the possible sentence. Judge Hayden was guided by concepts of fairness and the principles contained in the Sixth Amendment.

While a sentencing court may find facts relevant to sentencing, it cannot find facts which are elements of the crime because the Fifth and Sixth Amendments give individuals "a right to demand that each and every element of the alleged crime be submitted to a jury and proved beyond a reasonable doubt before sentence is imposed." United States v. Grier, 475 F.3d 556, 562 (3rd Cir. 2007) (en banc). So, if it were appropriate to utilize the Guidelines, the Court could have considered such issues as abuse of trust or more than minimal planning because those facts have never

37

been considered to be elements of an offense which a jury is asked to consider. However, facts such as the severity of an injury to the victim or whether a dangerous weapon was used, have traditionally been recognized to be elements of the offense. Before these facts can be used to effect a defendant's sentence, they must be found by a jury beyond a reasonable doubt.

Jones foreshadowed the Court's decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000) and United States v. Booker, 543 U.S. 220, 261 (2005). It recognized that the degree of injury to a victim typically determines the extent of punishment to which a defendant is exposed. Jones found that to treat such a fact as one which the court can find by a preponderance of the evidence raises "grave and doubtful constitutional questions" 526 U.S. at 239.

Those questions were later answered in Apprendi, where the Court found that determinations of factors which are customarily characterized as elements of the offense must be found by the jury. In Booker, Justice Stevens described the "holding in Apprendi: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum **authorized by the facts established by...a jury verdict** must be admitted by the defendant or **proved to a jury beyond a reasonable doubt**". 543 U.S. at 244 (emphasis added). Stated another way in Washington v. Recuenco, 548 U.S. 212, 216 (2006), "In Blakeley [v. Washington, 542 U.S. 296

(2004)], we clarified that 'the statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" (emphasis in original).

As the Court explained in <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 697-698 (1975), "the criminal law...is concerned not only with guilt or innocence in the abstract but also with the degree of criminal culpability". The degree of culpability, and, in turn, the amount of punishment, is determined by the facts found by a jury. In <u>Mullaney</u>, the Court was concerned about a state's ability to "manipulate its way out of [the requirement of <u>In re</u>] <u>Winship</u>", 397 U.S. 358 (1970), which required the prosecution to prove every element of a crime beyond a reasonable doubt. That improper manipulation cannot be done by "redefin[ing] the elements that constitute different crimes, characterizing them as factors that bear solely on the extent of punishment." <u>Mullaney</u>, 421 U.S. at 698.

Applying that reasoning to this case, the analogous offense cannot be one for which the jury has not found a determinative fact. ***The defendant cannot be tried for a charge for which no significant injury is required and then be sentenced as if a finding of such harm had been made.*** This Court said as much in <u>United States v. Lewis</u>, <u>supra.</u> A defendant cannot be tried for one crime and sentenced for another. 802 F.3d at 454-455.

The Government appears to believe that a state can enact a generic assault statute and, upon conviction, ask the court to find the degree of injury to the victim as a "sentencing factor". Such an approach has been thoroughly discredited by the cases discussed.

Judge Hayden was not, as the Government implies, finding fault with the entire federal sentencing regime, Gb43, and did not "establish[] its own sentencing process". Gb46. What she did find is that the Government's strained, though "intellectually very elegant" argument, would not result in justice. A6576.

Judge Hayden recognized that using the Guidelines would raise clear Sixth Amendment issues. The Court could not know whether the jury believed that the defendant had caused the injuries to the children.[34] Judge Hayden expressed her "concern...that the Court is being presented with evidence that was not considered and voted on by the jury", A6488-89, and that the Government was "making [the Court] a factfinder as to culpability because the jury wasn't charged whether or not an aggravated assault occurred." A6472[35].

---

[34] It should not escape notice that, despite the reduced burden on the Government because of the jury instructions given by the Court, the jury deliberated for five days.

[35] Although the Government suggests that, were the Court to make the findings of fact it seeks, no additional hearings would be needed, Gb44 n.20, Judge Hayden disagreed and stated that she was "not in a position without hearing more on something this grave, to decide that Carolyn Jackson whacked J▇▇▇ on the head or broke his arm or punctured his bile duct." A6693.

The Court clearly did not think it was appropriate for the Government to eschew having the jury decide these issues[36] and then ask the Court to find the necessary facts using a lower burden of proof. A6473. Judge Hayden stated, "The government rejected a jury charge that would define an abused or neglected child as suffering the degree of harm that its arguing I should say happened and...asking me to make that finding on a lower standard of proof. That is tough to swallow." A6576[37]. In the Court's view, utilizing the Guidelines "offends fairness to allow the government to charge one thing and [with] a lower standard of proof to prove something much harsher and come away with a sentence much greater than the jury verdict necessarily leads to with the Judge leading the charge" by making findings of fact. A6588. Rather than having "ignored many **provable** facts", as the Government contends, Gb 45, Judge Hayden sentenced the defendant based upon the **proven** facts.

### D.    The Court Recognized That Using The Guidelines Would Not Result In "Like Punishment" Required By The ACA

A central feature of the ACA is that, when a defendant is convicted, the punishment imposed must be similar to that which would have been imposed had the

---

[36] "[W]e are kind of going into now the extent of harm...something that the government felt the jury didn't have to find." A6477.

[37] "I am also rejecting the idea that I should find their narrative, given what the jury's findings were, and given the level of proof that I would be using and that they are arguing I can use." A6715.

case been heard in a state court. That is precisely what Judge Hayden did.    T h e Government's approach to this issue fails to understand that a five-year sentence under New Jersey law means that a defendant will actually serve twelve months[38], whereas, under the federal system, a defendant sentenced to five years would serve roughly 53 months. 18 U.S.C. § 3624(b)(1). Judge Hayden recognized this difference.

There is clearly "tension between the two policies of federal sentencing uniformity and intrastate sentencing uniformity", United States v. Garcia, 893 F.2d 250, 253 (10th Cir. 1989). However, the ACA "represents a deliberate choice to promote intrastate uniformity above interstate uniformity when a defendant commits a crime otherwise punishable by state law, on federal land" United States v Martinez, 274 F.3d 897, 908 (5th Cir. 2001); United States v. Reed, 734 F.3d 881, 885 (9th Cir. 2013); United States v. Kelly, 989 F.2d 162, 164 (4th Cir. 1993). Intrastate consistency is not only "more important in ACA cases", Gb 52, it is the heart of "like punishment".

The Government, citing United States v. Begin, 696 F.3d 405 (3rd Cir. 2012), argues that ACA sentences should seek to reduce federal sentencing disparities. Gb48, 52. That concept is not only inapplicable in this case, but it is impossible to apply.

---

[38] A defendant sentenced to ten years would serve 23 months.

ACA sentences are unavoidably going to vary from state to state. As <u>Garcia</u> pointed out, "[i]n the case of assimilative crimes, it is difficult to achieve fully the Sentencing Reform Act's goal of federal sentencing uniformity because the punishments for particular state offenses often vary significantly among the states." 893 F.2d at 253.    <u>Begin</u>, which was not an ACA case, itself makes this point:"Because penalties vary from state to state, sentence reductions to approach state penalties...vary with the state in which the federal court sits." 696 F.3d at 412. The conflicting goals of the SRA and the ACA should be resolved by "sentencing...in accordance with state law so that the defendant is 'subject to like punishment'." <u>Garcia</u>, at 254.

Furthermore, one of the tenets underlying the Guidelines is that the Sentencing Commission will continuously review federal sentences and adjust the guidelines as needed. <u>See</u> <u>Booker</u>, 543 U.S. at 264. That type of ongoing empirical study is impossible when the type of crime involved is rarely brought in a federal court. Comparing the sentences of defendants under disparate state laws in ACA prosecutions is meaningless. The Government's cherry-picked "examples of sentences imposed on other federal defendants convicted of child abuse under ACA", Gb48, and an article from the Army Times, A6343, are meaningless without full knowledge of the § 3553 factors in those cases.

Judge Hayden recognized that utilizing the Guidelines, particularly if calculated as sought by the Government, would not result in "like punishment". Employing the Government's analysis, the Court noted that beginning with aggravated assault as a base offense, certain enhancements "could be applied to every child endangerment charge". A6576. If aggravated assault were the base level and the enhancements noted by Judge Hayden, i.e., abuse of trust, vulnerable victim, and obstruction of justice were added, virtually all child endangerment cases would begin at offense level 20.[39] For a first offender, the Guidelines would call for a sentence of 33 to 41 months (before adding any enhancement based upon the extent of bodily injury). That length of incarceration is equivalent to what a state prisoner who had received a sentence of 14 to 17 years would serve. Such a sentence is well beyond the 23 months that a defendant given the maximum sentence for a second degree crime would serve.

The Court's reaction was that,

> [I]f that's the way the guidelines work, I don't buy that the justice that the guidelines will achieve is justice that I want to see for these defendants, or, I really believe in everybody's heart of hearts anybody should want. We should have justice that sounds just for just reasons unrelated to strained interpretations of the guidelines.

---

[39] Once the Court decided that there was no analogous offense, there was no reason to hear evidence related to the enhancements suggested by the Government. Gb45.

A6576-77.

Congress has determined that, when offenses are committed on federal enclaves, "to the extent that offenses are not preempted by congressional enactments, there shall be **complete current conformity** with the criminal laws of the respective States in which the enclaves are situated." United States v Sharpnack, 355 U.S. 286, 293 (1958) (emphasis added).

The ACA's assimilation is not of only selected parts of state law, but rather the **entire** substantive criminal law of the state. "[F]ederal courts should consider all provisions of state law that affect the length of the sentence." United States v. Martinez, supra, 274 F.3d at 907. This includes the laws governing the manner in which an offense is to be punished. United States v King, 824 F.3d 313, 315 (4th Cir. 1987).

While not "every last nuance of the sentence" must be identical to the way a defendant would be sentenced in a state court, United States v. Garcia, supra, 893 F.2d. at 254, a "like sentence" must be "similar" to that which would be imposed in the state system. United States v. Martinez, supra, 274 F.3d at 905. In order for a sentence to be "similar" to that which would be imposed in a state court in New Jersey, and to achieve the "uniformity in a state's prohibitory laws" which is the goal of the ACA, United States v Dotson, 615 F.3d 1162, 1165 (9th Cir. 2010), quoting

45

United States v. Maryces, 557 F.2d 1361, 1364 (9th Cir. 1977), it is necessary to examine all the New Jersey laws relevant to sentencing and to understand the **real time** the defendant would serve if she were sentenced in the New Jersey state court system.

While there can be some disagreement over what is a "nuance" of sentencing, there can be no dispute that the length of time a defendant will be incarcerated is not a "nuance". At sentencing, the Court rhetorically asked, "How is the difference between 21 months and seven years a nuance?" A6599.[40]

The Government argues that the Court should not have considered the real time a defendant would serve when imposing a sentence because "parole eligibility" is not a factor to be considered. The Government misapplies the cases it cites.

In a series of cases, courts have held that, once a defendant has been sentenced in federal court, a state-mandated mandatory minimum is not applicable. United States v. Pinto, 755 F.2d 150, 154 (10th Cir. 1985); United States v. Smith, 574 F.2d 988, 992 (9th Cir. 1978); United States v. Vaughan, 682 F.2d 290, 294 (2nd Cir. 1982). That is because, when there was a federal parole system, an overriding federal policy was that all inmates should be subject to the same parole considerations. In United

---

[40] 21 months is the maximum parole eligibility time for a defendant sentenced to a seven year term under the Parole Eligibility Table.

States v. Gaskell, 134 F.3d 1039, 1043 (11th Cir. 1998), citing Vaughan, Pinto, and Smith, the court stated that "[d]etermination of parole terms is one of the areas in which courts have held that federal law must preempt state law assimilated under the ACA to preserve federal sentencing policy." See United States v. Norquay, 905 F.2d 1157, 1162-63 (8th Cir. 1990).

Federal parole policy is not implicated here, and it is not contended that New Jersey parole policy should be adopted by the federal prison system. What Judge Hayden acknowledged was that "real time" should control. The Government acknowledged that, "following Booker, a sentencing court likely can consider what a state defendant would receive if he had been prosecuted in a state court." Gb 52. The period of time for which the defendant is to be incarcerated should be roughly equivalent to that which would be imposed in the state system. No case cited by the Government prohibited Judge Hayden from considering the "real time" of a state sentence and attempting to replicate it by the sentence she imposed.

Rather than try to twist this case into the Guidelines, Judge Hayden was determined to "get real" and impose "like punishment" as would be imposed in a State court. A6731. Judge Hayden determined that the sentence imposed "captures what would go on in the State", i.e., it was "like punishment", as well as capturing her "sense of fairness". A6731. She opined that, "I would, in fact, sentence to five but not

ten years if I were a state court judge." A6732.

This is precisely what is contemplated under the ACA, and Judge Hayden was uniquely qualified to carry out that duty.

## II.    EVEN IF THE TRIAL COURT ERRED IN FINDING THAT THERE IS NO ANALOGOUS SENTENCING GUIDELINE, ANY ERROR WAS HARMLESS

Even if there were an analogous guideline which should have been considered, it is only one of several factors to be taken into account when fashioning an appropriate sentence. 18 U.S.C. §3553(a)(4)(A)(i). Here, Judge Hayden's sentencing decision was not only bounded by 18 U.S.C. § 3553, but also by the ACA requirement of a "like punishment".

Judge Hayden made clear that she did not accept the Government's narrative regarding the children's injuries. But, even if the Court held factfinding hearings and accepted all the Guidelines calculations advanced by the Government, the Court was nonetheless anchored to the ACA's concept of "like punishment". As explained in United States v. Garcia, supra, "Although applying analogous federal guidelines in determining sentences for assimilative crimes promotes federal sentencing uniformity, it ignores the objective of intrastate uniformity underlying the Assimilative Crimes Act." 893 F.2d at 253. Thus, even if Judge Hayden should have found that there was an analogous offense, and considered the sentencing range for that offense, and held the required hearings, her decision as to a "like punishment" would have remained unchanged. Therefore, any error was harmless.

### III.  THE TRIAL COURT GAVE APPROPRIATE CONSIDERATION TO THE § 3553(a)  FACTORS RESULTING IN A SENTENCE THAT IS NOT PLAINLY UNREASONABLE

Judge Hayden explained, "particularly when there are no guidelines to apply and automatic algorithms...you really have to search your conscience and your soul" when imposing a sentence. A6724. The Government contends that Judge Hayden "failed to grapple with the seriousness of these offenses, essentially undermined large portions of the jury's verdicts, interposed its view that the prosecution was misguided, and imposed sentences that did not adequately account for several § 3553 factors." Gb54. Each assertion is incorrect.

The test is whether "the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)" was given,  and whether "that the district court understood and reasonably discharged its obligation to take all of the relevant factors into account in imposing a final sentence." United States v.Grier, supra, 475 F.3d at 571.

Judge Hayden was not only aware of these factors, she repeatedly read them into the record, A6716-17[41]; A6725; A6735, noting, in particular, the "parsimony clause" that the sentence imposed should be "sufficient, but not greater than necessary".

---

[41] The Government's argument that the Court "applied *state* sentencing guidelines" finds no support in the record. Gb51. No reference was made to those guidelines, contained in N.J.S.A. 2C:44-1a.

The Government acknowledges that this Court "may not substitute [its] judgment for the sentencing court's", United States v. Bungar, 478 F.3d 540, 543 (3rd Cir. 2007), and recognizes that it may only "reverse a sentence as substantively unreasonable where 'no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided'." Gb 54.

All agree that § 3553(a)(1) requires the history and characteristics of defendant be considered. Considering defense witnesses, Judge Hayden noted the Jacksons "were part of their community" and that "God-fearing serious people" from their community testified about their positive interactions with them. She observed that "[t]here's life outside of this courtroom that really made its way into this courtroom." A6697.

The Court had an extensive opportunity to observe the Jacksons over a 31-month period and "watched the Jacksons, many, many times come and go in this courthouse" and was favorably impressed with the "respect between these people and their lawyers, and respect given to court personnel and to me". That told the Court "something about [the Jacksons'] character." A6723. Such "insights not conveyed by the record" are precisely why Judge Hayden was "in a superior position to find facts and judge their import under § 3553(a)". Gall v. United States, 552 U.S. 38, 51

(2007). The Government's disparaging of the defendant, Gb73, cannot override the Court's findings.

Judge Hayden found that defendant was remorseful, A6726. She wrote, "I am heartbroken over my mistakes as a parent. There is not a day that goes by that I don't wish I had the opportunity to do things over". CJPSR ¶ 240.[42] The Court found that her acceptance "that her way of raising her kids caused them harm...has the ring of truth" and that "she shouldered the responsibility herself" for that. A6698.

The Government's discussion of this factor amounts to little more than a series of incorrect statements. The defendants did not lie "in order to obtain and maintain custody of the children",[43] and the fragmentary quotes it takes out of context, e.g.,

---

[42] The Government's complaint that Judge Hayden sentenced defendant as though she had mourned the death of J███ is based upon her view of the facts. Gb71-72. At trial, Denise Erway, the wife of a pastor in Oklahoma characterized as "a thoughtful witness", A4803, recounted Carolyn's rejection of a hospital worker's suggestion that, given all of Joshua's medical conditions (he was then being fostered), "people will understand if you don't follow through with the adoption". "When you commit to love a child you commit to love a child no matter what their sickness is." Ms. Erway explained that, if anything, J███ received more of Carolyn's attention than the other children because of his illness. A4771-73. Willetta Jacobs testified that J███ "seemed like one of the family". A4846.

[43] Judge Hayden specifically found the Government's contention that the "Jacksons deliberately went to Indiana ... because they were so anxious to get [J███ and C███]." was not true. "That's not what was happening. Brittany was aging out and the kids were going to be untethered. They were placed with the Jacksons..." A6732-33. "There's no fact that would suggest that Carolyn and John Jackson sought out children to adopt." A6726.

Gb70 n.32, totally distorts what the Court actually said. The Government seeks to have this Court disregard Judge Hayden's findings regarding Carolyn Jackson's character by attributing counsel's cross-examination of John Jr. to her, citing United States v.Kane, 639 F.3d 1121 (8th Cir. 2011), Gb 70-71. Unlike the defendant in Kane, Carolyn Jackson did not testify. Using cross-examination as a character factor has serious Sixth Amendment implications. Furthermore, the fact that counsel called John Jr. a "liar" can hardly be called a "smear campaign", Gb69-70, in light of his testimony in which he admitted that he had "a long standing problem with lying" that included lying in the Family Court, in school, and to his foster parents. A2172-73.

The Government's contention that, at sentencing, defendant "heaped blame on her cousin", Brittany, Gb71, like so much of its brief, is made out of whole cloth.

Although the Court actually spent little time discussing the fact, the Government argues that it "myopically dwelled" on the fact that the defendants had "'wrongly' lost custody of their biological children." Gb66. Not only is the Government's characterization inaccurate, it was certainly not inappropriate for the Court to take this factor into account. 18 U.S.C. § 3661. As Judge Hayden pointed out, the Appellate Division took the extraordinary step of determining that the termination decision was wrong as to two of the children, A6699, because the trial court's decision ."went so wide of the mark that a mistake must have been made."

2014 WL 3881311*38.[44]

While 18 U.S.C. 3553(a) requires consideration of "the nature and circumstances of the offense" and "the seriousness of the offense", Judge Hayden recognized that it was difficult, because of the jury instructions, to know precisely what the jury had found ("I can't be sure that a jury of their peers, in fact, found this"), A6693; ([N]owhere has the jury told us what they were particularly offended by, how the acts linked up with a particular medical condition of the children"). A6690.

The Government appears to think that both Judge Hayden and this Court should simply accept its "narrative" as overriding any other relevant sentencing factors. It explains the "respect" of the Jacksons' "friends" as the result of "lies" the friends were "fed" "similar to those given to the treating doctors". Gb60. Those "lies" cited in footnote 28 include:

Denice Erway was told J█████'s head injury was the result of a fall, A4781-82, a fact confirmed by testimony of three doctors. She testified that had she seen marks on J█████, she would have been alarmed; she saw none.

---

[44] Recently, the Appellate Division went even further and held "that the trial court erred in granting K[inship] L[egal]G[uardianship] [as to the Jacksons' other two children] because the underlying basis–that is, the finding of abuse and neglect–was reversed by this court" N.J. Div. Of Child Prot. & Permanency v. C.J., 2016 WL 4608231*3 (App.Div.2016)

Sandra Stahr was told C████ had "skin issues", A5080, a fact not only confirmed by the pediatrician in Indiana, but by testimony of her New Jersey pediatrician that skin issues continued for well over a year after she was removed from the Jackson home. A1415-29. This is despite the Government's erroneous contention that "[a]fter leaving Defendant's custody...her skin lesions healed with no recurrences." Gb17.

Julie Adelman was told that Brittany had drug issues, A5238-39, a fact confirmed by a report of her marijuana dependency at an early age. CJSA024; CJSA056. While pregnant with C████, she had been remanded to a "mental health and addiction treatment facility". CJSA017.

The Court simply did not give the type of credit the Government would like to its experts in the face of the testimony of the children's treating physicians, the Child Protection Team from the Indiana hospital, the investigation of Oklahoma child welfare workers, and friends of the Jacksons. A4851.

The Government's contention that neither the Court nor defendant showed "any concern about the actual victims in this case", Gb66, is flatly wrong. Judge Hayden expressed that concern repeatedly. A6688-97; A6721 ("the condition of the children as it deteriorated simply can't be overlooked"). The Court found that Carolyn Jackson's acceptance "that her way of raising her kids caused them harm" "has the

ring of truth." A6698.

The Court recognized that a crime had been committed[45] and that it was bound by the jury's verdict and found that the defendant had "endangered the welfare of these children". A6693. Thus, while it is impossible to determine the "seriousness of the offense" found by the jury, the Court clearly considered the facts in great detail and determined that Carolyn Jackson's conduct "simply can't be overlooked" and that, unlike her husband, a prison sentence was required. A6721; A6727-28. It should not escape notice when considering the "seriousness of the offense" that defendant could have been charged with a fourth degree offense under Title 9.

The Court was required to consider deterrence, 18 U.S.C. § 3553(a)(2)(B), and did so, stating that "deterrence is part of" the reason a prison sentence was being imposed. Judge Hayden explained that "just because she's a member of a valuable community" and "is remorseful now, does not mean that she escapes the bad experience" of prison. A6726. In order "to deter people from thinking that when [abuse] comes about even out of motives that are good, it is still punishable and prison is a way of deterring, making people sit up and take notice." A6727.

18 U.S.C. §3553(a)(2)(C) required the Court to consider protection of the

---

[45] "I'm satisfied that what they admit to now and what the statute said they shouldn't have done, was enough to constitute a second degree crime." A6701.

public. Judge Hayden rejected as "plain silly" the Government's argument that the Jacksons may abuse the grandchildren which their high school-age children may someday have. There was no argument than anyone else needed to be protected from the defendant. A6728. "Society as a whole was not harmed by these people."A6731.

18 U.S.C. §3553(a)(5)(A) requires the Court to consider "any pertinent policy statement issued by the Sentencing Commission", and it did so. Judge Hayden discussed USSG 5H1.11 as it relates to military service, A6704-05, and that it applies to the defendant as well as her husband. "She was an Army wife" who was "overwhelmed" by her life situation. A6732. "[F]ive kids in the house, three of them being home schooled. Stupid to think you could do it all." A6734.

The Government argues that the Court erred by not engaging in factfinding it hoped would support its position for a lengthier sentence. Yet, when the Court did comment on the facts, the Government criticizes Judge Hayden for ruling based on her "own perceptions of what proofs demonstrated in this case", Gb57, which is precisely what the Government asked her to do: find facts. Its claim that the defendant's explanations for injuries to the children were rejected by the jury, Gb58, is patently untrue.

The Government hoped that Judge Hayden would agree with its theory regarding the children's injuries. She did not and correctly recognized the limited

nature of the jury verdict. The defendant's responsibility for those injuries was hardly "necessarily implicit in the verdict". Gb57.

The Government's complaint is bottomed on the fact that the Court did not decide the way it wished. However, the sentence was not based on "a view of the evidence opposed to the jury's", Gb64, because the jury did not find the facts as described by the Government.

Sentence was imposed after a thorough and thoughtful analysis, giving meaningful consideration to the § 3553 factors. Judge Hayden just evaluated the factors differently than the Government would have preferred. Rather than the trial court substituting its view of the evidence for the jury's verdict, the Government seeks to substitute its view of the evidence for the jury verdict and wants to retry the case on paper before this Court.

Having taken all these factors into consideration, the Court imposed a sentence which it believed "captures what would go on in the State" court as well as its "sense of fairness". A6731. The Court determined that a two-year sentence was "sufficient but not more than necessary" to meet the goals of § 3553(a). A6734

To say that "no reasonable sentencing court would have imposed" a sentence of 24 months implies that there is universal agreement as to how a defendant in such a case should be sentenced. Defendant's Sentencing Memorandum discussed an

Essex County case to which Judge Hayden referred and demonstrated that, under the guidelines analysis urged by the Government, that defendant would have been sentenced to 57-71 months. A6137-38, A6702. He received probation. The Government, having no experience with such cases, has little appreciation of real world sentencing in New Jersey.

The fact that the three states within this circuit treat child endangerment very differently is an indication that there is no universal agreement as to how to treat the offense. In Delaware, child endangerment in which a serious injury occurs is a class G felony punishable by up to 2 years imprisonment pursuant to 11 Del C. § 1102; 11 Del.C. § 4205(b)(7). In Pennsylvania, "a course of conduct endangering the welfare of a child" is a third degree felony carrying a maximum penalty is seven years. 18 Pa.C.S.A. § 4304; 101 Pa.Code § 15.66(a)(4). The fact that there is a lack of consensus on issues relevant to the sentence in this case makes it difficult to conclude that no reasonable judge would have sentenced like Judge Hayden.[46]

Looked at another way, the 19 ½ years sought by the Government exceeds the length of time a person would serve on a 70-year sentence.[47] It is little wonder that

---

[46] At sentencing, the Government conceded that there would likely be variations in sentences among judges within New Jersey and elsewhere. A6601.

[47] Despite the Government's discussion of the issue, Gb46 n.21, Gb48, the Court indicated that it would not impose consecutive sentences so as to result in a sentence greater than ten years. A6732.

Judge Hayden was flabbergasted with the Government's position.

The Government's comparison to this case with United States v. Irey, 612 F.3d 1160 (11th Cir. 2010) and United States v. Kane, supra, Gb 65, demonstrate its unreasonable view of the evidence as found by the jury. In Irey, defendant "raped, sodomized, and sexually tortured fifty or more little girls, some as young as four years of age, on many occasions over a four- or five-year period [and]... scripted, cast, starred in, produced, and distributed worldwide some of the most graphic and disturbing child pornography that has ever turned up on the internet." 612 F.3d at 1166. In Kane, a mother, "for $20, ...repeatedly sold her nine-year-old daughter to a pedophile, restraining the child to assist the pedophile in his deviant sexual gratification. The pedophile sexually molested the child more than 200 times with Kane's active participation." 639 F.3d at 1136.

By way of contrast, Judge Hayden referred to two high-profile cases in which hysteria about child abuse ran wild. She stressed the importance of recognizing that "[t]he thought of children being abused...is abhorrent" and, thus, "we have to be careful about our desire to punish and protect and fix anything that looks awry." A6692. This accurately describes the Government's approach to the sentencing.

The Government's unusual reference to "murmurs of outrage from members of the public in the gallery" at sentencing and press coverage of the sentencing, Gb21,

is irrelevant to any meaningful analysis of the issues before the Court. However, it should not escape notice that it was Kate Rinaldi, the foster parent of the three Jackson children who the Government presented as a witness at sentencing, A6427, who was "chuckling" and almost removed from the proceedings. A6720. And it was the Government which issued a press release after the sentencing falsely claiming that the defendants' acts against the children included "breaking their bones". CJSA 150.

These facts led to the imposition of a fair and reasonable sentence. As Judge Hayden stated, the defendant "doesn't get a slap on the hands." A6727.

> [P]rison time...will be bad. It will be bad for anybody who goes in for this particular offense because it's really not tolerated....[S]he will not have contact with her daughter and her son....That is a terrible loss. I wish people sitting here understood what prison is like. I don't think anybody sitting here who has not regularly visited a prison has any business minimizing what prison is like. A6726-28.

## CONCLUSION

In <u>United States v. Jones</u>, 531 F.3d 163, 174 (2nd Cir. 2008), the court explained

why the standard for review is so difficult to meet.

> Sentencing is not, after all, a precise science....Rarely, if
> ever do the pertinent facts dictate one and only one
> appropriate sentence. Rather, the facts may frequently point
> in different directions so that even experienced district
> judges may reasonably differ, not only in their findings of
> fact, but in the relative weight they accord competing
> circumstances.... [T]he duty of a reviewing court is not to
> identify the "right" sentence but, giving due deference to
> the district court's exercise of judgment, to determine
> whether the sentence imposed falls within the broad range
> that can be considered reasonable under the totality of the
> circumstances.

The sentence was consistent with the § 3553(a) factors, adhered to the ACA's

requirement of "like punishment", and should be affirmed.

Respectfully submitted,

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.


___/s/ Herbert I. Waldman_____
By:  Rubin M. Sinins
     Herbert I. Waldman

## Certificate of Compliance

I hereby certify that I am an attorney at law of the State of New Jersey, counsel for appellee Carolyn Jackson, and that I am filing the attached Brief for Carolyn Jackson, and:

(1) this brief contains 13,998 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(b)(iii), and thus does not exceed the 14,000 word limit;

(2) this brief complies with the typeface requirements of Fed.R.App.32 (a)(5) and the type style requirements of Fed.R.App. 32(a)(6) because it has been prepared using a Microsoft Wordperfect X7 word-processing system and it is in a proportionally-spaced typeface, namely Times New Roman, that is at least 14 points;

(3) the text of the electronic PDF brief and appendix is identical to the text of the paper copies of the brief and appendix; and

(4) the electronic PDF brief and appendix have been prepared on a computer that is automatically protected by a virus detection program, namely a continuously-updated version of AV Bit Defender, and no virus was detected.

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.

___/s/  *Herbert I. Waldman*_____
By: Herbert I. Waldman
Attorney for Carolyn Jackson

Dated: October 7, 2016

### Certification of Filing and Service

I hereby certify that on October 7, 2016, I caused the Brief and Appendix for Appellee Carolyn Jackson to be filed with the Clerk of this Court by (a) electronic filing in the PDF form using the Circuit's electronic filing system, and (b) paper filing of an original and six paper copies of the Brief and four copies of the Appendix using U.P.S.

I also certify that on October 7, 2016, I cause the Brief and Appendix for Appellee Carolyn Jackson to be served:

(A) by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, on the following Filing Users:

John F. Romano, AUSA
John.Romano@usdoj.gov

Carol Gillen, AFPD
Carol_Gillen@fd.org

(B) by service of one paper copy, by U.P.S., on:

John F. Romano, AUSA
United States Attorney's Office - Newark Div
970 Broad Street; Rm 700
Newark, NJ 07102-2534

Carol Gillen, AFPD
Federal Public Defender's Office
1002 Broad Street; Floor 1
Newark, NJ 07102-2503

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.

_____/s/ Herbert I. Waldman_____
By: Herbert I. Waldman
Attorney for Carolyn Jackson

Dated: October 7, 2016