No. 16-1200 (consolidated with 16-1201)

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

**UNITED STATES OF AMERICA,**
**Appellant**

v.

**CAROLYN JACKSON,**
**Appellee**

---

Appeal from the United States District Court
for the District of New Jersey
Hon. Katharine S. Hayden, U.S.D.J.
at Criminal No. 2:13-cr-00290

---

**APPELLEE CAROLYN JACKSON'S PETITION**
**FOR REHEARING *EN BANC***

---

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.
505 Morris Avenue; Suite 200
Springfield, New Jersey 07081
(973) 379-4200
*Attorneys for Appellee Carolyn Jackson*

On the Petition:
Rubin M. Sinins, Esq.
Herbert I. Waldman, Esq.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES                                                    1

REASONS FOR GRANTING REHEARING                                            2

I.    The Decision of the Majority of the Panel is an
      Invitation to Fifth and Sixth Amendment Violations                  2

II.   The Majority Opinion Improperly Negated The
      ACA Requirement Of A "Like Punishment"                              9

CONCLUSION                                                                17

# CONTENTS OF APPENDIX

Bureau of Prisons Inmate Data re Carolyn Jackson                          1

Judgment of United States Court of Appeals For The Third Circuit          4

Opinion of United States Court of Appeals For The Third Circuit           6

III. A. "Sufficiently Analogous" Offense Guidelines                       9

     B. Refusal to Find Facts                                             55

     C. The ACA, Sentencing Guidelines and State Law                      59

     D. Substantive Unreasonableness                                      64

Judge McKee, Dissenting                                                   88

     I. Sufficiently Analogous Offense Guideline Analysis                 89

     II. Other Concerns                                                   101

          A. Acquitted Conduct & Unproven Harm                            102

i

B. Fact-Finding                                106

C. A Final Irony                               108

Appendix                                       114

# TABLE OF AUTHORITIES

## Cases

Alleyne v. United States, 133 S.Ct. 2151 (2013)                    3, 8

Blakeley v. Washington, 542 U.S. 296 (2004)                       1, 5, 6

Gall v. United States, 552 U.S. 38 (2007)                         16

Harris v. United States, 536 U.S. 545 (2002)                      7

Jones v. United States, 526 U.S. 227 (1999)                       7

James v. United States, 135 S.Ct. 8 (2014)                        7, 8

Kimbrough v. United States, 552 U.S. 85 (2007)                    15

McMillan v. Pennsylvania, 477 U.S. 79 (1986)                      7

Molina-Martinez v. United States, 136 S.Ct. 1338 (2016)          1, 8, 9

New Jersey Parole Bd. v. Byrne, 93 N.J. 192, 460 A.2d 103 (1983)  14

Oregon v. Ice, 555 U.S. 160 (2009)                                1, 5

Peugh v. United States,133 S.Ct. 2072 (2013)                      8

Pepper v. United States, 562 U.S. 476 (2011)                      15

Rita v. United States, 551 U.S. 338 (2007)                        16

State v. Johnson, 166 N.J. 523, 766 A.2d 1126 (2001)              13

State v. Richardson, 208 N.J.Super. 399, 506 A.2d 43 (App.Div. 1986)  13

United States v. Begin, 696 F.3d 405 (3rd Cir. 2012)              16

United States v. Booker, 543 U.S. 220 (2005)                                    16

United States v. Garcia, 893 F.2d 250 (10th Cir. 1989)                         15

United States v. Grier, 475 F.3d 556 (3rd Cir. 2007)                           6, 7

United States v. Mariea, 795 F.2d 1094 (1st Cir. 1986)                         9

United States v. Martinez, 274 F.3d 897 (5th Cir. 2001)                        9, 13

United States v. Norquay, 905 F.2d 1157 (8th Cir. 1990)                        15

United States v. Press Pub. Co., 219 U.S. 1 (1911)                             11

United States v. Reed, 734 F.3d 881 (9th Cir. 2013)                            9

United States v. Sabillon-Umana, 772 F.3d 1328 (10th Cir. 2014)                7, 8

United States v. Sharpnack, 355 U.S. 286 (1958)                                10, 11, 14

United States v. Smith, 574 F.2d 988 (9th Cir. 1978)                           15

United States v. Smith, 751 F.3d 107 (3rd Cir. 2014)                           6

United States v. Sturgis, 48 F.3d 784 (4th Cir. 1995)                          5

United States v. Vaughan, 682 F.2d 290 (2nd Cir. 1982)                         15

Washington v. Recuenco, 548 U.S. 212 (2006)                                    6, 7

## Statutes

N.J.S.A. 2C:43-2(f)(1)                                                          13

N.J.S.A. 2C:44-1c(2)                                                            13

18 U.S.C. § 13(a)                                                    8

18 U.S.C. § 3553(a)(6)                                          13, 15

**Sentencing Guidelines**

USSG § 2A2.2                                                      3, 4

USSG § 2A2.2(b)(3)                                                  3

USSG § 2A2.3(a)                                                     2

USSG § 2A2.3(b)                                                     2

USSG § 2A2.3(c)                                                     3

USSG § 1B1.1                                                     2, 3

**Other Authorities**

Brief for the United States, <u>Lewis v. United States</u>         14

Engulu and Harris, *Spanking, Ethnicity, Gender, and Religion:*
*The Development of a Spanking Scale*, 19 International Journal
of Scholarly Academic Intellectual Diversity 1, 4 (2017)          12

William K. Sessions, Written Statement Before United States
Sentencing Commission  (February 16, 2012)                       5-6

Straus and Stewart, *Corporal Punishment by American Parents:*
*National Data on Prevalence, Chronicity, Severity, and Duration,*
*in Relation to Child and Family Characteristics*, 2 Clinical Child
and Family Psychology Review 55 (1999)                            12

United States Sentencing Commission, *Special Report to Congress:*
*Cocaine and Federal Sentencing Policy* (April 1997)              12

## <u>TABLE OF ABBREVIATIONS</u>

"CJSA"        Refers to Carolyn Jackson's supplemental appendix filed in this appeal.

"CJPA"        Refers to the appendix of Carolyn Jackson's Petition for Rehearing *En Banc*

"Gb"          Refers to the brief filed by the United States of America in this appeal.

Pursuant to Federal Rule of Appellate Procedure 35, defendant Carolyn Jackson seeks rehearing *en banc* of the precedential opinion issued in this appeal on July 6, 2017. Counsel believes, based on a reasoned and studied professional judgment, that the panel decision is contrary to decisions of the United States Supreme Court and that the case involves questions of exceptional importance.

## STATEMENT OF THE ISSUES

A panel of this Court has issued a decision reversing the sentence imposed by the District Court and directed that court to re-sentence the defendant after conducting a hearing to find facts which have traditionally been within the exclusive province of the jury. The panel decision conflicts with Supreme Court decisions in Blakeley v. Washington, 542 U.S. 296 (2004), Oregon v. Ice, 555 U.S. 160 (2009), and Molina-Martinez v. United States, 136 S.Ct. 1338 (2016).

The proceedings also present a case of exceptional important regarding the interpretation of the Assimilative Crimes Act (ACA), 18 U.S.C. § 13(a), which provides that a convicted defendant is subject to "like punishment" as would be accorded in a state court.

1

## REASONS FOR GRANTING REHEARING[1]

### I.    The Decision of the Majority of the Panel is an Invitation to Fifth and Sixth Amendment Violations

Rehearing is warranted because the panel majority has directed the District Court to engage in fact-finding which will violate the defendants' right to trial by jury and due process. The majority found that "[t]he District Court committed reversible error by refusing to engage in the requisite fact-finding pursuant to the applicable preponderance of evidence standard." CJPA056. That fact-finding should address the fact that "the assault guideline's cross-reference directs the sentencing court to apply the aggravated assault guideline 'if the conduct constituted aggravated assault'". CJPA058.

Here, the base offense level for an <u>assault</u> involving physical contact under USSG § 2A2.3(a), level 7, increases by 2 levels if "the victim sustained bodily injury"[2] and by 4 levels if the victim is under sixteen. USSG § 2A2.3(b). If these factors are found, the Guidelines sentence range (level 13) for the defendant, who has a Criminal History Category I, is 12 to 18 months.

---

[1] Carolyn Jackson also relies upon the arguments set forth in the Petition for Rehearing of co-defendant, John Jackson.

[2] "Bodily injury" is "an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." USSG § 1B1.1, Note 1(B).

However, if the cross-reference is used to permit sentencing under the aggravated assault guideline, USSG § 2A2.2, the base level is 14. To utilize that guideline, a finding must be made that "the conduct constituted aggravated assault". USSG § 2A2.3(c). In this case, that would require a finding that an assault either resulted in "serious bodily injury" or that a "dangerous weapon" was used. USSG § 2A2.2, Application Note 1.[3]   A finding of "serious bodily injury" necessarily raises the offense level to level 19[4]. USSG § 2A2.2(b)(3). The sentence for that level is 30 to 37 months. Thus, finding those facts would "alter the prescribed range of sentences to which [Carolyn Jackson] is exposed". Alleyne v. United States, 133 S.Ct. 2151, 2158 (2013). That is precisely the result the Government seeks, i.e. to have her sentenced as if the jury found that she had inflicted serious injuries upon her children without ever asking the jury to make such a finding.[5]

It is undisputed that the defendants used corporal punishment on their children. According to the Government's proofs, it was sometimes employed for the most

---

[3] Those terms are defined in USSG § 1B1.1.

[4] Use of a "dangerous weapon" raises the offense level by 4, USSG § 2A2.2(b)(2)(B). The sentence range at level 23 is 46-57 months.

[5] "[T]he jury instructions did not require the jury to find the degree of harm suffered by the children". CJPA039. Defendant was acquitted of all charges which would have clearly fallen within the aggravated assault guideline. Id. 22

3

trivial of infractions. Gb5. Thus, the jury could have found such punishment to be "unnecessarily severe" or not "reasonable under the circumstances", violating the New Jersey child endangerment statute, even if it concluded that neither "serious bodily injury" nor "bodily injury" had occurred.

Both the majority, CJPA070, the dissent, CJPA088, and defendants acknowledge that "the children clearly suffered various injuries and had a number of serious medical conditions", but, as the majority notes, the defendants contested the cause of those injuries and conditions. Id. As Judge McKee noted in dissent, at trial, "the government successfully opposed the defendants' request that the jury make specific findings as to the degree of harm allegedly caused by the defendants." CJPA109.[6] Thus, even after the jury verdict, there was an "unresolved dispute regarding the causation of the children's injuries and medical conditions." Id., p.23. The dissent found it to be "ironic at best, and disingenuous at worst", that the Government should now ask the Court to "sentence the defendant for conduct without bearing the burden of proving it beyond a reasonable doubt." Id., p.23.

But, that is precisely the course on which the majority has set this case. The

---

[6] The defendants contended that the degree of harm was a necessary element of the offense. CJPA46n.9.

4

District Court is to conduct a hearing, using a preponderance of evidence standard,[7] to determine whether the various injuries or conditions (a) constitute "serious bodily injury" (b) whether defendants caused those injuries or conditions by a "felonious assault", USSG § 2A2.2, Application Note 1, and (c) whether a "dangerous weapon" was used. This is despite the Government's acknowledgment that the "degree of harm or danger are historically elements of assault", CJPA039n.6,[8] notwithstanding the fact that it was the Government which precluded the jury from making those findings, and notwithstanding <u>Oregon v. Ice</u>, <u>supra</u>, 555 U.S.at169, in which the Court noted that the Sixth Amendment did not permit "encroachment [at sentencing] by the judge upon facts historically found by the jury".[9]

The defendant's contention, that such a hearing is violative of her constitutional rights, is shared by the former Chairman of the Sentencing Commission, Judge William Sessions III, who, in testimony before the Commission

---

[7] CJPA059.

[8] Similarly, the "determination of whether a given instrumentality was used as a 'dangerous weapon' must be left to the jury." <u>United States v. Sturgis</u>, 48 F.3d 784, 788 (4th Cir. 1995), and cases cited therein.

[9] The view in <u>Ice</u> that "the scope of the constitutional jury right must be informed by the historical role of the jury at common law" was repeated by Justice Sotomayor in <u>S. Union Co. v. United States</u>, 567 U.S. 343, 353 (2012), quoting <u>Ice</u>.

in 2012, explained his understanding of Blakeley v. Washington, supra, :

> [A]ny facts that would increase the base offense level...
> would have to be submitted to a jury and proved beyond a
> reasonable doubt. Written Statement of Judge William K.
> Sessions, United States Sentencing Commission, February
> 16, 2012.

We submit that the majority's view, that the only judicial fact-finding which the Constitution prohibits is that which increases the maximum or minimum sentence to which the defendant is exposed, CJPA056, is mistaken. Nor can it any longer be maintained that, because the guidelines "are advisory only", Id., constitutional rights are not implicated.

The majority's statement that "[f]acts like the severity of the injury or the use of a weapon do not affect the maximum and minimum sentences established by statute", CJPA056, are at odds with controlling Supreme Court decisions. In Washington v. Recuenco, 548 U.S. 212, 216 (2006) and Blakeley, the Court explained that the "statutory maximum" is a term of art, which refers not to the term of years provided for in the statute, but rather "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*". (emphasis in original). Furthermore, in Blakeley, the Court explained "that the judge's authority to sentence derives wholly from the jury's verdict", 542 U.S. at 303. Nevertheless, the majority, relying upon this court's decision in United

6

States v. Smith, 751 F.3d 107 (3rd Cir. 2014), which, in turn relied upon United States v. Grier, 475 F.3d 556 (3rd Cir. 2007)[10], directed the District Court to find facts which, since Jones v. United States, 526 U.S. 227 (1999), have "traditionally been treated by both Congress and by the state legislatures, as defining an element of the offense." 526 U.S. at 235.

We submit that, since Grier was decided, the tide of judicial thought has emphasized the central role of the jury in the criminal justice process and has re-examined the extent of permissible judicial fact-finding. In United States v. Sabillon-Umana, 772 F.3d 1328, 1331 (10th Cir. 2014), Justice (then Judge) Gorsuch explicitly called into question the constitutionality of judicial fact-finding at sentencing. Describing the sentencing process that has developed under the guidelines, he stated that it "assumes that a district judge may either decrease or increase a defendant's sentence...based on facts the judge finds without the aid of a jury or the defendant's consent. It is far from certain whether the Constitution allows at least the second half of that equation." Reliance was placed upon the dissent of Justice Scalia in Jones v. United States, 135 S.Ct. 8 (2014), in which he, along with Justices Thomas (the author of Recuenco) and Ginsburg, dissented from the denial of certiorari, opining

---

[10] To the extent that Grier relied upon McMillan v. Pennsylvania, 477 U.S. 79 (1986) and Harris v. United States, 536 U.S. 545 (2002), its continued vitality has been undermined. See Alleyne, supra, 133 S.Ct. at 2155, 2157-58.

that "any fact that increases the penalty to which a defendant is exposed constitutes an element of a crime...and must be found by a jury, not a judge." Citing Alleyne , these Justices opined that, "[t]he Sixth Amendment, together with the Fifth Amendment's Due Process Clause, 'requires that each element of a crime' be either admitted by the defendant, or 'proved to the jury beyond a reasonable doubt'."

> [E]xposing the defendant to the longer sentence–is an element of the offense that must be either admitted by the defendant or found by the jury. It *may not* be found by a judge. For years, however, we have refrained from saying so....This has gone on long enough."
> 135 S.Ct. at 8-9.

These views have taken on increased significance not only by Justice Gorsuch's appointment to the Supreme Court, but by the fact that Sabillon-Umana was relied upon by Justice Kennedy in Molina-Martinez v. United States, supra. That decision also undercuts any reliance upon the argument that, because the guidelines are "advisory only", judicial fact-finding is permissible. In that case, the sentencing court had utilized a higher, incorrect guideline. However, the sentence imposed was within the correct guideline range. The fact that the guideline was "advisory only" was immaterial because it, nevertheless, sets "the framework for sentencing" and provides an "anchor [for] the district court's discretion", 136 S.Ct. at 1345, citing Peugh v. United States,133 S.Ct. 2072 (2013) (the Guidelines continue to "exert

controlling influence on the sentence that the court will impose" 133 S.Ct. at 2085).

We submit that the majority failed to address the impact of <u>Molina-Martinez</u> and other views calling into question the judicial fact-finding directed by its opinion.

## II.    The Majority Opinion Improperly Negated The ACA Requirement Of A "Like Punishment"

Rehearing is also warranted because the majority opinion improperly interpreted the ACA requirement, that a defendant convicted of an assimilated offense be "subject to a like punishment" as would be imposed under state law.

If the Fifth and First Circuits were correct that the ACA "represents a deliberate choice to promote intrastate uniformity above interstate uniformity when a defendant commits a crime otherwise punishable by state law, on federal land"[11] and the Ninth Circuit was correct that the ACA "promotes the even-handed application of state law to local conduct that federal law does not punish and, but for the situs being a federal enclave, would qualify as a local offense"[12], the sentence imposed by the District Court accurately reflected those values.

Defendant began serving her sentence on March 2, 2016 and is scheduled for

---

[11] <u>United States v. Martinez</u>, 274 F.3d 897, 908 (5th Cir. 2001); <u>United States v. Mariea</u>, 795 F.2d 1094, 1099 (1st Cir. 1986)(one of the "major aims" of the ACA was "achieving statewide uniformity" in sentencing).

[12] <u>United States v. Reed</u>, 734 F.3d 881, 885 (9th Cir. 2013).

9

release on November 24, 2017[13]. If released as scheduled, she will have served one year, eight months and 22 days for an offense which, had she been sentenced to the maximum of ten years by a state court, would have required her to serve 43 additional days.[14]

The majority's criticism that "the District Court essentially acted as a state court applying the various intricate aspects of New Jersey's sentencing practices", CJPA059, ignores the fact that, in enacting the predecessors to the current ACA, Congress "adopted the fundamental policy of conformity to local law" and that "consistent congressional purpose" was continued through "an unbroken series of Assimilative Crimes Acts." United States v. Sharpnack, 355 U.S. 286, 289-291 (1958). The goal of intrastate uniformity cannot be achieved if the sentencing court fails to consider the sentence the defendant would receive in a state court. Sharpnack, a seminal case, was not discussed by the majority.

In Sharpnack, the Court observed that Congress found that "it is especially appropriate to make federal regulation of local conduct conform to that already

---

[13] CJAP1

[14] The *real sentence* for a second degree crime is not 5 to 10 years, but 12 to 23 months. If sentenced to nine years by a New Jersey court, the defendant would have to serve one year, nine months and one day. The New Jersey Parole Eligibility Table is at CJSA149.

established by the State."355 U.S. at 294. The review of the history of the ACA in Sharpnack demonstrates the deference the Act pays to state sentencing law.

In the re-enactments from 1866 through 1940, the ACA incorporated only state offenses extent at the time of the re-enactment's passage. However, in 1948, the legislation was changed to provide that, when a state law changed, the ACA would incorporate that change. Id. at 289-294. This evinces a clear Congressional intent to be guided by the states as to what conduct is unlawful and how those acts should be punished and is consistent with the pre-1948 understanding that, in passing the ACA, Congress had "the enlightened purpose, so far as punishment of crime is concerned, to interfere as little as might be with the authority of the states". United States v. Press Pub. Co., 219 U.S. 1, 9 (1911). The deference to states has thus increased over the years. The 1948 amendment gave ultimate deference to the states by adopting prospectively-enacted state laws. It allowed states ongoing authority to increase or decrease, as they saw fit, the punishment for offenses which would be tried in federal courts. As stated in the Reviser's Note to the 1948 amendment to the ACA, federal courts were "to apply the same measuring stick to [incorporated] offenses as is applied in the adjoining State". United States v. Sharpnak, supra, 355 U.S. at 293 n.8.

The ACA serves important values of federalism by permitting District Courts

11

to reflect local conditions.[15] Deference to the states also makes practical sense because the states, rather than the federal government, have experience dealing with certain crimes. Thus, adjusting the penalties for these crimes, from time to time, is more appropriately left in the hands of the state. The United States Sentencing Commission has opined,

> The constitutional principles of federalism are no less imperative in the criminal law context than they are in other areas of constitutional inquiry....[T]he regional variations and preferences of state and local governments...should be respected in the criminal law context. United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (April 1997).

Therefore, acting like a state court is not a valid criticism of the District Court,

---

[15]This is particularly true in cases dealing with corporal punishment because of wide regional differences in approaching the same conduct. A recent study reported that "[i]n the United States, attitudes towards spanking also vary among different geographic regions." Engulu and Harris, *Spanking, Ethnicity, Gender, and Religion: The Development of a Spanking Scale*, 19 International Journal of Scholarly Academic Intellectual Diversity 1, 4 (2017). Studies discussing "regional differences in attitudes and norms concerning [corporal punishment]" are discussed in Straus and Stewart, *Corporal Punishment by American Parents: National Data on Prevalence, Chronicity, Severity, and Duration, in Relation to Child and Family Characteristics*, 2 Clinical Child and Family Psychology Review 55, 64 (1999). See discussion of other studies at A6133-6135. Even within this circuit, there is a significant disparity in how states treat cases of child abuse. See Carolyn Jackson brief, p.59. Consistency cannot even be expected within New Jersey as "the same conduct may be prosecuted...as a crime of the second degree (which happened here) or as a fourth degree crime." CJPA029.

but rather, an acknowledgment that the District Court acted appropriately in assuring that the defendant would serve approximately the same time as she would had she been sentenced in a state court. That is, the Court used "the same measuring stick" and imposed a "like sentence". By doing so, the District Court also acted consistently with the Sentencing Reform Act's direction to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Happenstance affords the opportunity to see that the Court's assessment was accurate, almost to the day.

The majority exaggerated the intricacies of New Jersey sentencing law, which were utilized by the District Court. CJPA059. For over thirty years, New Jersey courts have recognized that the "real sentence" imposed on a defendant is "the period of actual imprisonment". State v. Johnson, 166 N.J. 523, 541, 766 A.2d 1126, 1137 (2001), quoting Justice (then Judge) Coleman in State v. Richardson, 208 N.J.Super. 399, 413-414, 506 A.2d 43, 51 (App.Div. 1986). Before a defendant is sentenced the judge must "state the approximate period of time defendant will actually serve in custody according to the then current State Parole Board 'Parole Eligibility Tables'." Rule 3:21-4(j).[16] This requirement came about after legislation "eliminated the

---

[16] This Rule implements two statutes bearing upon sentencing. N.J.S.A. 2C:44-1c(2) requires the sentencing judge to consider eligibility for release on parole. N.J.S.A. 2C:43-2(f)(1) requires the sentencing judge to state at sentencing approximately when

13

conventional parole discretion relating to adequacy of punishment, and transferred

it substantially to the judiciary as a function of its sentencing authority." New Jersey

Parole Bd. v. Byrne, 93 N.J. 192, 205, 460 A.2d 103, 110 (1983).

Thus, while the historical reasons behind the New Jersey sentencing process

may be intricate, its application is not. Judge Hayden remarked that, as a state court

judge, she "gave sentences and I said five years of which you will do X before your

parole eligibility date comes." A6730. However, regardless of how "intricate" New

Jersey law might be, Congress has determined that "there shall be complete current

conformity with the criminal laws of respective States in which [federal] enclaves are

situated." United States v. Sharpnack, supra, 355 U.S. at 293.[17]

The majority's view that "there is no real difference between a sentencing court

directing the Bureau of Prisons to apply state parole policies and a court simply

adopting those policies from the outset by imposing a term of imprisonment based on

the putative date that the defendant would be eligible for release if prosecuted,

---

the defendant will be eligible for parole.

[17] See United States v. Martinez, supra, 274 F.3d at 907 ("federal courts should consider all provisions of state law that affect the length of the sentence"). The Government's brief in Lewis v. United States, 523 U.S. 155 (1998), explained that the ACA "must be construed in light of Congress's intent to minimize disparities between the criminal laws applicable to federal enclaves and those that govern the surrounding areas." Brief, p. 37-38.

convicted, and sentenced in the state system", CJPA063, is not shared by the decisions it cites.[18] Those cases all rejected the application of state laws in the federal system because it would undermine the orderly administration of the federal prison system "to have two classes of prisoners subject to different rules", Smith, 574 F.2d at 992. That is, once an ACA prisoner is in the federal prison system, she should be treated the same as any other prisoner. That federal policy is simply not implicated when a sentencing judge adopts state sentencing policies when imposing a "like" sentence.

The majority referred to, but did not discuss, § 3553(a)(6), which "directs district courts to consider the need to avoid unwarranted federal sentencing disparities". CJPA062[19] However, federal sentencing uniformity is inherently at odds with the intrastate uniformity sought by the ACA. As the Tenth Circuit explained in United States v. Garcia, 893 F.2d 250, 253 (10th Cir. 1989), there is "tension between the two policies" and "[i]n the case of assimilative crimes, it is difficult to achieve

---

[18] United States v. Smith, 574 F.2d 988 (9th Cir. 1978); United States v. Vaughan, 682 F.2d 290 (2nd Cir. 1982); United States v. Norquay, 905 F.2d 1157 (8th Cir. 1990)

[19] The argument regarding possible sentencing disparities was undermined by the decisions in Kimbrough v. United States, 552 U.S. 85, 107-108 (2007) (permitting a court to reject particular guidelines on the basis of "policy" differences with Congress) and Pepper v. United States, 562 U.S. 476, 501 (2011) (permitting a court to reject a policy determination of the Sentencing Commission).

fully the Sentencing Reform Act's goal of federal sentencing uniformity because the punishments for particular state offenses often vary significantly among the states". The majority cites this Court's opinion in United States v. Begin, 696 F.3d 405, 412 (3rd Cir. 2012), which makes this very point: "Because penalties vary from state to state, sentence reductions to approach state penalties similarly vary with the state in which the federal court sits." Moreover, the type of ongoing review and adjustments that are a central feature of the Guidelines is impossible because of the scarcity of cases and the disparate state sentencing laws.[20]

In essence, the majority opinion finds fault with the District Court's utilization of the state law concept of a "real sentence" while rendering meaningless the ACA's requirement of a "like sentence".

---

[20] This institutional expertise undergirded the decisions in Gall v. United States, 552 U.S. 38, 46 (2007) and Rita v. United States, 551 U.S. 338, 349-350 (2007). See United States v. Booker, 543 U.S. 220, 264 (2005).

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the matter be reheard by the Court *en banc*.

Respectfully submitted,

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.

___*/s/ Herbert I. Waldman*_____
By:    Rubin M. Sinins
         Herbert I. Waldman

August 18, 2017

17

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that pursuant to Federal Rule of Appellate Procedure 35(b)(2)(A), the attached petition for rehearing *en banc* is proportionately spaced, has typeface of 14 points or more, and contains 3865 words.

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.

*/s/ Herbert I. Waldman*
By: Herbert I. Waldman

Dated: August 18, 2017

## CERTIFICATE OF SERVICE

I hereby certify that the following are filing users and will be served

electronically by the Notice of Docketing Activity:


John F. Romano, AUSA
Email: John.Romano@usdoj.gov
United States Attorney's Office - Newark Div
970 Broad Street;  Rm 700
Newark, NJ 07102-2534


Carol Gillen, AFPD
Email: Carol_Gillen@fd.org
Federal Public Defender's Office
1002 Broad Street;  Floor 1
Newark, NJ 07102-2503


JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.

_____/s/ Herbert I. Waldman_____
By: Herbert I. Waldman
Attorney for Carolyn Jackson

Dated: August 18, 2017

```
SERA8              *        PUBLIC INFORMATION          *        07-18-2017
PAGE 001           *            INMATE DATA             *        10:22:16
                            AS OF 07-18-2017

REGNO..: 65373-050 NAME: JACKSON, CAROLYN

                   RESP OF: COR
                   PHONE..: 352-689-7390    FAX: 352-689-7396
                                            RACE/SEX...: BLACK / FEMALE
                                            AGE:  39
PROJ REL MT: GOOD CONDUCT TIME RELEASE      PAR ELIG DT: N/A
PROJ REL DT: 11-24-2017                     PAR HEAR DT:




G0002        MORE PAGES TO FOLLOW . . .
```

```
SERA8              *        PUBLIC INFORMATION        *      07-18-2017
PAGE 002           *          INMATE DATA             *      10:22:16
                              AS OF 07-18-2017
```

REGNO..: 65373-050 NAME: JACKSON, CAROLYN

```
                       RESP OF: COR
                       PHONE..: 352-689-7390   FAX: 352-689-7396
HOME DETENTION ELIGIBILITY DATE: 09-13-2017
```

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  11-24-2017 VIA GCT REL

----------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

```
COURT OF JURISDICTION............: NEW JERSEY
DOCKET NUMBER....................: 2:2013CR290-01
JUDGE............................: HAYDEN
DATE SENTENCED/PROBATION IMPOSED: 12-15-2015
DATE COMMITTED...................: 03-02-2016
HOW COMMITTED....................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED................: NO
```

```
                  FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED..: $1,200.00       $00.00          $00.00       $00.00
```

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

-----------------------CURRENT OBLIGATION NO: 010 ----------------------------
OFFENSE CODE....:  899
OFF/CHG: N.J.S.A. 2C:5-2; CONSPIRACY TO ENDANGER THE WELFARE OF A CHILD
         N.J.S.A. 2C:24-4A; ENDANGERING THE WELFARE OF A CHILD

```
 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   24 MONTHS
 TERM OF SUPERVISION............:    3 YEARS
 DATE OF OFFENSE................: 04-23-2010
```

G0002       MORE PAGES TO FOLLOW . . .

```
       SERA8        *        PUBLIC INFORMATION        *        07-18-2017
  PAGE 003 OF 003  *           INMATE DATA             *        10:22:16
                             AS OF 07-18-2017
```

REGNO..: 65373-050 NAME: JACKSON, CAROLYN

```
                    RESP OF: COR
                    PHONE..: 352-689-7390   FAX: 352-689-7396
------------------------CURRENT COMPUTATION NO: 010 ------------------------
```

COMPUTATION 010 WAS LAST UPDATED ON 03-08-2016 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 03-14-2016 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010

```
DATE COMPUTATION BEGAN..........: 03-02-2016
TOTAL TERM IN EFFECT............:    24 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:     2 YEARS
EARLIEST DATE OF OFFENSE........: 04-23-2010

JAIL CREDIT.....................:    FROM DATE      THRU DATE
                                    04-30-2013     05-02-2013

TOTAL PRIOR CREDIT TIME.........: 3
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 94
TOTAL GCT EARNED................: 54
STATUTORY RELEASE DATE PROJECTED: 11-24-2017
EXPIRATION FULL TERM DATE.......: 02-26-2018
TIME SERVED.....................:     1 YEARS      4 MONTHS     20 DAYS
PERCENTAGE OF FULL TERM SERVED..: 69.4

PROJECTED SATISFACTION DATE.....: 11-24-2017
PROJECTED SATISFACTION METHOD...: GCT REL
```

G0000       TRANSACTION SUCCESSFULLY COMPLETED

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 16-1200

UNITED STATES OF AMERICA,
Appellant

v.

CAROLYN JACKSON

No. 16-1201

UNITED STATES OF AMERICA,
Appellant

v.

JOHN E. JACKSON

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. Nos.. 2-13-cr-00290-001 & 2-13-cr-00290-002)
Honorable Katharine S. Hayden, District Judge

Argued February 7, 2017

BEFORE:  MCKEE, COWEN, and FUENTES, Circuit Judges

JUDGMENT

This cause came on to be considered on the record on appeal from the United

States District Court for the District of New Jersey and was argued on February 7, 2017.

On consideration whereof, it is hereby

ORDERED and ADJUDGED by this Court that the judgments entered by the

District Court on December 28, 2015 and January 8, 2016, be and hereby are vacated and

that this case be and hereby is remanded for further proceedings consistent with this

Court's opinion.

ATTEST:


s/ Marcia M. Waldron
Clerk

DATED: July 6, 2017

2

PRECEDENTIAL

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

No. 16-1200

_____

UNITED STATES OF AMERICA,
                              Appellant

v.

CAROLYN JACKSON

_____

No. 16-1201

_____

UNITED STATES OF AMERICA,
                              Appellant

v.

JOHN E. JACKSON

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J.. Nos. 2-13-cr-00290-001 & 2-13-cr-00290-002)
Honorable Katharine S. Hayden, District Judge

_____

Argued February 7, 2017

BEFORE:  MCKEE, COWEN, and FUENTES, <u>Circuit</u>
<u>Judges</u>

(Filed: July 6, 2017)

———————————

Mark E. Coyne
John F. Romano    [Argued]
Office of United States Attorney
970 Broad Street, Room 700
Newark, N.J. 07102
    *Counsel for Appellants*

Rubin M. Sinins
Herbert I. Waldman    [Argued]
Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins
505 Morris Avenue
Springfield, N.J. 07081
    *Counsel for Appellee in No. 16-1200*

Louise Arkel    [Argued]
Carol Gillen
David A. Holman
Office of the Federal Public Defender
1002 Broad Street
Newark N.J. 07102
    *Counsel for Appellee in No. 16-1201*

2

---

OPINION OF THE COURT

---

COWEN, Circuit Judge.

John and Carolyn Jackson ("John" and "Carolyn") were convicted of conspiracy to endanger the welfare of a child and endangering the welfare of a child under New Jersey law—offenses that were "assimilated" into federal law pursuant to the Assimilative Crimes Act ("ACA"). The United States District Court for the District of New Jersey sentenced Carolyn to 24 months of imprisonment (as well as three years of supervised release). John received a sentence of three years of probation (together with 400 hours of community service and a $15,000 fine). The government appeals from these sentences.

We will vacate the sentences and remand for resentencing. Concluding that there is no "sufficiently analogous" offense guideline, the District Court declined to calculate Defendants' applicable sentencing ranges under the Guidelines. Although we adopt an "elements-based" approach for this inquiry, we conclude that the assault guideline is "sufficiently analogous" to Defendants' offenses of conviction. Furthermore, the District Court failed to make the requisite findings of fact—under the applicable preponderance of the evidence standard—with respect to this Guidelines calculation as well as the application of the statutory sentencing factors. We also agree with the government that the District Court, while it could consider what would happen if Defendants had been prosecuted in state court, simply went too far in this case by

3

focusing on state sentencing practices to the exclusion of federal sentencing principles. Finally, the sentences themselves were substantively unreasonable.

## I.

John, a major in the United States Army, and Carolyn, his wife, were the biological parents of three children, including "JJ." They also became the foster parents of three young children: Joshua (born on May 13, 2005), "J" (born on April 1, 2006), and "C" (born on April 7, 2008). The three children were eventually adopted. Joshua died on May 8, 2008.

Defendants were charged in a fifteen-count superseding indictment. These counts can be organized into three different categories: an assimilated state conspiracy charge, assimilated state substantive offenses, and substantive charges under federal law. These offenses occurred (at least in part) within the special maritime and territorial jurisdiction of the United States, i.e., at Picatinny Arsenal Installation in Morris County, New Jersey.

Count 1 charged John and Carolyn with conspiracy to endanger the welfare of a child—Joshua, J, and C—under N.J. Stat. Ann. §§ 2C:24-4a and 2C:5-2—assimilated pursuant to the ACA. From August 2005 through April 23, 2010, Defendants, "for the purpose of promoting and facilitating conduct which endangered the welfare of a child, did agree with each other to engage in acts which constituted endangering the welfare of a child whom they had assumed responsibility for and accepted a legal duty to care for, namely, [Joshua, J, and C]." (A35-A36.) They carried out this conspiracy by, inter alia, physically assaulting the children with various objects and with their hands,

4

withholding proper medical care (and failing to seek prompt medical attention for Joshua and C), withholding sufficient nourishment from the children (and adequate water from J and C), forcing J and C to consume food that caused them pain and suffering, such as red pepper flakes, hot sauce, and/or raw onion, causing C to ingest excessive sodium or sodium-laden substances, and employing cruel and neglectful disciplinary and child-rearing techniques.

Counts 2 to 12 and Count 15 charged offenses under assimilated New Jersey law for endangering the welfare of a child (and aiding and abetting such endangerment) in violation of § 2C:24-4a and 18 U.S.C. § 2. Specifically, Defendants allegedly caused harm to the children in various ways, made them "neglected" children, and children "upon whom cruelty had been inflicted, as defined in N.J.S.A. Sections 9:6-1 and 9:6-3." (A39-A49, A52.) Counts 2 and 7 alleged that Defendants withheld sufficient nourishment and food from Joshua and C, respectively. Counts 4 and 8 similarly alleged that they withheld adequate water from J and C and prohibited these two children from drinking water. Counts 3, 6, and 12 charged that Defendants "physically assault[ed] [Joshua, J, and C, respectively] with various objects and with their hands." (A40, A43, A49.) In Counts 5 and 9, it was alleged that Defendants forced J "to ingest hot sauce, red pepper flakes, and raw onion" (A42) and C "to ingest hot sauce and red pepper flakes" (A46). Count 10 claimed that Defendants "caus[ed] [C] to ingest excessive sodium and a sodium-laden substance while restricting [C's] fluid intake, causing [C] to suffer hypernatremia and dehydration, a life threatening condition." (A47.) Count 11 then charged Defendants with withholding prompt and proper medical care for C's dehydration and

5

elevated sodium levels. Finally, Count 15 alleged that Defendants withheld prompt and proper medical care for C's fractured humerus.

Defendants were also accused of assaulting C with a dangerous weapon with intent to do bodily harm (and aiding and abetting this assault) in violation of 18 U.S.C. §§ 113(a)(3) and 2 (Count 13) as well as with intentionally assaulting C (and aiding and abetting such an assault) resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and § 2 (Count 14).

Trial commenced on April 13, 2015, and lasted 39 days.[1] At the close of the government's case, the District Court granted judgments of acquittal on Counts 13 and 14. On July 8, 2015, the jury returned guilty verdicts on Counts 1 to 12 as to Carolyn and on Counts 1, Counts 3 to 9, and Counts 11 to 12 as to John. Accordingly, both Defendants were acquitted on Count 15 (renumbered as Count 13), and John was found not guilty on Counts 2 and 10.

Using the offense guidelines for assault, U.S.S.G. § 2A2.3, and aggravated assault, U.S.S.G. § 2A2.2, the Probation Office calculated both Defendants' Guidelines range as 210 to 262 months. The government similarly calculated a sentencing range of 292 to 365 months. It sought sentences of 235 months for Carolyn and 188 months for John. A 10 1/2-hour sentencing was held on December 15, 2015. At the sentencing hearing, the District Court rendered an especially thorough ruling on the record. Declining to calculate a Guidelines sentence, it

---

[1] An earlier trial ended in a mistrial when the government asked a question suggesting that Joshua was no longer alive.

ultimately sentenced Carolyn to a term of imprisonment of 24 months (as well as three years of supervised release). John was sentenced to three years of probation (as well as 400 hours of community service and a $15,000 fine).[2]

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction pursuant to 18 U.S.C. § 3742(b). As required by § 3742(b), the Solicitor General personally authorized the government to appeal.

---

[2] The District Court also struck the assertions regarding the offense conduct set forth in the Presentence Investigation Reports ("PSRs") because they were written by the government, no independent investigation was conducted by the Probation Office, no countervailing evidence was referenced, and certain paragraphs were related to extraneous guidelines.

Additionally, the District Court had the benefit of a lengthy decision by the Appellate Division of the New Jersey Superior Court, which affirmed the judicial determination that Defendants abused and neglected J, C, and JJ and the termination of their parental rights as to these three children but reversed the state family judge's finding of abuse and neglect with respect to two other children [their other two biological children]. See N.J. Div. of Child Prot. & Permanency v. C.J., 2014 WL 3881311 (N.J. Super. Ct. App. Div. Aug. 8, 2014) (per curiam); see also N.J. Div. of Child Prot. & Permanency v. C.J., 2016 WL 4608231 (N.J. Super. Ct. App. Div. Sept. 6, 2016) (per curiam) (holding that trial court erred in granting kinship legal guardianship as to the two biological children).

7

This case implicates a number of rather unusual sentencing issues. This is not surprising because Defendants were not convicted and sentenced for committing enumerated federal crimes of the sort that federal courts consider on a regular basis. Instead, they were convicted and sentenced in federal court for state law offenses "assimilated" into federal law pursuant to a federal statute, the ACA. The ACA provides that:

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, or on, above, or below any portion of the United States not within the jurisdiction of any State, Commonwealth, territory, possession, or district is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13(a). This statute, which in its original form dates back to the 1820s, is designed to borrow state laws in order to fill gaps that exist in federal criminal laws with respect to criminal offenses that are committed on federal enclaves. See, e.g., Lewis v. United States, 523 U.S. 155, 160-61 (1998).

However, setting aside these special circumstances, we

8

look to the generally applicable post-Booker sentencing process. The sentencing court must engage in the following three-step process: (1) calculate the defendant's (now advisory) Guidelines range; (2) formally rule on the parties' motions for departure and, if a motion is granted, state how the departure affects the Guidelines calculation; and (3) consider the statutory sentencing factors specified in 18 U.S.C. § 3553(a) and determine the appropriate sentence to impose. See, e.g., United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2014) (en banc). We review sentences for both procedural as well as substantive reasonableness. See, e.g., id.

III.

A.    "Sufficiently Analogous" Offense Guidelines

We begin, as we must, with the Guidelines. Pursuant to U.S.S.G. § 2X5.1, the sentencing court, in cases where the offense is a felony for which no guideline expressly has been promulgated, applies the "most analogous" offense guideline. Defendants are correct that this Court should adopt an "elements-based" approach to this inquiry—which calls for a comparison between the elements of the offense of conviction with the purportedly analogous offense guideline and the elements of the various federal offenses covered by this guideline. However, we also agree with the government that, under this approach, the assault guideline is "sufficiently analogous" to Defendants' offenses of conviction. The District Court accordingly committed reversible error by concluding that there is no "sufficiently analogous" offense guideline in this case.

9

The "Applications Instructions" direct the sentencing court to begin by "[d]etermin[ing], pursuant to § 1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction." U.S.S.G. § 1B1.1(a)(1) (citing U.S.S.G. § 1B1.2). U.S.S.G. § 1B1.2(a) ("Applicable Guidelines") states, inter alia, that the sentencing court should "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted)." This guideline provides basic instructions on how to identify the offense guideline section:

> Refer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction. If the offense involved a conspiracy, attempt, or solicitation, refer to §2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense. For statutory provisions not listed in the Statutory Index, use the most analogous guideline. See § 2X5.1 (Other Offenses).

Id.

The Sentencing Commission's commentary explains that § 1B1.1 provides the basic rules for determining the guideline applicable to the offense conduct under Chapter Two (Offense Conduct). "The court is to use the Chapter Two guideline section referenced in the Statutory Index (Appendix A) for the

10

offense of conviction." U.S.S.G. § 1B1.2 cmt. n.1. "However, . . . for statutory provisions not listed in the Statutory Index, the most analogous guideline, determined pursuant to § 2X5.1 (Other Offenses), is to be used." Id. "In the case of a particular statute that proscribes only a single type of criminal conduct, the offense of conviction and the conduct proscribed by the statute will coincide, and the Statutory Index will specify only one offense guideline for that offense of conviction." Id. The commentary to § 1B1.2 also deals with the situation where the particular statute proscribes a variety of conduct that might constitute the subject of different offense guidelines—and the Statutory Index specifies more than one offense guideline for that particular statute: "[T]he court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted." Id. "For statutory provisions not listed in the Statutory Index, the most analogous guideline is to be used. See § 2X5.1 (Other Offenses")." Id.; see also id. ("If the offense involved a conspiracy, attempt, or solicitation, refer to § 2X.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense.").

U.S.S.G. § 2X5.1 ("Other Felony Offense") states the following:

> If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter

11

Two offense guideline shall remain applicable.

If the defendant is convicted under 18 U.S.C. § 1841(a)(1), apply the guideline that covers the conduct the defendant is convicted of having engaged in, as that conduct is described in 18 U.S.C. § 1841(a)(1) and listed in 18 U.S.C. § 1841(b).

The commentary to § 2X5.1 states in relevant part that this guideline applies only to felony offenses not referenced to Appendix A (Statutory Index) (and accordingly U.S.S.G. § 2X5.2 (Class A Misdemeanors (Not Covered by Another Specific Offense Guideline)) should be used for Class A misdemeanors)). U.S.S.G. § 2X5.1 cmt. n.3. It then states:

**Background:**    Many offenses, especially assimilative crimes, are not listed in the Statutory Index or in any of the lists of Statutory Provisions that follow each offense guideline. Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offenses proscribe. The court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous. In a case in which there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 control.

The sentencing guidelines apply to convictions under 18 U.S.C. § 13 (Assimilative Crimes Act) and 18 U.S.C. § 1153 (Indian Major Crimes Act);

12

see 18 U.S.C. § 3551(a), as amended by section
1602 of Public Law 101-647.

Id. cmt. background.

There are three basic tests that could be used to identify a
"sufficiently analogous" offense guideline: (1) an "elements-
based" approach, i.e., "[w]hether there is a sufficiently
analogous guideline to a particular crime is generally a task of
comparing the elements of the defendant's crime of conviction
to the elements of federal offenses already covered by a specific
guideline," United States v. Nichols, 169 F.3d 1255, 1270 (10th
Cir. 1999) (citing United States v. Allard, 164 F.3d 1146, 1149
(8th Cir. 1999); United States v. Osborne, 164 F.3d 434, 437
(8th Cir. 1999)); (2) "comparing various Guidelines to 'the facts
alleged in the indictment'" (Appellant's Brief at 28 (quoting
United States v. McEnry, 659 F.3d 893, 899-901 (9th Cir.
2011))); or (3) a broader approach in which the sentencing court
must take into account all of the circumstances and make factual
findings to support its ultimate selection. Although it contends
that "the assault Guidelines are sufficiently analogous offense
Guidelines" under the "elements-based" approach (id. at 33), the
government asks the Court to adopt the second test, what we call
the "indictment-facts" approach. We, however, determine that
the "elements-based" approach should apply.[3]

Initially, the precedential "indictment-facts" case law
cited by the government generally "pertain to the scope of

_____

[3] No one suggests that the sentencing court should decide
whether there is a "sufficiently analogous" offense guideline
based on its own findings of fact.

13

inquiry when more than one guideline is assigned to a statute or when no guideline is assigned and the court determines that more than one guideline is sufficiently analogous [and must therefore select the 'most analogous' offense guideline]." (John's Brief at 24.) In United States v. Boney, 769 F.3d 153 (3d Cir. 2014), cert. denied, 135 S. Ct. 1003 (2015), this Court concluded that the district court failed to select the "most appropriate" offense guideline for the offense conduct charged in the counts of which the defendant was convicted pursuant to Application Note 1 of § 1B1.2, id. at 154-63. Likewise, we considered in United States v. Aquino, 555 F.3d 124 (3d Cir. 2009), which of two offense guidelines specified in the Statutory Index for a particular federal offense was the "most appropriate" guideline under this § 1B1.2 commentary and then applied the respective offense guidelines' cross-references, id. at 125-31. In another Third Circuit case cited by the government, we specifically addressed several issues that arose as a consequence of the sentencing court applying the "most analogous" offense guideline. United States v. Cherry, 10 F.3d 1003, 1005 (3d Cir. 2003) ("This appeal requires us to decide several issues which arise when the United States Sentencing Guidelines . . . do not contain a provision expressly applicable to the offense for which a defendant has been convicted and the district court applies a guideline deemed to be most analogous to the offense of conviction.").

While the government does not cite to any precedential opinion adopting its understanding of the "sufficiently analogous" guideline inquiry,[4] the Fifth, Eighth, and Tenth

---

[4] In a § 2X5.1 appeal, the Ninth Circuit refused to express an opinion "as to whether the district court's look to the

14

Circuits have adopted the "elements-based" approach. This approach began with the Eighth Circuit's 1999 ruling in <u>United States v. Osborne</u>, 164 F.3d 434 (8th Cir. 1999).

According to the Eighth Circuit, "[t]he first step of the USSG § 2X5.1 analysis is to determine whether there are any guidelines which are sufficiently analogous to the defendant's crime; if there are no sufficiently analogous guidelines, then the defendant is to be sentenced using the general provisions of 18 U.S.C. § 3553(b)," <u>id.</u> at 437 (footnote omitted) (citing <u>United States v. Cefalu</u>, 85 F.3d 964, 966-69 (2d Cir. 1996)). The <u>Osborne</u> court held that a de novo standard of review applies to this initial step because, among other things, "the issue most generally will involve comparing the elements of federal offenses to the elements of the crime of conviction." <u>Id.</u>; <u>see also</u> <u>id.</u> ("Secondly, a determination that there is not a sufficiently analogous guideline will require the district court to impose sentence under 18 U.S.C. § 3553(b), which we are convinced is a legal issue.").

---

allegations in the indictment to select the appropriate guideline would have been permissible in this case." <u>United States v. McEnry</u>, 659 F.3d 893, 901 n.13 (9th Cir. 2011). "Moreover, because this case does not present a situation where more than one guideline is 'sufficiently analogous' to McEnry's crime of conviction, U.S.S.G. § 2X5.1, we express no opinion about whether the court might be permitted to look to more facts in such a case." <u>Id.</u> An unpublished per curiam disposition by the Fourth Circuit was the only decision cited by the government that looked to the facts alleged in the indictment as part of its "sufficiently analogous" guideline analysis. <u>See United States v. Centner</u>, 116 F.3d 473, at *1-*4 (4th Cir. 1997) (per curiam).

15

The government takes issue with this ruling, claiming that the Eighth Circuit offered no support for its approach. But the Osborne court did offer a persuasive explanation based on the Background Note to § 2X5.1 and the distinction the Sentencing Commission draws between a "sufficiently analogous" offense guideline, on the one hand, and the "most analogous" such guideline, on the other hand:

> The background note to USSG § 2X5.1 states specifically, "The court is required to determine if there is a sufficiently analogous guideline and, if so, to apply the guideline that is most analogous. Where there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) control." USSG 2X5.1, comment. (backg'd). This portion of the application note mandates a two-step analysis, and makes abundantly clear that there is a difference between a situation where the district judge is choosing the most analogous guideline among sufficiently analogous guidelines, and a situation where there is no sufficiently analogous guideline. In construing the guideline and the application note, we must give meaning to each of these terms.

Id.[5]

---

[5] The Eighth Circuit thereby quoted from an older version of the commentary. However, the current version of this language is essentially indistinguishable. See § 2X5.1 cmt. background ("The court is required to determine if there is a

16

The Eighth Circuit went on to conclude that a deferential standard of review applies to the district court's "most analogous" guideline selection, indicating that the district court must take into account the circumstances of the case and make its own factual findings. Id. at 437-38. "Absent an indication that the district court misunderstood the legal standards, that is, it misunderstood the elements of the state offense or the analogous federal offenses, we will defer to its judgment as to how the facts fit into those elements." Id. at 438 (citing United States v. Mariano, 983 F.2d 1150, 1158 (1st Cir. 1993)). Furthermore, the Osborne court noted that choosing the "most analogous" offense guideline involves more than just interpretation of the various guidelines (but instead implicates the applicability of different guidelines to the facts). Id.

In this case, the government agrees with the Eighth Circuit that "[w]hether there is a sufficiently analogous offense Guideline is a legal question subject to plenary review." (Appellant's Brief at 25 (citing United States v. Cothran, 286 F.3d 173, 176-77 (3d Cir. 2002); Aquino, 555 F.3d at 127).) According to the Osborne court, the divergent standards of review strike the appropriate balance between avoiding unwarranted sentencing disparities and imposing individualized sentences. Id. "With appellate courts reviewing the sufficiency question de novo, defendants will not receive sentences based on wholly inapplicable guidelines." Id. Nevertheless, § 2X5.1

---

sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous. In a case in which there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 control.")

17

cases "are inherently out of the ordinary; the Commission does not offer a predetermined guideline or offense level." Id. "By giving due deference to the district court's choice of the most analogous guideline, district courts will have more freedom to fashion the appropriate sentence in these unconventional situations on a case by case basis." Id.; see also United States v. Allard, 164 F.3d 1146, 1147-50 (8th Cir. 1999) (companion case to Osborne applying same principles).

The Fifth Circuit as well as the Tenth Circuit have followed the Eighth Circuit's example by comparing the elements of the defendant's offense of conviction with the elements of federal offenses covered by a specific offense guideline in order to ascertain whether, as a legal matter, this guideline is "sufficiently analogous" to the offense of conviction. See, e.g., United States v. Rakes, 510 F.3d 1280, 1287-88 (10th Cir. 2007); United States v. Calbat, 266 F.3d 358, 363 (5th Cir. 2001); Nichols, 169 F.3d at 1269-71.

In support for its assertion that a plenary standard of review applies to this inquiry, the government cites to our opinion in United States v. Cothran, 286 F.3d 173 (3d Cir. 2002). Cothran strongly weighs in favor of the "elements-based" approach.

In that case, the defendant was convicted of conveying false information and threats about carrying an explosive device on an airplane in violation of 49 U.S.C. § 46507, and he contested the district court's "finding that the United States Sentencing Guideline (U.S.S.G.) § 2A6.1 [(Threatening or Harassing Communications)] was the most analogous offense guideline for Cothran's crime [as opposed to U.S.S.G. § 2K1.5

18

(Possessing Dangerous Weapons or Materials While Boarding or Abroad an Aircraft)]." Id. at 174. Observing that the courts are split vis-à-vis the applicable standard of review, we turned to Osborne's "comprehensive and cogent analysis of the standard to be applied." Id. at 176.

"The [Eighth Circuit] noted that there is a two-step process involved: first, the district court must determine whether there is a sufficiently analogous offense guideline, and, if there is, it then must determine which guideline is most analogous." Id. at 177 (citing Osborne, 164 F.3d at 437). It "held that the first step, determining whether there is a sufficiently analogous guideline, is a legal question and is reviewed de novo." Id. (citing Osborne, 164 F.3d at 437). According to Cothran, the Osborne court correctly identified the standard of review to apply to the first step "[b]ecause determining whether there is an analogous guideline is substantially interpreting and applying the guidelines." Id. The Cothran Court then accepted Osborne's "logical" analysis with respect to the "most analogous" guideline inquiry, applying a deferential standard of review as to the district court's factual findings and application of the guidelines to these facts. Id. (citing Calbat, 266 F.3d at 363 n.1).

While the Cothran Court did not specifically mention Osborne's "elements" language (and did not actually conduct the initial "sufficiently analogous" guideline inquiry), we did express approval for the Eighth Circuit's "cogent" analysis of the applicable standards of review. The Eighth Circuit adopted these standards for the "sufficiently analogous" guideline inquiry specifically because the first step would require district courts to look only to the elements, while the second step would

19

require factual findings. Cothran thus adopted the elements-based inquiry from Osborne.

Even though we must look to the respective elements, we stress that this inquiry must be conducted in a flexible and open-ended fashion. After all:

> Numerous sections of the sentencing guidelines direct the court to apply the offense level of the federal offense most "analogous" to a particular unlawful activity; it would be unreasonable to read into every one of these sections the requirement that, in order to apply the analogous offense guideline, the sentencing court must effectively retry the defendant for an otherwise unrelated offense. "[A]nalogy does not mean identity. It implies difference." Sturm v. Ulrich, 10 F.2d 9, 11 (8th Cir. 1925).

United States v. Langley, 919 F.2d 926, 930-31 & n.8 (5th Cir. 1990) (citing inter alia § 2X5.1). In turn, the Tenth Circuit explained that "the court first had to ask what analogous provisions were within the ballpark; it then had to ask which represented the best fit." Rakes, 510 F.3d at 1287. "We generally compare the elements of the defendant's crime to the elements of federal offenses already covered by specific Guidelines sections to ascertain which plausible analogies exist for sentencing." Id. at 1288 (citing Nichols, 169 F.3d at 1270). In Allard (decided on the same day as Osborne), the Eighth Circuit similarly observed that, "by definition, analogous guidelines do not and need not perfectly match the defendant's crime." Allard, 164 F.3d at 1149 (citing United States v. Terry,

20

86 F.3d 353, 358 (4th Cir. 1996)).  While the inquiry may still be "bounded by the elements of the offense of conviction" (John's Brief at 23), a perfect match of elements is not necessary (or even expected).  Instead, the proffered guideline need only be within the same proverbial "ballpark" as the offense of conviction.

This "ballpark" or "plausible analogy" notion actually makes a lot of sense in the ACA context.  It is undisputed that "assimilated crimes, by definition, have no perfect matches among federal offenses"—otherwise they would not be assimilated under the terms of the ACA itself.  (Appellant's Brief at 32 (citing Lewis v. United States, 523 U.S. 155, 164-72 (1988)).)  The Background Note to § 2X5.1 explains that many offenses, particularly "assimilative offenses," are not listed in the Statutory Index or in any of the lists of statutory provisions that follow each guideline—"Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offenses proscribe."  § 2X5.1 cmt. background.   The Sentencing Commission thereby contemplates that most assimilated offenses will actually have a "sufficiently analogous" offense guideline.  In addition, this comment "suggests that the most analogous guideline is the one that covers the 'type of criminal behavior' of which the defendant was convicted."  Calbat, 266 F.3d at 363.

Accordingly, we now consider whether there is a "sufficiently analogous" offense guideline to Defendants' offenses of conviction.  We begin by setting forth the assault (and aggravated assault) guidelines and the related federal offenses.  The Court then turns to the state statutory provisions at issue here and (in particular) the jury instructions addressing

21

the elements of the assimilated New Jersey offense of endangering the welfare of a child. Having done so, we compare the respective elements. In the end, we conclude that Defendants' offenses of conviction, the assault guideline, and the federal offense of simple assault are within the same proverbial "ballpark."

The "Assault" guideline, U.S.S.G. § 2A2.3, "applies to misdemeanor assault and battery and to any felonious assault not covered by § 2A2.2 (Aggravated Assault)." § 2A2.2 cmt. background. The commentary to § 2A2.2, in turn, defines "Aggravated assault" as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." § 2A2.2 cmt. n.1. "This [aggravated assault] guideline covers felonious assaults that are more serious than other assaults because of the presence of an aggravating factor, i.e., serious bodily injury; the involvement of a dangerous weapon with intent to cause bodily injury; strangling, suffocating, or attempting to strangle or suffocate; or the intent to commit another felony." § 2A2.2 cmt. background.

18 U.S.C. § 113 prohibits "[a]ssaults within the special maritime and territorial jurisdiction." Defendants here were charged with (and judgments of acquittal were granted on) assault under § 113(a)(3) ("Assault with a dangerous weapon, with intent to do bodily harm") and § 113(a)(6) ("Assault resulting in serious bodily injury"). However, this federal provision sets forth additional assault offenses. For instance, "Assault by striking, beating, or wounding," is punishable by a

22

fine or imprisonment for not more than six months (or, pursuant to a 2013 amendment, for not more than one year). § 113(a)(4); see also Pub. L. No. 113-4, § 906, 104 Stat. 478 (2013). Pursuant to § 113(a)(5), "[w]hoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows: . . . . (5) Simple assault, by a fine under this title or imprisonment for not more than six months, or both, or, if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year, or both."

The Statutory Index lists more than forty different statutory sections for these two offense guidelines. See U.S.S.G. App'x A. It specifically lists § 2A2.3 for "18 U.S.C. § 113(a)(5) (Class A misdemeanor provisions only)." Id. In other words, the assault guideline applies where the victim is under the age of sixteen—thereby triggering either a fine or imprisonment for not more than one year (or both). See, e.g., 18 U.S.C. § 3559(a)(6) (specifying that Class A misdemeanor is any offense for which maximum term of imprisonment is one year or less but more than six months); U.S.S.G. § 2X5.2 cmt. n.1 ("Do not apply this guideline to a Class A misdemeanor that has been specifically referenced in Appendix A to another Chapter Two guideline.").

Turning to the New Jersey statutory scheme, the District Court aptly observed that "we are dealing with a less than clear statute" (A6688), which "is very unsatisfactory . . . really a morass" (A6580). Specifically, N.J. Stat. Ann. § 2C:24-4a ("Endangering welfare of children") incorporates definitions of basic concepts like abuse and neglect from various provisions of Title 9 of the New Jersey Statutes Annotated ("Children—

23

Juvenile and Domestic Relations Courts"). See, e.g., N.J. Stat. Ann. §§ 9:6-1 ("Abuse, abandonment, cruelty and neglect of child; what constitutes"), 9:6-3 ("Cruelty and neglect of children; crime of fourth degree; remedies"), 9:6-8.21 ("Definitions"); State v. N.I., 793 A.2d 760, 770 (N.J. Super. Ct. App. Div. 2002) ("The imprecision of the Title 9 definitions incorporated into N.J.S.A. 2C:24-4a, which caused the [Criminal Law Revision] Commission to be 'not happy' and to recommend the statute only "[w]ith hesitancy," has come home to roost in this case. It would, of course, be best if N.J.S.A. 2C:24-4a was self-contained with its own appropriate and precise definitions." (emphasis omitted)). Furthermore, it appears that the same conduct may be prosecuted under § 2C:24-4a as a crime of the second degree (which happened here) or as a fourth degree crime under N.J. Stat. Ann. § 9:6-3. See, e.g., State v. D.A.V., 823 A.2d 34, 34 (N.J. 2003) (Albin, J., concurring) ("[T]he same conduct is proscribed in the same language; however, when prosecuted pursuant to N.J.S.A. 2C:24-4, a defendant is exposed to a five- to ten-year state prison term, and when prosecuted pursuant to N.J.S.A. 9:6-3, a defendant is exposed only to an eighteen-month prison term. In that respect, it appears that those provisions are unique in the New Jersey Statutes Annotated." (emphasis omitted)).

Under these circumstances, it is understandable the parties (especially Defendants) focus on the District Court's (rather extensive) jury instructions.

Addressing Count 1 (the conspiracy charge) of the indictment, the District Court reviewed the elements of the child endangerment offense:

24

The New Jersey statutes upon which endangering the welfare of a child are based are Sections 2C:24-4a, 9:6-1 and 9:6-3 of the New Jersey Statutes Annotated. Section 2C:24-4a and Section 9:6-3 criminalize the act of endangering the welfare of a child, and Section 9:6-1 provides definitions of what constitutes abuse, abandonment, cruelty and neglect of a child.

At the outset I will read the statutes to you and then I will explain how you must apply the statutes to the facts of this case by identifying the specific elements that the government must prove beyond a reasonable doubt.

Section 2C:24-4a reads, in pertinent part:

Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who causes the child harm that would make the child an abused or neglected child . . . is guilty of a crime.

Section 9:6-3 reads, in pertinent part:

Any parent, guardian or person having the care, custody or control of any child who shall . . . be cruel to or neglectful of such child. . . shall be deemed to be guilty of a crime . . . .

25

Turning to the elements, to find Carolyn Jackson and John E. Jackson guilty of endangering the welfare of a child, the government must prove the following elements beyond a reasonable doubt:

1. That [Joshua, J, or C] was a child;

2. That the defendant knowingly caused the child harm that would make the child neglected or knowingly committed an act of cruelty against the child;

3. That the defendant knew that such conduct would cause the child harm or would inflict cruelty upon the child; and

4. That the defendant had a legal duty for the care of the child or had assumed responsibility for the care of the child.

(A6008-A6009.) The District Court then explained each element, defining the terms "child" (any person under the age of eighteen at the time of the offense), "cruelty," and "neglect":

The second element that the government must prove beyond a reasonable doubt is that Carolyn Jackson and John E. Jackson knowingly caused the child harm that would make the child neglected or knowingly committed an act of cruelty against the child.

26

Section 9:6-1 of the New Jersey Statutes Annotated includes the following applicable definitions of cruelty and neglect. As defined under Section 9:6-1, the legal definition of abuse does not apply in this case.

Cruelty consists of any of the following acts, by anyone having the custody or control of the child:

(a) Inflicting unnecessarily severe corporal punishment upon a child;

(b) Inflicting upon a child unnecessary suffering or pain, either mental or physical;

(c) Habitually tormenting, vexing or afflicting a child;

(d) Any act of omission or commission whereby unnecessary pain and suffering, whether mental or physical, is caused or permitted to be inflicted on a child; or

(e) Exposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical well-being of such child.

Neglect consists in any of the following acts, by

27

anyone having the custody or control of the child:

(a) Failing to provide proper and sufficient food, clothing, maintenance . . . medical attendance or surgical treatment . . . or

(b) Failure to do or permit to be done any act necessary for the child's physical well-being.

In New Jersey, the use of corporal punishment is not necessarily unlawful. The law prohibits the infliction of unnecessarily severe corporal punishment; however, as a general matter, a parent may inflict moderate correction such as is reasonable under the circumstances of the case. A parent may not inflict corporal punishment that is cruel, as I have just defined for you.

(A6010-A6011.) The District Court explored what is meant by acting "knowingly" (e.g., "A person acts knowingly with respect to the nature of his or her conduct or the attendant circumstances if he or she is aware that the conduct is of that nature or that such circumstances exist or the person is aware of a high probability of their existence. A person acts knowingly with respect to a result of the conduct if he or she is aware that it is practically certain that the conduct will cause a result" (A6011)). It explained how Defendants could be found guilty for omissions or the failure to act. The jury was told that a failure to act or an omission can be the basis for criminal liability if the government proves beyond a reasonable doubt that the

28

defendant had a legal duty to act and failed or omitted to perform that legal duty with knowledge that this failure was practically certain to cause harm. Additionally, the District Court instructed the jury that the government must prove beyond a reasonable doubt that each defendant had a legal duty, or assumed responsibility, for the care of Joshua, J, or C. Noting that these concepts encompass adoptive and foster parents, the District Court stated that "[a] person who has assumed responsibility for the care of the child includes any person who assumes a general and ongoing responsibility for the child and who establishes a continuing or regular supervisory or caretaker relationship with the child." (A6012.)

The District Court, after summarizing the factual allegations for each substantive count (Counts 2 through 13), expressly incorporated its Count 1 instructions in each count. For the first substantive charge (Count 2), the written instructions provided a little more detail regarding the requisite elements:

> I have previously instructed you regarding the Assimilative Crimes Act and Endangering the Welfare of a Child. There are two elements that the government must prove in a violation of the Assimilative Crimes Act:
>
> 1. First, that the defendants endangered the welfare of a child; and
>
> 2. Second, that the offense occurred within the special maritime and territorial jurisdiction of the United States.

29

Additionally, to prove a violation of endangering the welfare of a child in violation of New Jersey law, the government must prove:

1. That [Joshua] was a child.

2. That the defendant knowingly caused the child harm that would make the child neglected or a child upon whom cruelty has been inflicted;

3. That the defendant knew that such conduct would cause the child harm or would inflict cruelty upon the child; and

4. That the defendant had a legal duty for the care of the child or had assumed responsibility for the care of the child.

Because I already gave you detailed instructions regarding this offense in Count One, I will not repeat them. The same instructions apply to this count of the Superseding Indictment.

(A6019-A6020.)

The jury was also given a written "Good Faith Defense" instruction, which stated, among other things that, "[i]f you find that Carolyn Jackson and John E. Jackson acted in 'good faith,' as that term is defined below, that would be a complete defense to this charge, because good faith on the part of Carolyn Jackson

30

or John E. Jackson would be inconsistent with his or her acting knowingly." (A6035.) According to the District Court:

> A defendant acts in "good faith" when he or she did not know that his or her acts or omissions were practically certain to cause harm to a child, even though that knowledge turns out to be inaccurate or incorrect. Thus, in this case if Carolyn Jackson or John E. Jackson made an honest mistake or had an honest misunderstanding about whether his or her acts or omissions were practically certain to cause harm to a child then he or she did not act knowingly. A belief need not be objectively reasonable to be held in good faith; nevertheless, you may consider whether Carolyn Jackson or John E. Jackson's stated belief that his or her acts or omissions were not practically certain to cause harm to a child was reasonable as a factor in deciding whether the belief was honestly or genuinely held.

(Id.) Defendants did not have the burden of proving good faith. The written instructions summarized the defenses offered by Carolyn and John: (1) the conduct was done in good faith and not knowing that Defendants' acts or omissions were practically certain to cause Joshua, J, or C harm (i.e., they did not knowingly harm the three children): (2) they merely acted negligently or accidentally or otherwise failed to act through ignorance or mistake; (3) they did not inflict unnecessarily severe corporal punishment; and (4) Defendants did not enter into a criminal conspiracy to endanger the welfare of Joshua, J, or C.

31

The written instructions for Counts 2, 4, 7, 8, 9, 10, 11, and 13 stated that Defendants allegedly caused harm to the respective child, "and made [him or her] a neglected child, and a child upon whom cruelty has been inflicted, as I have defined for you previously, in violation of Title 18, United States Code, Sections 13 and 2, and N.J.S.A. Section 2C:24-4a." (A6019, A6022, A6025-A6026, A6027, A6028-A6029, A6031.) For Counts 3, 5, 6, 9, and 12, the District Court's instructions did not mention the concept of neglect. Instead, the District Court referenced allegations that Defendants caused harm to the respective child and made him or her "a child upon whom cruelty has been inflicted, as I have defined for you previously, in violation of Title 18, United States Code, Sections 13 and 2, and N.J.S.A. Section 2C:24-4a." (A6021, A6023-A6024, A6027, A6030.) In its oral instructions, the District Court stated the following:

> For Counts Two, Four, Seven, Eight, Ten, Eleven, and Thirteen, you may find a defendant guilty of endangering the welfare of a child based on either neglect or cruelty, but all twelve of you must unanimously find beyond a reasonable doubt that defendant knowingly caused harm to a child by either neglecting a child, as I have defined previously, or by inflicting cruelty upon a child, as I have defined it previously, or both. The government, however, does not have to prove both contentions for those Counts Two, Four, Seven, Eight, Ten, Eleven and Thirteen, and you do not have to unanimously agree that the defendant knowingly caused harm by neglecting a

32

child and inflicting cruelty upon a child for those
counts.

(A5901.)

We acknowledge that there are some differences between
the elements of Defendants' offenses of conviction, on the one
hand, and the assault guideline and the various federal offenses
implicated by this guideline (especially the offense of simple
assault), on the other hand. Specifically, the expansive elements
of child endangerment encompass a wide range of actions—and
inaction. For instance, the jury was told that cruelty consists of
not only unnecessarily severe corporal punishment and
unnecessary physical suffering or pain but also unnecessary
mental suffering or pain as well as habitual tormenting, vexing,
or afflicting. Even the government "argued there was no
sufficiently analogous offense Guideline for the crimes of
omission." (Appellant's Brief at 25.) The government asserts
that, while the jury could find Defendants guilty on the omission
charges because they either inflicted cruelty or neglected the
child, the jury was instructed that, to find them guilty on the
purported crimes of commission (with the exception of Count
10), it had to find that they inflicted cruelty. We observe that
the jury instructions for Counts 2, 4, 7, 8, 9, 10, 11, and 13,
specifically referred to both neglect and cruelty, and the District
Court explained that the jury could find Defendants guilty on
these charges based on a finding of either neglect or cruelty. In
contrast, the instructions for Counts 3, 5, 6, 9, and 12
exclusively referenced the concept of cruelty. Nevertheless, the
District Court also defined "cruelty" as including "[a]ny act of
omission . . . whereby unnecessary pain and suffering, whether
mental or physical, is caused or permitted to be inflicted on a

33

child" and "[e]xposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical well-being of such child." (A6010.)

Yet the jury, at least with respect to the cruelty charges, still had to find that the government established beyond a reasonable doubt that Defendants "knowingly committed an act of cruelty against the child." (A6009.) If it is fair to say that the New Jersey offense at issue here incorporates a number of expansive components, the same could be said with respect to the federal assault scheme. The federal simple assault provision encompasses common law battery—the unlawful application of force to the person of another, including offensive touching. See, e.g., United States v. Delis, 558 F.3d 177, 177-84 (2d Cir. 2009). It also includes common law assault, defined as an attempted battery or the deliberate infliction upon another of the reasonable fear of physical injury. Id. In addition, the jury instructions did not require the jury to find the degree of harm suffered by the children. The assault guideline as well as the federal offense of simple assault, in turn, do not mandate proof of any sort of bodily injury or even actual physical contact.[6] As

---

[6] While the government noted below that "certain things, such as degree of harm or danger are historically elements of assault, they are not elements of the crimes for which these defendants were convicted" (A6460), such "things" are not elements of simple assault. We further observe that Carolyn's defense counsel indicated that the federal assault counts were redundant because "there's already a charge of neglect by administering salt or sodium-laden substances while withholding water." (A5377.) At a presentencing hearing tentatively addressing, inter alia, how to handle various issues

34

Carolyn explains, assault "requires nothing more than . . . placing of the victim in reasonable apprehension of physical harm," and "[n]o injury is required." (Carolyn's Brief at 28.) "When the victim of an assault is under 16 years old, an assault is punishable by imprisonment for up to one year." (Id. (citing § 113(a)(5)).) We further note that the jury generally rejected Defendants' "Good Faith Defense," determining instead that they did not make "an honest mistake or had an honest misunderstanding about whether his or her acts or omissions were practically certain to cause harm to a child." (A6035.)

In turn, it is only to be expected that the offense of conviction may include more expansive elements than the federal offense or additional elements missing from the federal counterpart. After all, "'analogy does not mean identity. It implies difference.'" Langley, 919 F.2d at 931 (quoting Sturm, 10 F.2d at 11); see also, e.g., Rakes, 510 F.3d at 1287 (stating that court first had to ask what analogous provisions were within "the ballpark"); Allard, 164 F.3d at 1149 ("[B]y definition, analogous guidelines do not and need not perfectly match the defendant's crime." (citing Terry, 86 F.3d at 358)). Carolyn points out that, when corporal punishment by a parent is the basis of a child endangerment charge, the prosecution must prove that the punishment was unnecessarily severe or caused

---

identified in a letter from Carolyn's attorney (on behalf of both Defendants), Carolyn's attorney took issue with the PSR's identification of "aggravated assault" as "the analogous offense." (A6083.) "We think that's wrong. Analogous offense is what they call a minor assault. A different guideline. We think a matter of law and that could be briefed easily. And if we are right, it eliminates certain enhancements." (Id.)

35

unnecessary pain. According to her, "[t]here is no such requirement under the federal assault statute which does not address corporal punishment employed by parents." (Carolyn's Brief at 34.) She further observes that, unlike the federal scheme, the New Jersey provision requires that the defendant either have a legal duty for the care of the child or have assumed responsibility for the child. Yet a jury finding that a defendant, for instance, had assumed responsibility for a child and then inflicted unnecessarily severe corporal punishment on this child by (to give two examples offered by Carolyn herself) "wash[ing] her child's mouth out with soap" or "forcing the ingestion of hot sauce" (id. at 35 & n.32 (citations omitted)), would necessarily (if implicitly) find that the defendant thereby committed simple assault, i.e., an offensive touching. In fact, Carolyn essentially admits this overlap when she claims that "'parents commit this [assault] offense every day of the week in every state in the union.'"[7] (Carolyn's Brief at 28.)

---

[7] In Cothran, this Court found that a particular offense guideline was more analogous than another offense guideline on the grounds that, inter alia, the other guideline's base offense level lacked an element of the offense of conviction. Specifically, we observed that U.S.S.G. § 2A6.1 (Threatening or Harassing Communications) constituted the "most analogous" offense guideline because "there is a scienter element present in the base offense level for § 2A6.1 that is not present in the base offense level of § 2K1.5 [(Possessing Dangerous Weapons or Materials While Boarding or Abroad an Aircraft)]." Cothran, 286 F.3d at 178. Accordingly, "[t]o most accurately analogize Cothran's act under § 2K1.5, we would therefore have to increase his base offense level to 24 because he knowingly conveyed the false threat." Id. As the District Court noted in

36

Defendants and the District Court rely on a Fifth Circuit non-precedential decision: United States v. Loften, 465 F. App'x 294 (5th Cir. 2010) (per curiam). In this case, the defendant was convicted under the ACA for violating a Texas criminal provision by causing injury to a child. Id. at 295. In addition to claiming that the ACA did not incorporate this state offense because the federal simple assault provision governed his conduct, the defendant argued that, among other things, the district court erred by failing to apply the "most analogous" offense guideline, i.e., the assault guideline. Id. He did not raise these arguments below, and the Fifth Circuit concluded that he failed to satisfy the plain error standard of review:

> However, the district court was obligated to apply the Sentencing Guidelines in Loften's case and erred by failing to consider whether an analogous Guideline existed that could be used in determining Loften's sentencing range. See [Calbat, 266 F.3d at 362]. That error did not affect Loften's substantial rights. A review of the applicable statutes reveals no analogous Guideline.

---

this case, certain enhancements under the assault and aggravated assault guidelines ("the abuse of trust, the vulnerable victim, the obstruction of justice") would appear to apply "to every child endangerment charge." (A6576.) However, we addressed the issue of whether § 2K1.5 or § 2A6.1 constituted the "most analogous" offense guideline—and not whether § 2K1.5 satisfied the initial "sufficiently analogous" offense guideline requirement.

37

Id. at 295. The government argued in Loften that, under the applicable "elements-based" approach, the elements of the federal assault offenses implicated by the assault guideline were significantly different from the elements of the offense of conviction (i.e., § 113(a)(4) does not require that the victim be a child under the age of fourteen, the federal simple assault provision does not require that the assault cause bodily injury (a key element of the Texas offense), and § 113(a)(7) only punishes assaults that result in substantial bodily injury to a child under the age of sixteen). As John puts it, "[i]t is unsettling that the government calls the position it took in Loften 'mistaken,' when it took that position to secure a more severe sentence for the defendant, but now takes precisely the opposite position here, in an effort to secure a draconian guideline range and sentence." (John's Brief at 28-29.)

Nevertheless, we do not place much weight on a non-precedential ruling from another circuit concluding, without any real discussion, that the district court's failure to consider whether there was an analogous offense guideline did not affect the defendant's substantial rights because a review of the applicable statutes supposedly revealed no such guidelines. Defendants point to nothing binding the government in this case—a case implicating assimilated New Jersey law in which the Solicitor General granted personal approval to appeal—to another United States Attorney's Office's position with respect to a conviction under assimilated Texas law. We further note that the Texas statutory provision addressed in Loften differs from the New Jersey offense at issue here. Specifically, the

38

Texas provision actually requires proof of bodily injury.[8]

The government argues that the District Court's various reasons for rejecting the "assault Guidelines" do not withstand scrutiny. "For example, the Court protested that: the jury was

---

[8] In addition, we observe that the aggravated assault guideline was applied to a conviction under this Texas bodily injury provision in a precedential Fifth Circuit opinion. United States v. Bell, 993 F.2d 427, 430 (5th Cir. 1993) ("In applying section 2A2.2, the district court relied on a finding that Bell injured his victim with intent to commit another felony—the sexual assault. Relying on his claim that insufficient evidence supported the aggravated sexual assault conviction, Bell asserts that the district court should have sentenced him under U.S.S.G. § 2A2.3 on the second count. Because we find Bell's conviction under 18 U.S.C. § 2241(c) fully supported by the record, this assignment of error necessarily founders." (footnote omitted)). Finally, this non-precedential Fifth Circuit ruling must be weighed against other non-precedential dispositions applying the aggravated assault guideline to various assimilated abuse convictions. See United States v. Bailey, 169 F. App'x 815, 823-24 (5th Cir. 2006) (finding no error in district court's use of aggravated assault guideline as "most analogous" guideline offense for conviction for cruelty to juvenile); United States v. Truax, 69 F. App'x 219, 220-21 (6th Cir. June 6, 2003) (district court applied aggravated assault guideline to conviction for first degree criminal abuse of child); Centner, 116 F.3d 473, at *3 ("As we concluded above, U.S.S.G. §§ 2X2.1 and 2A2.2 are sufficiently analogous to warrant their application to Centner's offense [of knowingly and willfully causing children be in place where they could be abused]." (footnote omitted)).

39

not asked to make the findings contained in the assault Guidelines; it would not be 'justice' to allow the Court to make those findings under the lower [preponderance of the evidence] standard of proof that governs all federal sentencings; and it would be unfair to allow the Government to charge one statute and seek punishment for another." (Appellant's Brief at 37-38 (citing A6468-A6472, A6477, A6484, A6491, A6558, A6573-A6578, A6584-A6590, A6703).) Carolyn offers an extensive explanation for why the use of the Guidelines in this case would purportedly require impermissible judicial fact-finding. She insists that the sentencing court "cannot find facts which are elements of the crime because the Fifth and Sixth Amendment give individuals 'a right to demand that each and every element of the alleged crime be submitted to a jury and proved beyond a reasonable doubt before sentence is imposed.'" (Carolyn's Brief at 37 (quoting United States v. Grier, 475 F.3d 556, 562 (3d Cir. 2007) (en banc)).) While the sentencing court could decide whether the offense involved, for example, an abuse of trust because such matters have not traditionally been considered elements of a crime, it purportedly cannot find facts that have traditionally been seen as elements of assault offenses, such as the severity of an injury or whether a dangerous weapon was used. "Applying that reasoning to this case, the analogous offense cannot be one for which the jury has not found a determinative fact. *The defendant cannot be tried for a charge for which no significant injury is required and then be sentenced as if a finding of such harm had been made*. . . . A defendant cannot be tried for one crime and sentenced for another." (Id. at 39 (citing United States v. Lewis, 802 F.3d 449, 454-55 (3d Cir. 2015)). According to Carolyn (and the District Court itself), it was the government's own conduct in this case that precludes the application of the Guidelines: "The

40

government rejected a jury charge that would define an abused or neglected child as suffering the degree of harm that its arguing I should say happened and that the child indeed did suffer. And instead, asking me to make that kind of finding, as well as asking me to make that finding on a lower standard of proof. That is tough to swallow."[9]  (A6576.)

---

[9] The parties had a disagreement below regarding the degree of harm needed to sustain a conviction for endangering the welfare of a child under § 2C:24-4a.  Carolyn sought an instruction incorporating "the definition of 'abused or neglected child' contained in N.J.S.A. § 9:6-8.21 or, alternatively, the language approved in [a 2002 Appellate Division ruling]." (Carolyn's Brief at 18-19 (citing State v. T.C., 789 A.2d 173, 186 (N.J. Super. Ct. App. Div. 2002) ("Abused or neglect child means a child . . . whose parent or guardian . . . inflicts . . . physical injury . . . which causes or creates a substantial risk of protracted impairment of physical or emotional health.")).) While the government opposed this proposal, "to the extent that the Court is concerned that at sentencing it would be lacking information sufficient to understand the jury's conclusions about the severity of this offense, the government is willing to have the Court charge a bifurcated instruction [on degree of harm] in verdict form, where the jury is instructed after they've reached their verdicts on the initial instructions." (A5460, see also A5467 ("But, you know, we are comfortable as an alternative bifurcated verdict, putting before the jury [8.21].") Carolyn's attorney stated that "as an alternative we would be comfortable instructing everything and giving the lesser included offense, not the bifurcation the government is asking for, but a lesser included offense." (A5469.)

41

However, Defendants were tried, convicted, and should be sentenced for child endangerment (and conspiracy to commit child endangerment)—not for assault. It would have been inappropriate for the District Court to charge the jury on offenses that were not before it. It is § 2X5.1 that then requires the sentencing court to consider, whenever the offense of conviction is a felony for which no offense guideline has been promulgated, whether there are any "sufficiently analogous" offense guidelines, and, if so, apply the guideline that is "most analogous" to the crime of conviction. No fact-finding is required to select the offense guideline because we have determined that the "sufficiently analogous" guideline inquiry merely implicates a comparison of legal elements—a question of law reviewed under a plenary standard of review. In turn, "by definition, analogous guidelines do not and need not perfectly match the defendant's crime." Allard, 164 F.3d at 1149 (citing Terry, 86 F.3d at 358); see also, e.g., Rakes, 510 F.3d at 1287 (noting that court first had to ask what provisions were within ballpark); Langley, 919 F.2d at 931 (observing that analogy implies difference). Defendants, for their part, do not cite to any case law calling into question the constitutionality of § 2X5.1 itself, and a district court cannot refuse to apply the Guidelines

---

The District Court ultimately refused to ask the jury to determine the extent of any injuries, while indicating that its decision on this point could have an effect at sentencing: "If the government prevails, in terms of not adding this definition of substantial harm to the endangerment that's charged then we may have an issue coming up, should there be a conviction, as to the extent of culpability, but the government will have culpability." (A5475.)

42

and calculate an advisory sentencing range because of its disagreement with otherwise applicable Guidelines. United States v. Napolitan, 762 F.3d 297, 312-313 (3d Cir. 2014); United States v. Gonzalez, 462 F.3d 754, 755 (7th Cir. 2006). In fact, the assault guideline would apply even if the jury had actually found that Defendants were not guilty of simple assault under the federal assault provision.[10] See, e.g., Rakes, 510 F.3d at 1290 ("Finally, Mr. Rakes contends that it was improper for the district court to sentence him under guideline 2A6.1, threatening or harassing communications, when the court granted him an acquittal on mailing a threatening communication, 18 U.S.C. § 876, which falls squarely within guideline 2A6.1. We have, however, rejected this precise argument in Nichols. . . . We affirmed Mr. Nichols's sentence under the first degree murder guideline, finding that it was the most analogous, and his acquittal of murder did not affect our 'most analogous guideline' inquiry." (citing Nichols, 169 F.3d at 1270-76)). It also bears repeating yet again that proof of physical injury is not necessary to trigger application of the assault guideline or for a simple assault conviction under federal law (and that these provisions likewise do not require use of a weapon).[11]

---

[10] The District Court granted judgments of acquittal on charges of assault with a dangerous weapon with intent to do bodily harm and intentional assault resulting in serious bodily injury. Defendants were not charged with simple assault under the federal assault provision.

[11] As we explain in Section III.B., we reject the notion that it would be improper to engage in the sort of fact-finding (under a preponderance of the evidence standard) that is necessary to calculate the advisory Guidelines range once an

43

The District Court (as well as Carolyn) have devoted a great deal of attention to the nature of what is an admittedly complicated state statutory scheme. Specifically, § 2C:24-4a incorporates definitions from Title 9 of the New Jersey Statutes Annotated ("Children—Juvenile and Domestic Relations Courts"). According to Carolyn, Title 9—which has no federal analog—implicates the state's unique parens patrie responsibility to protect children, the parent-child relationship, and a parent's right to use reasonable discipline (as opposed to unnecessarily severe corporal punishment or unnecessary pain or suffering). The District Court observed that Title 9 "is there to protect the children" and to provide a constitutionally appropriate mechanism for state family court judges to decide whether these children should be taken from their parents, whether they should eventually be reunified, and whether the parental relationship should be terminated:

> And this is all very serious. And this is all procedurally taken care of. And this is all about what Title 9 does for the citizens of New Jersey. And why? Because of what the courts have in the State of New Jersey, not in the federal government, when is parens patrie jurisdiction. We don't talk about it. No one's briefed it for me. Maybe you all know I know it.
>
> But, I exercised parens patrie jurisdiction

---

offense guideline is identified. In Section III.C., we consider whether application of the Guidelines would be consistent with the ACA's "like punishment" requirement.

44

as a family court judge and any of you who have had a family court matter in the State of New Jersey, including custody matters, private litigation, divorce custody, adoption, you all know that it's the parens patrie jurisdiction of the family part. And sometimes well, it's part of Chancery.

That gives the authority to the judge to say what time you have to pick up your kids, to say where your child lives, to be as intrusive as one needs to be to protect the interests of the children, to move property around, to seize property if, in fact, somebody is trying to divest because it could hurt the family's interest, to pass property through probate. All of this has to do with the parens patrie jurisdiction if the interests of a child are involved.

So, is that federal? Does the federal government have anything to say where that's concerned? I really do not believe it does. And if somebody wants to make an argument, I will give you time to do it. But, I'm saying it would be a strained and difficult argument to make as some of the enhancements were.

Let the State of New Jersey have its parens patrie jurisdiction. And let us honor and respect it by seeing what we can do with this statute that incorporates that parens patrie jurisdiction in the rubric and the meaning of the definitions and the state crime that we are trying

45

to move because it arises out of the parens
patrie jurisdiction.

(A6581-A6582.)  In short, "this statute doesn't really fit with
assault because it is balancing the rights of parents to discipline
their kids with the outcome of the execution of that right to
discipline their kids." (A6583.) The District Court believed that
it simply could not fit a proverbial square peg into a round hole:

> So, this case is about parental discipline,
> the choices of discipline and the findings of the
> jury that the choices of discipline, as identified in
> the various counts, amounted to either acts of
> cruelty as defined to them in the jury charge, or
> neglect that caused harm.
>
> So, I don't find an analogous federal
> statute. I don't find that the federal government's
> laws about assault cover that parental relationship
> or custodial or legal guardian or authority over
> relationship that infuses and is the basis and is the
> reason for the state's statute. I find that this is
> fitting a square peg into a round hole.

(A6588.)

"In Osborne, [the Eighth Circuit] commented that
attempting to fashion a sentence pursuant to USSG § 2X5.1 is
frequently similar to attempting to determine which round hole
best accommodates a square peg." Allard, 164 F.3d at 1150.
Nevertheless, § 2X5.1 still requires the sentencing court to
undertake this admittedly difficult task, and the District Court

46

committed reversible error by failing to comply with this
obligation.

In any event, we find that these various observations
about Title 9 and New Jersey's parens patrie jurisdiction
ultimately have little, if any, real bearing on the outcome of the
"sufficiently analogous" guideline inquiry. As we have already
explained, it is reasonable to expect that the offense of
conviction may include an additional element missing from, or
incorporate a more expansive element than, the federal offense.
Based on the jury instructions given in this case, a jury finding
that a defendant exceeded his or her parental rights by, for
example, inflicting unnecessarily severe corporal punishment
constituted an implicit finding that defendant thereby committed
simple assault. Furthermore, the District Court's discussion of
Title 9 and New Jersey family court proceedings appeared rather
removed from the "elements-based" inquiry—an approach that
Defendants themselves ask us to adopt. By indicating that the
"federal government does [not] have anything to say" here
(A6582), the District Court also effectively called into question
whether the child endangerment offense was properly
assimilated under the ACA in the first place. However, it is
undisputed that the New Jersey Legislature, by enacting §
2C:24-4a, decided that any person having a legal duty for the
care of a child or who has assumed responsibility for the care of
a child who causes the child harm that would make the child an
abused or neglected child is guilty of a crime of the second
degree. In turn, the offenses at issue here—because they
occurred on a military installation under the special jurisdiction
of the federal government—were assimilated under the ACA.
Even though the state criminal provision implicates the state's
interest in protecting children from harm while preserving the

47

parent-child relationship (and incorporates aspects of the state's "Children-Juvenile and Domestic Relations Courts" scheme), this is still a criminal prosecution in federal court under an assimilated state criminal statutory provision—and not, to give just one example, an action before a state family judge to terminate Defendants' parental rights.   In fact, a separate Chancery Division proceeding was filed by the appropriate New Jersey authorities, which has resulted in the termination of Defendants' parental rights vis-à-vis both J and C.[12]  See, e.g., C.J., 2014 WL 388131, at *39-*52.

Finally, we believe that the existing case law indicates that the assault guideline is "sufficiently analogous" to Defendants' offenses of conviction.

---

[12] Title 9 also incorporates criminal provisions. See, e.g., § 9:6-3 ("crime of fourth degree").  We further note that Title 9 does not merely apply to parents or legal guardians.  Section 9:6-8.21a specifies that "[p]arent or guardian" includes, inter alia, "a teacher, employee, or volunteer" of an institution who is responsible for the child's welfare, any other staff person regardless of whether he or she is responsible for the care or supervision of the child, and a teaching staff member or other employee of a day school.  In this case, the jury was instructed that "[a] person who has assumed responsibility for the care of a child includes any person who assumes a general and ongoing responsibility for the care of the child and who establishes a continuing or regular supervisory or caretaker relationship with the child." (A6012.) Section 2C:24-4a also provides that "any other person" who engages in conduct or who causes harm as described in this paragraph to the child is guilty of a crime of the third degree.

48

After all, the threshold "sufficiently analogous" guideline inquiry is satisfied merely if the analogous provisions are, inter alia, "within the ballpark," Rakes, 510 F.3d at 1287, or "some plausible analog[y]" exists between the elements of the defendant's crime and the elements of federal offenses covered by the existing offense guideline, id. at 1288. The Sentencing Commission also indicates that most assimilated offenses will have a "sufficiently analogous" offense guideline. See § 2X5.1 cmt. background ("Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offenses proscribe."). Concluding that the ACA did not assimilate a state first-degree murder child victim provision, the Supreme Court reserved judgment on the question of whether state child abuse statutes may be assimilated given the existence of a federal assault statute: "And, without expressing any view on the merits of lower court cases that have assimilated state child abuse statutes despite the presence of a federal assault law, § 113, see, e.g., United States v. Brown, [608 F.2d 551, 553-54 (5th Cir. 1979)]; United States v. Fesler, 781 F.2d 384, 390-391 (C.A.5 1986), we note that the federal assault prohibition is less comprehensive than the federal murder statute, and the relevant statutory relationships are less direct than those at issue here." Lewis, 523 U.S. at 171-72.

In a companion case to its Osborne decision, the Eighth Circuit determined that the involuntary manslaughter guideline was "sufficiently analogous" to the assimilated state offense of vehicular battery—even though involuntary manslaughter requires the death of the victim while the battery charge only requires serious bodily injury. Allard, 164 F.3d at 1149. Pointing out that analogous guidelines, by definition, do not and

49

need not perfectly match the defendant's crime, the Allard court "cannot say as a matter of law that the difference between death and serious bodily injury makes involuntary manslaughter insufficiently analogous to vehicular battery." Id. (observing that necessary line drawing in determining whether victim's injury is serious enough is better left to district court to decide as part of "most analogous" guideline analysis); see also, e.g., Calbat, 266 F.3d at 363-64 (rejecting defendant's argument that involuntary manslaughter guideline was "most analogous" offense guideline to offense of intoxication assault); Osborne, 164 F.3d at 440 ("As for Osborne's argument that involuntary manslaughter is more analogous to vehicular battery, we first observe that death did not result in this case. More importantly, we give due deference to the district court's choice of the most analogous guideline and cannot say the aggravated assault guideline was inappropriately applied in this case."). Yet, if a homicide guideline could be considered to be "sufficiently analogous" to an offense that does not even require proof of death, we see no reason why the assault guideline should not apply here.[13]

### B.    Refusal to Find Facts

---

[13] According to Carolyn, any error was harmless. Nevertheless, Carolyn's burden to establish harmless error is a heavy one, and it is one that she clearly does not meet here. See, e.g., United States v. Zabielski, 711 F.3d 381, 387 (3d Cir. 2013) (noting that burden is very difficult to satisfy absent clear statement by district court that same sentence would have been imposed); United States v. Wright, 642 F.3d 148, 154 n.6 (3d Cir. 2011) (stating that error is not harmless unless alternative sentence was product of three-step Booker sentencing process).

50

The District Court committed reversible error by refusing to engage in the requisite fact-finding pursuant to the applicable preponderance of the evidence standard.

It is well established that "the constitutional rights to a jury trial and proof beyond a reasonable doubt attach only to facts that 'constitut[e] the elements of a crime,' which are those facts that increase the maximum [or minimum] statutory punishment to which the defendant is exposed." United States v. Smith, 751 F.3d 107, 117 (3d Cir. 2014) (quoting Grier, 475 F.3d at 562). In contrast, "facts that only enhance sentences within the range allowed by the jury's verdict (or guilty plea) need not be charged in an indictment or proven beyond a reasonable doubt." United States v. Tidwell, 521 F.3d 236, 250 n.9 (3d Cir. 2008) (citing Grier); see also, e.g., Smith, 751 F.3d at 117 ("Facts relevant to the application of various Guidelines provisions, which are advisory only, do not implicate these rights." (citing Grier, 475 F.3d at 562)). As we have already explained, Defendants were charged, convicted, and should be sentenced for child endangerment (and conspiracy to commit child endangerment). By finding Defendants guilty of crimes of the second degree, the jury triggered a maximum sentence for each count of conviction of ten years' imprisonment (together with a minimum term of imprisonment of five years). See N.J. Stat. Ann. § 2C:43-6a(2). New Jersey law permits consecutive sentencing, meaning that the absolute maximum term of imprisonment at issue here is 120 years for Carolyn and 100 years for John. See, e.g. N.J. Stat. Ann. § 2C:44-5. Facts like the severity of the injury or the use of a weapon do not affect the maximum and minimum sentences established by statute. In fact, neither the degree of harm suffered by the victim nor the

51

use of a weapon constitute an element of the offenses of conviction—or the federal crime of simple assault. While "Booker afforded judges broad discretion to enter appropriate sentences in consideration of § 3553(a) factors," it "is not within the sentencing judge's discretion to diverge from applying the preponderance-of-the-evidence standard in the initial sentencing calculation at step one [i.e., calculation of the advisory Guidelines range.]" United States v. Ali, 508 F.3d 136, 155 (3d Cir. 2007) (footnote omitted). Likewise, a sentencing court cannot refuse to apply the Guidelines and calculate an advisory sentencing range because of its disagreement with otherwise applicable Guidelines. See, e.g., Napolitan, 762 F.3d at 312-13; Gonzalez, 462 F.3d at 755.

Having identified the offense guideline applicable to the offense of conviction under the Guidelines, the sentencing court must then "determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct)." U.S.S.G. § 1B1.2(b); see also, e.g., U.S.S.G. § 1B1.1(2) (directing court to determine base offense level and apply any appropriate specific offense characteristics, cross-references, and special instructions contained in applicable offense guideline). As John explains, "[i]f a guideline is applicable, the second step involves applying enhancements and adjustments based on, inter alia, relevant conduct." (John's Brief at 14 (citing § 1B1.2(b)).) In other words, the court must "apply 'any applicable specific offense characteristics (under that guideline), and any other applicable sentencing factors pursuant to the relevant conduct definition in § 1B1.3.'" (Id. at 16 (quoting U.S.S.G. § 1B1.2(b) cmt. n.2).) Unlike the "offense of conviction," "'Relevant Conduct' includes other, uncharged and related activities." United States v. Pressler, 256 F.3d 144, 157 n.7 (3d Cir. 2001). This includes

52

facts that might have formed the basis of uncharged offenses as well as charges on which the defendant was acquitted. See, e.g., United States v. Ciavarella, 716 F.3d 705, 735-36 (3d Cir. 2013) ("But 'a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge so long as that conduct has been proved by a preponderance of the evidence.'" (quoting United States v. Watts, 519 U.S. 148, 157 (1997))); Grier, 475 F.3d at 568 ("[Facts relevant to the application of the Guidelines—whether or not they constitute a separate offense] do not constitute 'elements' of a 'crime' under the rationale of Apprendi and do not implicate the rights to a jury trial and proof beyond a reasonable doubt." (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000))). But see United States v. Berry, 553 F.3d 273, 281 n.6 (3d Cir. 2009) (questioning whether Watts is in tension with Apprendi line of cases). In this case, the assault guideline's cross-reference directs the sentencing court to apply the aggravated assault guideline "[i]f the conduct constituted aggravated assault." U.S.S.G. § 2A2.3(c). In turn, the Guidelines set forth various enhancements for, inter alia, the level of planning, the degree of injury, the victim's vulnerability, the use of dangerous weapons, the defendant's abuse of trust, and obstruction of justice. See U.S.S.G. §§ 2A2.2(b), 2A2.3(b), 3A1.1(b)(1), 3B1.3, 3C1.1.

The District Court committed reversible error by refusing to make the requisite findings of fact with respect to both the advisory Guidelines calculation as well as the application of the § 3553(a) factors. Refusing to find aggravating facts under the applicable preponderance standard, it repeatedly indicated that it would not make any factual findings that were not necessarily found by the jury, or "'shown beyond a reasonable doubt"

53

(A6701; see also A6578, 6715). In particular, the District Court (having determined that there is no "sufficiently analogous" offense guideline) failed to make findings of fact relevant to the various sentencing enhancements as well as the assault guideline's cross-reference to the offense guideline for aggravated assault. John acknowledges that, if we conclude that there is a "sufficiently analogous" offense guideline, we "should remand the case to permit the [District Court] to calculate the guidelines range." (John's Brief at 30.) Because we conclude that the assault guideline constitutes a "sufficiently analogous" offense guideline, the District Court must now make the requisite findings of fact (under a preponderance of the evidence standard) in order to calculate this range (which includes deciding whether the aggravated assault guideline applies pursuant to the cross-reference as well as applying any relevant sentencing enhancements).

## C.    The ACA, Sentencing Guidelines, and State Law

We agree with the government that—while, "following Booker, a sentencing court likely can consider what a state defendant would receive if he had been prosecuted in state court" (Appellant's Brief at 52)—the District Court simply went too far in this case by focusing on state sentencing practices to the exclusion of basic federal sentencing principles. Instead of acting as a federal court applying the well-established federal sentencing scheme, the District Court essentially acted as a state court applying the various intricate aspects of New Jersey's sentencing practices.

18 U.S.C. § 13(a) subjects the defendant to "a like punishment." It is undisputed that state law thereby sets the

54

minimum and maximum punishment that may be imposed. Defendants do not claim that the Guidelines-based sentences sought by the government exceed this limitation.

Carolyn discusses New Jersey sentencing principles at some length. She contends that the District Court "recognized that, in order to give effect to the fundamental principle of the ACA that a crime under that statute is 'punishable only **in the way and to the extent** that it would have been punishable' if committed on non-federal property, it was necessary to consider the actual time that the defendant will serve." (Carolyn's Brief at 14-15 (quoting United States v. Press Publ'g Co., 219 U.S. 1, 10 (1911) (emphasis added)).) According to Carolyn, the District Court appropriately recognized that application of the Guidelines would not satisfy the ACA's "like punishment" requirement. According to the New Jersey Appellate Division, "'the basic sentencing issue is always the real time defendant must serve, and we have always recognized that real time is the realistic and practical measure of the punishment imposed.'" State v. Cooper, 952 A.2d 1122, 1126 (N.J. Super. Ct. App. Div. 2008) (citation omitted). "The 'real sentence' is found in the State Parole Board Eligibility Tables which provide 'a fair and practical indicator of the likely actual custodial time for those defendants who get full credit for good time, work time, and minimum custody time.'" (Carolyn's Brief at 15 (footnote omitted) (quoting Pressler & Veniero, Current N.J. Court Rules, Comment R. 3:21-4[10] (Gann 2017)).) Carolyn explains that a defendant sentenced to a five-year term of imprisonment under New Jersey law would actually serve approximately 12 months (while, if he or she was sentenced to the same term under federal

55

law, the defendant would serve approximately 53 months).[14] In addition, the state trial court may sentence a defendant to a term appropriate to a crime one degree lower if it is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and the interest of justice so demand (which in this case would result in a term of between three and five years). N.J. Stat. Ann. §§ 2C:43-6a(3), 2C:44-1f(2). Similarly, there is a presumption of imprisonment for a person convicted of a second degree offense, but it may be overcome when the state sentencing judge finds imprisonment would constitute a serious injustice overriding the need to deter others. N.J. Stat. Ann. § 2C:44-1d. While acknowledging that a federal court need not follow every last nuance of state sentencing practices, Carolyn argues that Judge Hayden (a former state court judge) properly attempted to replicate a "real time" sentence.

However, Congress made it clear in 1990 that ACA defendants "shall be sentenced in accordance" with § 3553 and the Guidelines. See Pub. L. No. 101-647, § 1602, 104 Stat. 478 (1990). We have explained that "state law sets the minimum and maximum punishment while the federal sentencing guidelines should be used to determine the actual sentence

---

[14] Likewise, Carolyn argues that a defendant sentenced under New Jersey law to ten years' imprisonment would have a "real time" sentence of around 23 months. "Looked at another way, the 19 ½ years [for Carolyn] sought by the government exceeds the length of time a person would serve on a 70-year sentence." (Carolyn's Brief at 59 (footnote omitted).) Carolyn further claims that the maximum parole eligibility time for a defendant sentenced to a seven-year term of imprisonment is approximately 21 months.

56

within that range." See, e.g., United States v. Queensborough, 227 F.3d 149, 160 (3d Cir. 2000) (citing United States v. Pierce, 75 F.3d 173, 176 (4th Cir. 1996); United States v. Marmolejo, 915 F.2d 981, 984 (5th Cir. 1990); United States v. Garcia, 893 F.2d 250, 254 (10th Cir. 1989)), abrogation on other grounds recognized by United States v. Dahmen, 675 F.3d 244 (3d Cir. 2012). In addition, § 3553(a)(6) directs district courts to consider the need to avoid unwarranted federal sentencing disparities. See, e.g., United States v. Begin, 696 F.3d 405, 412-14 (3d Cir. 2012). The ACA does not assimilate a state sentencing policy or practice that conflicts with federal sentencing policies. See, e.g., United States v. Coleman, 38 F.3d 856, 861 (7th Cir. 1994) ("Coleman argues that with good time under Illinois law he would have had to serve a maximum of 7 ½ years (1/2 of the maximum 15 year penalty allowed). However, while the Assimilative Crimes Act states that punishment should be 'like' that of the state punishment, the federal government does not have to adopt the same provisions for computing when a sentence is satisfied." (citing United States v. Norquay, 905 F.2d 1157, 1162 (8th Cir. 1990); United States v. Vaughan, 682 F.2d 290, 294-95 (2d Cir. 1982))); Norquay, 905 F.2d at 1163 ("We are similarly persuaded that application of state law regarding good time credits and consecutive versus concurrent sentencing to a federal offender under the Major Crimes Act would be disruptive to the federal prison system."); United States v. Smith, 574 F.2d 988, 992 (9th Cir. 1978) (rejecting district court's application of three-year minimum term under state law before prisoner could be eligible for parole because ACA "does not further require adherence to state policy with reference to parole eligibility," prisoner is federal prisoner subject to federal correctional policies, and it would be disruptive to have two classes of prisoners subject to

different rules).[15]

According to Carolyn, "[f]ederal parole policy is not implicated here, and it is not contended that New Jersey parole policy should be adopted by the federal prison system." (Carolyn's Brief at 47.) But insofar as Carolyn and the District Court have indicated that the concept of "real time"—i.e., the parole eligibility date under state law—should control, this is what in essence occurred here. After all, there is no real difference between a sentencing court directing the Bureau of Prisons to apply state parole policies and a court simply adopting these policies from the outset by imposing a term of imprisonment based on the putative date that the defendant would be eligible for release if prosecuted, convicted, and sentenced in the state court system.

---

[15] Asserting that the ACA "represents a deliberate choice to promote intrastate uniformity above interstate uniformity when a defendant commits a crime, otherwise punishable by state law, on federal land," the Fifth Circuit determined that Texas law requiring concurrent sentences must be honored. United States v. Martinez, 274 F.3d 897, 908 (5th Cir. 2001) (citing Garcia, 893 F.2d at 253-54). However, Martinez addressed the maximum sentence allowed under state law (as opposed to anything resembling New Jersey's "real time" concept). Id. at 909 ("Texas's choice to limit the length of all concurrent sentences deserves as much deference as does a choice to set the statutory maximum for an individual crime." (footnote omitted)). We also note that the Eighth Circuit refused to apply state law governing concurrent and consecutive sentences. Norquay, 905 F.3d at 1163.

### D.    Substantive Unreasonableness[16]

Finally, we consider the substantive reasonableness of the sentences imposed by the District Court. According to the government, "no reasonable sentencing court would have imposed such lenient sentences on parents who beat, starved, and neglected their young and defenseless adopted children over a five-year period, contributing to the death of one, almost killing another twice, and causing permanent damage to the survivors." (Appellant's Brief at 54 (emphasis omitted).) The government may go too far in its characterization of Defendants' conduct and the injuries they inflicted on their children. In addition, we do not suggest that the District Court must sentence Defendants to the terms of imprisonment sought by the government (235 months for Carolyn and 188 months for John). Nevertheless, we do conclude that "no reasonable sentencing court would have imposed [a sentence of 24 months' imprisonment and three years of supervised release for Carolyn and a sentence of two years of probation, a fine, and community service for John] for the reasons the district court provided." Tomko, 562 F.3d at 568. Simply put, more than two years of incarceration and probation is required to satisfy the purposes of sentencing established by Congress.

The third step of the three-step sentencing process requires the district court to exercise its discretion by considering the relevant § 3553(a) sentencing factors. See, e.g.,

---

[16] Upon finding these procedural errors in the sentences, Judge Fuentes would vacate and remand for resentencing without reaching the substantive unreasonableness of the sentences.

id. at 567. These factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentence and the sentencing range established for—

>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

60

.;

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission .
. . .;

(6) the need to avoid unwarranted sentence
disparities among defendants with similar records
who have been found guilty of similar conduct;
and

(7) the need to provide restitution to any victims
of the offense.

§ 3553(a). Under this statutory provision, the court must impose
a sentence that is "sufficient, but not greater than necessary, to
comply with the purposes of [sentencing]." Id.  "This
requirement is often referred to as 'the parsimony provision,'
and the Supreme Court has referred to it as the 'overarching
instruction' of 18 U.S.C. § 3553(a)." United States v. Olhovsky,
562 F.3d 530, 548-49 (3d Cir. 2009) (quoting Kimbrough v.
United States, 552 U.S. 85, 101 (2007)).  It is well established
that the sentencing judge occupies a "'superior position to find
facts and judge their import under § 3553(a) in the individual
case,'" and "'gain[ ] insights not conveyed by the record.'"
Tomko, 562 F.3d at 560-61 (quoting Gall v. United States, 552
U.S. 38, 51-52 (2007)).  However, this does not make us a mere
rubber stamp.   A sentence must still be reversed if "no
reasonable sentencing court would have imposed the same
sentence on that particular defendant for the reasons the district
court provided." Id. at 568. This standard is "not an exercise in

61

[appellate] self-abnegation." Id. at 575.

Our preferred course of action upon finding procedural error is to remand the case for resentencing, without considering the substantive reasonableness of the sentence imposed. See, e.g., United States v. Merced, 603 F.3d 203, 214 (3d Cir. 2010). Nevertheless, "procedural problems may lead to substantive problems, so there are times when a discussion of procedural error will necessarily raise questions about the substantive reasonableness of a sentence." United States v. Levinson, 543 F.3d 190, 195 (3d Cir. 2008) (citing United States v. Goff, 501 F.3d 250, 256 (3d Cir. 2007)). This is one of those times.

The government asserts that proper consideration of the facts and the relevant Guidelines would have resulted in a sentencing range for Defendants of 210 to 262 months (according to the Probation Office) or 292 to 365 months (as calculated by the government). See, e.g., § 3553(a)(4)(A) (referring to sentencing range for "the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines"). While the District Court never undertook the proper Guidelines calculation, it appears undisputed that the advisory range under the Guidelines would have been substantially higher than the sentences that were imposed here. In essence, probation for John and 24 months' imprisonment for Carolyn represented enormous downward variances, which require correspondingly robust explanations for why such lenience was warranted. See, e.g., Gall, 552 U.S. at 50 ("We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one."); Merced, 603 F.3d at 216 ("The extent of the explanation we require [to allow us to conduct the substantive

62

reasonableness review] may turn on whether the court has varied from the Guidelines range, and, if it has, on the magnitude of the variance."). The District Court, however, clearly did not provide the requisite explanation for such lenient sentences.

Characterizing Defendants' conduct as misguided corporal punishment and mistaken or bad parenting, the District Court refused to hold Defendants' responsible for the children's various injuries and medical conditions. Relying on the parties' jury instruction dispute (addressed in Section III.A., supra), it claimed that "[t]he government rejected a jury charge that would define an abused or neglected child as suffering the degree of harm that its arguing I should say happened and that the child did suffer." (A6576.) According to the District Court, this case implicated "a very naked verdict sheet," in which the jury failed to indicate "what they were particularly offended by, how the acts linked up with a particular medical condition of the children." (A6690.) "I have to cope with the fact, everybody has to cope with the fact that the live doctors who touched these children during the time that the children were in their care, up to the time in May 2010, or actually I believe it was April 2010 the child was brought to the hospital, these doctors did not find what the government is saying was going on, which is a systematic torture resulting in terrible injuries to vulnerable children." (A6691.) The District Court wished that it knew what the jury found, but all it had were findings that Defendants committed acts of cruelty and neglect that caused harm: "I don't know the extent of harm. And I don't know whether the jury bought that all of these physical conditions that were explained to the satisfaction of medical doctors at the time the children were examined, up until April of 2010, I don't know that the jury found that they are the result of massive, horrible, criminal,

63

sadistic abuse as a result of a five-year conspiracy to do that."
(A6700-A6701.)

However, "a guilty verdict, not set aside, binds the
sentencing court to accept the facts necessarily implicit in the
verdict." United States v. Boggi, 74 F.3d 470, 478-79 (3d Cir.
1996) (quoting United States v. Weston, 960 F.2d 212, 218 (1st
Cir. 1992). We agree with the government that the District
Court in this case effectively "substitut[ed] its view of the
evidence . . . for the jury's verdict." United States v. Bertling,
611 F.3d 477, 481 (8th Cir. 2004) (citing United States v.
Rivera, 411 F.3d 864, 866 (7th Cir. 2005)).

The government admittedly does read too much into the
jury's verdict. Specifically, the jury never explicitly found that
Defendants "'torture[d]' three young adopted children over a
five-year period." (Appellant's Brief at 1 (quoting A6360).)
The indictment did not charge Defendants with "torture," and
the jury was never instructed that they had to find that
Defendants "tortured" the children. Given the expansive nature
of the child endangerment instructions as well as the allegations
against Defendants (involving numerous acts of abuse
committed over the course of a five-year conspiracy), we
recognize the difficulty in connecting each count with a specific
incident or a particular injury or condition.

Nevertheless, the jury did find Defendants guilty of
conspiracy to endanger the welfare of a child. Carolyn was
found guilty on eleven counts of child endangerment while John
was convicted on nine such counts. The jury was instructed that
"cruelty" consists of either—(a) inflicting unnecessarily severe
corporal punishment, (b) inflicting upon a child unnecessary

64

suffering or pain, either mental or physical, or habitually tormenting, vexing or afflicting a child, (c) any act of omission or commission whereby unnecessary pain and suffering (whether mental or physical) is caused or permitted to be inflicted on a child; or (d) exposing a child to unnecessary hardship, fatigue, or mental or physical strains that may tend to injure the health or physical well-being of the child. The District Court defined "neglect" as failing to provide proper and sufficient food, clothing, maintenance, medical attendance, or surgical treatment, or the failure to do or permit to be done any act necessary for the child's physical well-being. The government also established beyond a reasonable doubt that Defendants knew their conduct would cause the harm or would inflict cruelty. The jury was even specifically instructed on both the permissible use of corporal punishment and a "Good Faith Defense"—and yet it still returned guilty verdicts on multiple counts against Defendants.

While the parties may contest causation, the children clearly suffered various injuries and had a number of serious medical conditions. Joshua had a life-threatening bile duct perforation, a serious brain injury, a fractured skull, a fractured right arm, a spinal problem, and a gangrenous finger that required partial amputation. He also was admitted to the hospital with an extensive case of scalded skin syndrome, a skin condition that causes skin to peel off. J had bruises on her body, and C's body was covered with marks, scars, and lesions. C was hospitalized in January 2010 with hypernatremia, i.e., high sodium levels and dehydration. Normal sodium levels are generally between 133 to 143, and 10 points above normal levels is considered dangerous. C's sodium level (181) was so high that her doctor "was surprised she was still alive and

65

functioning in the emergency department." (A922-A923.) She
was again hospitalized in April 2010 for the same condition.
This time her sodium level (195) was "[r]are for any living
person" (A572) and was "at the margins of what you can
survive" (A3405).    Furthermore, evidence was introduced
indicating that C's arm was fractured.  The children, especially
Joshua and C, did not really grow (and even regressed) during
their time with Defendants.  For example, Joshua weighed less
than he did at 11 months just three weeks before his third
birthday.  He weighed, at the age of two years and 11 months,
"as much as a baby that is less than one year old." (A4275.) At
the age of approximately one year and 10 months, C weighed
the same as the average 4 ½-month-old baby and less than she
had weighed at nine months.  Following their removal from
Defendants' custody, J and C grew quickly (with C doubling her
weight in several months).

　　For each substantive count, the jury instructions reiterated
the factual allegations set forth in the indictment.    The
instruction for Count 2, for example, stated the following:

> Count Two alleges that from in or about March
> 2006 through on or about May 8, 2008, within the
> special maritime and territorial jurisdiction of the
> United States, at Picatinny Arsenal Installation, in
> Morris County, in the District of New Jersey, and
> elsewhere, the defendants, Carolyn Jackson and
> John E. Jackson, having a legal duty for the care
> of and having assumed responsibility for the care
> of Joshua Jackson, a/k/a "Joshua Kennedy," born
> May 13, 2005, knowingly caused harm to Joshua
> by withholding sufficient nourishment and food

66

from him, and made Joshua a neglected child, and
a child upon whom cruelty has been inflicted, as I
have defined for you previously, in violation of
Title 18, United States Code, Sections 13 and 2,
and N.J.S.A. Section 2C:24-4a.

(A6019.)  Likewise, the instruction for Count 7 stated that
Defendants knowingly caused harm to C by withholding
sufficient nourishment and food, and the instructions for Counts
4 and 8 repeated the allegations that Defendants knowingly
caused harm by withholding adequate water from J and C
(respectively). The Count 3, 6, and 12 instructions respectively
stated that Defendants "knowingly caused harm to [Joshua, J,
and C] by physically assaulting [Joshua, J, and C] with various
objects and with their hands." (A6021, A6024, A6030.) The
jury was told that Counts 5 and 9 "alleges that" Defendants
"knowingly caused harm to [J and C, respectively] by forcing
[them] to ingest hot sauce, red pepper flakes, and raw onion" [in
the case of J] (A6023) or "hot sauce and red peppers [in the case
of C]" (A6027).  The instruction for Count 11 stated that
Defendants "knowingly caused harm to [C] by withholding
prompt and proper medical care for her dehydration and
elevated sodium levels."  (A6029.) The Defendants' verdict
sheets similarly set forth these factual allegations under each
respective count. For instance, the form stated for Count 3:
"(Endangering the Welfare of a Child:  Physically assaulting
**JOSHUA JACKSON** with various objects and with their
hands)." (A6054, A6058.) The District Court asked for the
jury's verdict using these basic allegations to identify each
count. For example, the jury foreperson was asked with respect
to Carolyn: "As to Count Two. Endangering the Welfare of a
Child:  Withholding sufficient nourishment and food from

67

Joshua Jackson?" (A5963.) The answer was, "Guilty." (Id.)

It defies common sense to believe that the jury found that Defendants physically assaulted their adopted children, withheld sufficient nourishment and water from them, and forced them to ingest hot sauce, red pepper flakes, and raw onion—but that such conduct did not cause the marks and bruises, the malnourishment, the hypernatremia, and the children's other injuries and medical issues. In fact, the instruction for Count 10 was explicit on the question of causation:

> Count Ten alleges that from on or about April 10, 2010 through on or about April 15, 2010, within the special maritime and territorial jurisdiction of the United States, at Picatinny Arsenal Installation, in Morris County, in the District of New Jersey, and elsewhere, the defendants, Carolyn Jackson and John E. Jackson, having a legal duty for the care of and having assumed responsibility for the care of [C], born April 7, 2008, knowingly caused harm to [C] by causing her to ingest excessive sodium and a sodium-laden substance while restricting her fluid intake, causing [C] to suffer hypernatremia and dehydration, a life-threatening condition, and made [C] a neglected child, and a child upon whom cruelty has been inflicted, as I have defined for you previously, in violation of Title 18, United States Code Sections 13 and 2, and N.J.S.A. Section 2C:24-4a.

(A6028.) The jury returned a guilty verdict on this count as to

68

Carolyn.

Given these circumstances, the District Court committed reversible error by downplaying the severity of Defendants' criminal misconduct. According to John, "[t]he government incorrectly asserts that the court erroneously minimized the defendants' conduct as 'mistaken,' 'merely "foolish,"', or 'bad parenting.'" (John's Brief at 46 (quoting Appellant's Brief at 57-59).) "While the court indeed uttered these particular words during the over ten-hour sentencing hearing, they do not, individually or collectively, reflect the court's view of the offenses as trivial." (Id.) John goes on to claim that the District Court fully took into account his role in the offenses. Although the District Court did acknowledge, for instance, that it was satisfied that Defendants committed a second degree offense and that the children suffered pain, its more dismissive sentiments cannot be set aside so easily. After all, it did impose lenient sentences, while "reject[ing] many of the government's claims regarding causation and degree of harm." (Id. at 9 (emphasis omitted).) Carolyn herself continues to minimize the offenses she committed by indicating (like the District Court) that Defendants could have been charged with a crime of the fourth degree under Title 9.

While John was clearly less culpable than his wife and thereby deserved a shorter sentence than she should have received, the District Court unduly minimized his role here. Simply put, this was not a case in which (as the District Court put it) he merely "watched" and "tolerated" Carolyn's conduct. (A6708.) On the contrary, the jury found that John conspired— i.e., agreed—with Carolyn to endanger the welfare of a child— and that he was criminally liable for nine substantive child

69

endangerment counts. In fact, he was found guilty of the same substantive offenses as Carolyn,[17] with the exception of the charges for withholding sufficient nourishment and food from J and for causing C to ingest excessive sodium and a sodium-laden substance while restricting C's fluid intake.

Accordingly, the sentences imposed failed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"—as well as to account for the "nature and characteristics of the offense." Given the serious harm that the jury indicated Defendants inflicted on Joshua, J, and C, this was not a simple case of bad or misguided parenting. Nevertheless, the District Court indicated that what Carolyn was attempting to do was actually brave: "But, let's not forget, five kids in the house, three of them being home schooled. Stupid to think you could do it all. If it had worked out, if it had worked out, it would have been called brave. Just remember that everybody. If it had worked out, that would have been called brave." (A6734.) How is it "brave" to make a young girl ingest excessive sodium and then deny her adequate

---

[17] The jury was charged on the theory of "Accomplice Liability; Aiding and Abetting (18 U.S.C. § 2(a))." (A6042 (emphasis omitted).) The District Court also explained that the jury could find Defendants guilty of the substantive offenses "based on the legal rule that each member of a conspiracy is responsible for crimes and other acts committed by the other members, as long as those crimes and acts were committed to help further or achieve the objective of the conspiracy and were reasonably foreseeable to Carolyn Jackson and John E. Jackson as a necessary or natural consequence of the agreement." (A6039.)

70

medical care when this excessive sodium causes a life-threatening medical condition? While we do not suggest at this time that the District Court must accept the sentences proposed by the government, it was also inappropriate, especially in the light of the severity of the injuries inflicted in this case, to compare the government's position to a football game:

> Nineteen years for Carolyn Jackson for this? Are you kidding me? Fifteen years for Mr. Jackson for this? Are you kidding me? Why can't people think clearly. This is not a game. This is not the Giants versus Miami. This is not how many touchdowns do we win by. This is life. And if you want the proportionality, I know they say the same offense. We don't have a same offense. This is one of a kind. Let's hope the government is able to duck another one. Let's hope I am. But, the bottom line is, this is serious, 19 years and 15 years, give everybody a break and let's get real.

(A6729.) Stating that society as a whole was not harmed by Defendants, the District Court observed that "[t]hey were not running around State lines, finding people, committing real federal offenses. Real ones." (A6731.) Even if the District Court was merely responding to a specific argument the government raised with respect to deterrence (i.e., that Defendants were a threat to their future grandchildren), it still minimized the seriousness of their conduct as compared with so-called "real federal offenses."

The District Court understandably took into account the

71

collateral consequences facing Defendants as a result of their convictions and underlying conduct. Specifically, it noted that they lost custody of their biological children (a decision that was partially overturned on appeal), that lengthier sentences would further remove them from two of their biological children's lives, and that they were now "dead" to their third biological child (JJ). John also lost his military career and his pension—he was discharged from the United States Army under other than honorable conditions for unacceptable conduct. Yet these consequences, which were the understandable results of their own criminal conduct, must be weighed against the harm they caused to the actual victims in this case. If anything, the losses they have incurred demonstrate that this is not a case of disadvantaged individuals who may have believed they had no choice but to engage in criminal conduct. Instead, Defendants were the well-educated and respected parents of several biological and adopted children, and John, in particular, was a career military officer with twenty-two years of service. Yet they still endangered the welfare of their children despite their many advantages.

According to John, the government's theory rests on the premise that probation is not punitive, and it ignores the $15,000 fine and the requirement that John serve 400 hours of community service. We do not dispute the punitive nature of probation or the relevance of the other components of John's sentence. Instead, we simply agree with the government that, under these specific circumstances, the District Court's sentence of probation (and a fine and community service) did not really take account the seriousness of John's offense, the need to promote respect for the law and to provide just punishment, and the nature and circumstances of the offense. We further note

72

that, even under the state sentencing scheme, there is a presumption of imprisonment for second degree offenses, which is overcome only when the sentencing judge finds that imprisonment would constitute a serious injustice overriding the need to deter others. See § 2C:44-1d.

Section 3553 also requires the sentencing court to consider the issue of deterrence. The lenient sentences imposed here clearly failed to afford either specific or general deterrence. The District Court stated that "everything that [John] lost is deterrence, both specific and general." (A6725.) "And everything that the Army may want in terms of showing that it doesn't like things like this going on at the base, you have somebody that high up who's taken down, that all happened already." (Id.) With respect to Carolyn, it indicated that her prison sentence would demonstrate that her conduct was intolerable. However, it also observed that: "I don't need to be worried about doing something with the sentence to deter. I really have a problem with saying under the ACA I have to be doing Army base cleanup. That's not what the sentence is about. And I specifically reject that that should be a piece in terms of the deterrence." (A6726-A6727.) With respect to the need for specific deterrence, we note that the criminal conduct involved conspiracy and various acts of neglect and cruelty committed over a period of time against three different victims. Cf., e.g., United States v. Kane, 639 F.3d 1121, 1131-32 (8th Cir. 2011) ("Far from demonstrating Kane posed no risk to recidivate, we observed, 'The facts show Kane repeated her crime over and over again. Instead of protecting her daughter and choosing to stop participating in her daughter's abuse after the first, or 50th, or 150th molestation, Kane continued to hold her daughter down or block the door on more than 200

73

occasions while Champion sexually violated the child.'"
(quoting United States v. Kane, 552 F.3d 748, 753 (8th Cir.
2009))). Especially given the District Court's statement that, "if
it had worked out, [the parenting] would have been called
brave," (A6734), the sentences "convey to Defendants (and
others who may share their parenting 'philosophy') that their
conduct might not have been so terrible after all." (Appellant's
Brief at 69 (citation omitted)).

Section 3553(a)(6) directs the sentencing court to
consider "the need to avoid unwarranted sentence disparities
among defendants with similar records who have been found
guilty of similar conduct." According to the government, the
District Court overlooked other federal child abuse cases by
focusing on state sentencing policies and hypothetical state
sentences. According to John, most of the federal cases cited by
the government are distinguishable (specifically all but one
implicated federal murder charges). The District Court also
noted that the government "settled the case through a plea of
somebody who was using a platform called KIK, had 600 phone
calls to young girls, met 6 of them, had sex with them."
(A6728.) The government was satisfied with a one-year
sentence even though the conduct in that case was significantly
more harmful than what occurred here. But the government still
sought "19 years [for Carolyn] and 15 years [for John]." (Id.)
Nevertheless, we question how this other case (in which the
defendant pled guilty and still received a twenty-year sentence)
justifies sentences of 24 months' incarceration and probation.
The District Court further referred to a New Jersey state court
proceeding in which the defendant was sentenced to probation
where a hypernatremia episode resulted in permanent brain
damage. However, one of the federal cases cited by the

74

government "involved a prosecution for a state offense under the ACA, i.e., willfully and maliciously engaging in child abuse under Oklahoma law" in which the defendant received a sentence of 144 months. (John's Brief at 40-41 (citing United States v. Hill, No. 5:11-cr-00152-F (W.D. Okla.).) We have already observed that, while the District Court went too far by considering state sentencing practices to the exclusion of federal sentencing principles, a sentencing court "likely can consider what a state defendant would receive if he had been prosecuted in state court" (Appellant's Brief at 52.) Even so, there is still a presumption of imprisonment for offenses of the second degree under New Jersey law. See § 2C:44-1d. In addition, "crimes involving multiple victims represent an especially suitable circumstance for the imposition of consecutive sentences." State v. Molina, 775 A.2d 509, 512 (N.J. 2001) (citing State v. Carey, 775 A.2d 495, 504 (N.J. 2001)); see also, e.g., N.J. Stat. Ann. § 2C:43-6b (authorizing sentencing court to impose periods of parole ineligibility where it is clearly convinced that aggravating factors substantially outweigh mitigating factors). In addition, the District Court should also consider on remand a recent state court disposition in which the judge "imposed a 25-year sentence on a mother for the manslaughter of her daughter and two 10-year consecutive sentences for the endangerment of her other two children." (Appellant's Reply Brief at 23 n.14 (emphasis omitted) (citing State v. Rezireksyon, No. 11-003445 (Essex County)).)

We also agree with the government that the sentences did not properly account for "the history and characteristics" of these two Defendants.

Admittedly, Defendants did express some remorse for

their actions, although at the same time they offered justifications for what they had done or focused on what they suffered as a result of their conduct. Even the government acknowledges that "John 'extend[ed] a sincere apology to all of my children.'" (Appellant's Brief at 72 (citing A6632-A6633).) Yet he also claimed that "[w]ith all my heart I believed that I was rearing all of my children with lawful discipline." (A6633.) In a written statement, Carolyn asserted that she was heartbroken over her mistakes as a parent. While she claimed at the sentencing hearing that she took responsibility for her actions and "won't make excuses" (A6630), she also stated that "I probably was not equipped to handle that responsibility" (A6629). Carolyn, like the District Court, focused on what she had lost as a result of her own actions. Asserting that "I would like to tell you that I directly feel like I have lost what's most important to me, and that's my family," she explained that, "as [JJ] eloquently demonstrated this morning, he, [J] and [C] will never be a part of our family again." (A6630.) While the District Court credited Defendants with how they conducted themselves during JJ's testimony, Carolyn's defense counsel vigorously attacked him and his credibility. He was called a "liar" (A2173), a "habitual" liar (A5742), a "pathological" liar (A2486), a "disruptive" kid (A2246), and a "marionette" (A5744). Character witnesses were called to attack his reputation. See, e.g., Kane, 639 F.3d at 1136 ("Instead of accepting responsibility for her crimes, Kane challenged the truthfulness of her child's testimony at trial, calling the child a liar, as the child mustered the courage to confront her abusers.").

More importantly, the government appropriately takes issue with the emphasis that the District Court placed on John's military record. The District Court turned to a Sentencing

76

Commission policy statement stating that "[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.11; see also, e.g., § 3553(a)(5) (requiring court to consider "any pertinent policy statement"). According to the District Court:

> So, what stands out in the 3553 and 3553(a) analysis is what role that military service should play. The focal point of the defense's argument, quite different argument than presented for Mrs. Jackson, it was something that totally guided the way the family lived. But, apparently Mr. Jackson was a stellar soldier. I don't think we think enough about that, what that means in this day and age when somebody chooses to be a soldier. And as this man did, chose when he was young and stuck it out and moved his family around and sought to excel and apparently was excelling.
>
> I thought a troubling point came, Miss Jampol [an Assistant United States Attorney] kind of came close to it, Mr. Shumofsky [another federal prosecutor] came down on it with two feet when in his closing remarks to the jury, he said that to the extent that Mr. Jackson is characterized as not really being around for some of the abusive acts ascribed to both parties, there came a point when he was back from his tour in Iraq and he

didn't have Iraq to hide behind anymore.

> I don't think that's what military service is. I don't know if he would say that again. Mr. Shumofsky, you argued very hard, and I admire your zeal, but Iraq is not something to hide behind. Military service is something, frankly, to praise when it is pursued as Mr. Jackson did. So, we have that.

(A6705-A6706.) The District Court "put [John] in a separate category" because of his military service:

> History and characteristics of the defendant, we've talked about his military career. And I put him in a separate category, rightly or wrongly, of citizens before this Court because of that military service. Because of the times we are in when it is volunteer service. Because of the quality of the service. Because of the hardship of his family that was subjected to his military service. Because of the risks that he took when he went abroad to fight. Because he was in combat. I believe it was wrong to walk away from that. So history and characteristics and of course an unblemished criminal record.

(A6717.) It also applied this line of reasoning to Carolyn. "In recognizing whether I would give her prison time at all and recognizing when I say that Mr. Jackson is exceptional, she was exceptional too. She was an Army wife." (A6732.)

78

While it appears undisputed that military service can be taken into account in fashioning an appropriate sentence, the District Court went too far in this case. In particular, it was improper to place members of the military (and their families) into "a separate category." We certainly do not question the great sacrifices made by men and women who volunteer to defend this country—as well as their families. However, the military does not constitute some separate caste or class entitled to special rights or privileges not shared by other Americans. Even the policy guideline states that a departure may be appropriate where military service is present to an "unusual degree" and distinguishes the case from the typical cases covered by the Guidelines. In turn, neither the District Court nor Carolyn herself cite to any case applying § 5H1.11 to military spouses or other family members. John's military service was also used as a defense at the trial itself, with the defense claiming that he did not know what was happening to the children because he was serving in Iraq. In any event, his stellar and admirable record as a soldier did little, if anything, to mitigate the harm suffered by Joshua, J, and C.

In fact, it is undisputed that these crimes occurred despite the fact that John was a well-educated and respected member of the community who had obtained the rank of major in the United States Army. Like her husband, Carolyn had a college education, and, having earned a degree in Individual and Family Studies, she even briefly worked as a teacher. Both Defendants raised several biological children, and received training about parenting and child welfare in connection with the adoptions.

Finally, we are troubled by the particular emphasis that the District Court placed on Defendants' appearance and

79

conduct in (and around) the courtroom.  It stated the following:

And I find too, and this is very important, not only have I have read all of this stuff, not only have I read stuff you haven't seen, but, I've watched the Jacksons, many, many times come and go in this courthouse.  I have seen them in the corridors and I have seen other defendants.  I have seen how people come in dressed very sloppily, just lollygagging around in the pews, bringing in food, you brought it in today and just kind of treating this courtroom like a luncheonette.

That's not the way the Jacksons have ever behaved.  They have had long car rides.  They are always on time.  Always on time.  They are interacting with the lawyers.  One of the things a Judge sees, I tell young lawyers this over and over again, we see how you interact with your clients. If you don't like your clients or if your clients are real big swift pains in the neck, we see it.  You can't hide it.  We see it.

I have seen nothing but respect between these people and their lawyers, and respect given to court personnel and to me.  You don't just do that day after day for over two years, not everyday, but during the time these proceedings have lumbered through this courtroom, without saying something about your character.  And that is inconsistent with the kind of monstrosities that the government would suggest were committed

80

upon these little girls, and inconsistent with
having the kind of vindictiveness against their son
that is suggested.

(A6722-A6723.) Is it really appropriate to impose sentences of
probation or two years of imprisonment because a defendant's
attorney did not exhibit any visible animosity to his or her own
client in the courthouse? Defendants' disciplined attitude in the
courthouse actually is not too surprising given the fact that John
was an army officer (and Carolyn was his spouse). If anything,
it would seem that this same attitude may explain why they used
unnecessarily severe corporal punishment when three very
young children failed to measure up to their exacting standards.
In any event, it was the jury that found that Defendants agreed to
endanger—and endangered—the welfare of Joshua, J, and C,
which, as the jury instructions indicated, resulted in a number of
serious injuries and medical condition. How could one say that,
because a defendant acted in a courteous manner, he or she was
incapable of committing a "monstrosity"—when the jury
returned a guilty verdict on a charge that the defendant
"knowingly caused harm to [a young child] by causing her to
ingest excessive sodium and a sodium-laden substance while
restricting her fluid intake, causing [the child] to suffer
hypernatremia and dehydration, a life-threatening condition"?
(A6028.) Under these circumstances, we do not believe that the
sentences were substantively reasonable.[18]

---

[18] However, we are also troubled by the government's
surprising references to both murmurs of outrage from the
gallery when the sentences were announced and a press report
claiming that the District Court had essentially negated the
guilty verdict. While the sentence imposed (and the process

81

IV.

For the foregoing reasons, we will vacate the sentences imposed by the District Court and remand for further proceedings consistent with this opinion.

---

used) should promote respect for the law, <u>see</u> § 3553(a)(2)(A), a judge obviously should not sentence someone in order to curry favor with the public or fail to exercise his or her own discretion under the three-step sentencing process so as to avoid public criticism. Furthermore, a press report cannot be used as evidence that a court committed reversible error.

82

McKEE, Dissenting.

It is impossible for anyone with an ounce of compassion to read through this transcript without becoming extraordinarily moved by allegations about what these children had to endure. Had the defendants been convicted of assault, or crimes necessarily involving conduct that was in the same "ballpark" as assault as defined under New Jersey law, I would readily agree that this matter had to be remanded for resentencing using the federal guidelines that govern assault. However, the district court held a ten and a half hour sentencing hearing in an extraordinarily difficult attempt to sort through the emotion and unproven allegations and sentence defendants for their crimes rather than the conduct the government alleged at trial and assumes in its brief. I believe the court appropriately did so pursuant to 18 U.S.C. §3553(a). Accordingly, I must respectfully dissent.

Before I begin my discussion, however, I must note that the defendants in this case were acquitted of the only federal offenses with which they were charged: assault with a dangerous weapon, with intent to do bodily harm,[1] and assault resulting in serious bodily injury.[2] As I discuss more fully in Section II, these assault charges seem to drive the government's argument and the Majority's analysis. In order to minimize confusion about the precise nature of the charges in this case and the conduct that was proven, a chart listing each of the charges and their outcomes is attached as an

_____

[1] 18 U.S.C. § 113(a)(3).
[2] *Id.* at § 113(a)(6). Both federal assault charges were dismissed when the district court granted judgments of acquittal at the close of the government's case.

1

addendum to this dissent.[3]

## I. Sufficiently Analogous Offense Guideline Analysis

The defendants were charged with what can accurately be described as incredibly inhumane treatment approaching (if not actually amounting to) torture of the minor children whose care and well-being had been entrusted to them. Since the defendants lived on a federal military installation, they were subject to federal law pursuant to the Assimilated Crimes Act.[4]

"When an assimilated state offense resembles conduct for which a sentencing guideline for a federal offense has been promulgated, the Sentencing Guidelines provide that 'the most analogous offense guideline' should be applied."[5] When it is thus necessary to select a "sufficiently analogous" offense guideline, I agree with the Majority's adoption of an "elements-based" approach. The reasons for adopting that test are thoroughly explained in the Majority opinion.[6] However, for reasons I will explain, I do not agree with my colleagues' application of that test on this record. I think the Majority's application of that test confuses the two steps of the analysis. It also fails to appreciate several reasons that a sweeping statute like New Jersey's endangering the welfare of a child ("EWC") statute cannot be sufficiently analogous to the offenses corresponding to the federal assault guidelines under

---

[3] *See* Appendix, Table of Charges Against Carolyn & John Jackson.

[4] 18 U.S.C. § 13(a). Given the Majority's thorough discussion of the ACA, I need not reiterate its text or its historical development. *See* Maj. Slip Op. at 7–8.

[5] *United States v. Finley*, 531 F.3d 288, 292 (4th Cir. 2008) (quoting U.S.S.G. § 2X5.1).

[6] Maj. Slip Op. at 17–20.

2

the circumstances here.

As we explained in *United States v. Cothran*, "there is a two-stop process involved [in sentencing for a conviction without a corresponding federal guideline]: first, the district court must determine whether there is a sufficiently analogous [federal] guideline, and, if there is, it must determine which guideline is most analogous."[7] These two steps are quite distinct. At step one, the court's analysis is limited to a comparison of the elements of the state crime and any potentially analogous federal crimes. As the Court of Appeals for the Eighth Circuit has explained, "[D]etermining whether there is a sufficiently analogous guideline to a particular crime is generally a task of comparing the elements of federal offenses to the elements of the crimes of conviction."[8]

This step-one analysis may result in any one of three possible outcomes: (1) the court could determine that no guideline offenses are sufficiently analogous to the defendant's conviction and apply the general sentencing

---

[7] 286 F.3d 173, 177 (3d Cir. 2011) (explaining and then adopting the Eighth Circuit's approach in *United States v. Osborne*, 164 F.3d 434 (8th Cir. 1999)).

[8] *United States v. Allard*, 164 F.3d 1146, 1149 (8th Cir. 1999); *see also United States v. Nichols*, 169 F.3d 1255, 1270 (10th Cir. 1999) ("Whether there is a sufficiently analogous guideline to a particular crime is generally a task of comparing the elements of the defendant's crime of conviction to the elements of federal offenses already covered by a specific guideline. The determination on this point is a purely legal one, and the district court need not consider the underlying factual circumstances of the defendant's case." (citation omitted)).

3

provisions contained in 18 U.S.C. § 3553(a);[9] (2) the court could determine that only one guideline offense is sufficiently analogous to the crime of conviction and rely on that guideline to sentence the defendant;[10] or (3) the court could determine that there is more than one sufficiently analogous guideline to guide its sentencing inquiry. In that situation, the court must then move to step two to select the guideline that is "sufficiently analogous" to the offense of conviction to justify sentencing pursuant to that guideline.[11] Thus, the court only gets to step two if more than one federal crime has elements sufficiently analogous to the crime of conviction to justify fashioning a sentence that is guided by that federal

---

[9] *See, e.g., Finley*, 531 F.3d at 289–90 (finding no sufficiently analogous federal guideline for "'knowingly driving or operating a motor vehicle while under the influence of alcohol, third offense within ten years'" and "'driving a motor vehicle on a highway while [his] operator's license was suspended and/or revoked,'" in violation of Virginia law); *United States v. Reyes*, 48 F.3d 435, 437-38 (9th Cir. 1995) (finding no sufficiently analogous federal guideline for the state offense of driving without a license).

[10] *See, e.g., United States v. Calbat*, 266 F.3d 358, 362-63 (5th Cir. 2001) (applying "aggravated assault" guideline to an Assimilative Crimes Act conviction for "intoxication assault"); *United States v. Queensborough*, 227 F.3d 149, 152 n.2 (3d Cir. 2000) (applying "criminal sexual abuse" guideline to an Assimilative Crimes Act conviction for "aggravated rape").

[11] *See, e.g., United States v. Terry*, 86 F.3d 353, 357-58 (4th Cir. 1996) (comparing "aggravated assault" guideline and "property damage or destruction" guideline to an Assimilative Crimes Act conviction for "shooting at an occupied vehicle").

4

crime. At step two, a court may expand its view of the state crime to include the actual conduct to determine which of several potentially analogous crimes is the *most* analogous.[12] Indeed, it *must* do so in order to arrive at an appropriate sentence. Here, the district court did not find any sufficiently analogous guideline under step one (the first potential outcome described above), and therefore never moved to step two, where consideration of actual conduct would have been both necessary and appropriate.

Given the circumstances surrounding these convictions, the government's argument addresses the inquiry at step one. The government claims that the state crimes of conviction—EWC and conspiracy to commit EWC[13]—are sufficiently analogous to offenses corresponding to the federal assault and aggravated assault guidelines to require application of those guidelines. As we have explained, when discussing whether a state crime[14] is analogous to a federal

---

[12] *Osborne*, 164 F.3d at 439 ("In determining the most analogous guideline under USSG § 2X5.1, a district court is to look not merely to the definition of the offenses, but also to the actual conduct of the individual defendant.").

[13] As discussed more thoroughly in Section II.A, though the defendants were charged with two counts of federal assault, the district court granted judgments of acquittal on those two counts, and they were never submitted to the jury.

[14] It is important to note that many cases dealing with U.S.S.G. § 2X5.1's "most analogous offense guideline" provision deal not with state crimes that have been assimilated into federal law under the ACA, but with sentencing for federal crimes without any corresponding guideline. *See, e.g., Cothran*, 286 F.3d at 176–78 (affirming district court's conclusion that conveying false information

5

guidelines offense, our sister circuit courts of appeals have compared the elements of the crime of conviction to the elements of one or more federal crimes. [15] Here, however, the

---

and threats about carrying an explosive device on an airplane under 49 U.S.C. § 46507 was most analogous to crimes corresponding to U.S.S.G. § 2A6.1, which is applicable to "Threatening or Harassing Communications"); *United States v. McEnry*, 659 F.3d 893, 897 (9th Cir. 2011) (finding that district court erred in holding federal crime of "'knowingly and willfully serv[ing] . . . as an airman without an airman's certificate authorizing the individual to serve in that capacity'" under 49 U.S.C. § 46306(b)(7) was most analogous to crimes corresponding to U.S.S.G. § 2A5.2, which applies to "Interference with Flight Crew Member of Flight Attendant; Interference with Dispatch, Navigation, Operation, or Maintenance of Mass Transportation Vehicle"); *United States v. Rakes*, 510 F.3d 1280, 1287-90 (10th Cir. 2007) (affirming district court's conclusion that conspiracy to impede or injure an officer under 18 U.S.C. § 372 was most analogous to crimes corresponding to U.S.S.G. § 2A6.1(a)(1), which covers certain crimes involving threatening or harassing communications); *Nichols*, 169 F.3d at 1269–76 (affirming district court's conclusion that conspiring to use weapon of mass destruction under 18 U.S.C. § 2332a was most analogous to first-degree murder and U.S.S.G. § 2A1.1). Because these cases are not quite the same as cases wherein a state statute is assimilated into federal law, I have focused my analysis on the latter.

[15] *See, e.g., Calbat*, 266 F.3d at 363 (comparing intoxication assault under Texas law to the federal offense of aggravated assault involving serious bodily injury); *Osborne*, 164 F.3d at 438–39 (comparing vehicular battery under South Dakota law

6

government does not point to a single specific federal offense
that has elements sufficiently analogous to New Jersey's
definition of EWC to justify using the federal assault
guideline to determine these defendants' sentences for
conviction of that state offense. Instead, the government
concludes that the federal assault and aggravated assault
guidelines, which apply to 41 different sections in the
Statutory Index,[16] generally cover the same crimes
encompassed within the EWC statute. However, such blanket
assertions are no substitute for the kind of side-by-side
comparison of elements that the first step of the elements-
based approach requires.[17] Moreover, as discussed below, an
attempt to define the myriad types of conduct criminalized
under the EWC statute as assault, and equate the two
dissimilar offenses, overlooks the sweeping nature of the
EWC statute and the imprecision that would result from the
government's approach.

New Jersey defines the crime of EWC in two statutes:
N.J.S.A. §§ 2C:24-4a and 9:6-1. Section 2C:24-4a(2) defines
the crime itself:

Any person having a legal duty for the care of a child or who
has assumed responsibility for the care of a child who causes
the child harm that would make the child an abused or
neglected child as defined in R.S.9:6-1, R.S.9:6-3 and P.L.

---

to the federal offense of assault resulting in serious bodily
injury); *Allard*, 164 F.3d at 1149 (comparing vehicular
battery under South Dakota law to the federal offense of
involuntary manslaughter).

[16] The Statutory Index specifies which sentencing guideline
matches the federal statute of conviction.

[17] *See Calbat*, 266 F.3d at 363; *Allard*, 164 F.3d at 1149;
*Osborne*, 164 F.3d 434 at 437.

7

1974, c. 119, § (C.9:6-8.21) is guilty of a crime of the second degree.[18]

Accordingly, here, the jury instructions required the jury to find the following elements beyond a reasonable doubt in order to find Carolyn and John guilty:

1. That [J.J.#2, J.J.#3, and C.J.#3] were children;

2. That the defendant knowingly caused the child harm that would make the child neglected or knowingly committed an act of cruelty against the child;

3. That the defendant knew that such conduct would cause the child harm or would inflict cruelty upon the child; and

4. That the defendant had a legal duty for the care of the child or had assumed responsibility for the care of the child.[19]

For the second element, the jury was instructed that Section 9:6-1[20] of the New Jersey Statutes Annotated **defines cruelty**

---

[18] N.J.S.A. § 2C:24-4(a)(2).

[19] A6009.

[20] The jury instructions are almost word-for-word recitations of the statutory definitions of cruelty and neglect, as defined in N.J.S.A. § 9:6-1:

> Cruelty to a child shall consist in any of the following acts: (a) inflicting unnecessarily severe corporal punishment upon a child; (b) inflicting upon a child unnecessary suffering or pain, either mental or physical; (c) habitually tormenting, vexing or afflicting a child; (d) any willful act of omission or commission whereby unnecessary pain and suffering, whether mental or physical, is caused or permitted to be

8

as consisting of any of the following acts performed by anyone having custody or control of the child:

(a) Inflicting unnecessarily severe corporal punishment upon a child;

(b) Inflicting upon a child unnecessary suffering or pain, either mental or physical;

(c) Habitually tormenting, vexing or afflicting a child;

---

inflicted on a child; (e) or exposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical or moral well-being of such child.

Neglect of a child shall consist in any of the following acts, by anyone having the custody or control of the child: (a) willfully failing to provide proper and sufficient food, clothing, maintenance, regular school education as required by law, medical attendance or surgical treatment, and a clean and proper home, or (b) failure to do or permit to be done any act necessary for the child's physical or moral well-being. Neglect also means the continued inappropriate placement of a child in an institution, as defined in section 1 of P.L.1974, c. 119 (C. 9:6-8.21), with the knowledge that the placement has resulted and may continue to result in harm to the child's mental or physical well-being.

9

(d) Any act of omission or commission whereby unnecessary pain and suffering, whether mental or physical, is caused or permitted to be inflicted on a child; or

(e) Exposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical or moral well-being of such child.[21]

The jury instructions then **defined neglect** as "any of the following acts, by anyone having the custody or control of the child:"

(a) Failing to provide proper and sufficient food, clothing, maintenance . . . medical attendance or surgical treatment . . . or

(b) Failure to do or permit to be done any act necessary for the child's physical well-being.[22]

In sum, to be guilty of second degree EWC under New Jersey law, a defendant must have knowingly harmed or neglected a child for whom he or she had a legal duty of care, in the manner set forth in the statutes. And the statute itself defines at least a dozen acts that would satisfy those elements.

In contrast, federal assault proscribes a much more limited and focused type of conduct. The federal crime of assault that the government seems to want the defendants to be sentenced for is defined as follows:

1) Simple assault of an individual under 16 years old;[23] or

2) Assault resulting in substantial bodily injury to an individual

---

[21] A6010. There is a line drawn through the words "or moral" in Section (e) of the jury instructions, the word "moral" is circled, and there is a check mark in the margin. It is unclear whether these words were therefore omitted from the jury instructions.

[22] *Id.* at 6011.

[23] 18 U.S.C. § 113(a)(5).

10

under 16 years old.[24]

The lesser of these crimes, the crime of simple assault, "is not defined anywhere in the federal criminal code," but "has been held to 'embrace the common law meaning of that term.'"[25] At common-law, simple assault is a crime "'committed by either a willful attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.'"[26] For the second potentially analogous crime, assault resulting in substantial bodily injury, the statute defines "substantial bodily injury" as either "temporary but substantial disfigurement" or "temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty."[27] Though I agree with my colleagues' conclusion that the EWC and federal assault offenses need not be a perfect match, there are nevertheless irreconcilable problems that prohibit the elements of the assault offenses from being viewed as sufficiently analogous to the elements

---

[24] 18 U.S.C. § 113(a)(7). Defendants were acquitted of the related charge of 18 U.S.C. § 113(a)(6), which prohibits "[a]ssault resulting in serious bodily injury" without the requirement that the victim be under 16 years of age.

[25] *United States v. Chestaro*, 197 F.3d 600, 605 (2d Cir. 1999) (quoting *United States v. Stewart*, 568 F.2d 501, 504 (6th Cir. 1978)); *see also United States v. Estrada-Fernandez*, 150 F.3d 491, 494 n.1 (5th Cir. 1998); *United States v. Juvenile Male*, 930 F.2d 727, 728 (9th Cir. 1991).

[26] *United States v. McCulligan*, 256 F.3d 97, 103 (quoting *Chestaro*, 197 F.3d at 605).

[27] 18 U.S.C. § 113(b)(1)(A)-(B).

11

of EWC for sentencing purposes under the ACA.

There are so many ways to violate New Jersey's EWC statute that claiming the statute's elements are sufficiently analogous to the elements of federal assault for ACA purposes oversimplifies the crime of EWC, and redefines it to such an extent that the resulting crime bears almost no resemblance to the crime defined by the New Jersey legislature or the policy behind it. Where, as here, the state criminalizes a wide variety of conduct, the inquiry must be *whether any iteration* of the state crime *would necessarily constitute a violation of the federal offense.* The district court correctly concluded that is just not the case here. I realize, of course, that "assaulting" one's child could potentially (but, as discussed below, not necessarily) constitute a violation of the EWC statute, but that is only one of numerous ways New Jersey's statute would be violated; the disconnect between such conduct and the elements of assault under federal law is just too great to consider one to be sufficiently analogous to the other to control sentencing for EWC under New Jersey law.

The district court recognized that none of the federal assault offenses are aimed at many of the particular elements of EWC. For example, the federal assault statute does not proscribe crimes of neglect, like the failure of a child's caregiver to provide proper meals, schooling, medical attention, or clothing. Nor does it prohibit many of the acts of cruelty, such as "[h]abitually tormenting, vexing or afflicting a child" or "[e]xposing a child to unnecessary hardship, fatigue, or mental or physical strains," that are elements of EWC.[28] No definition of assault, no matter how expansive, includes such elements. Yet, such conduct would constitute a

---

[28] N.J.S.A. § 9:6-1.

12

clear violation of New Jersey's EWC statute. The Majority's conclusion that EWC is sufficiently analogous to assault oversimplifies the former statute's wide sweep while simultaneously ignoring and obfuscating its breadth.

This incongruence is amplified and best illustrated by the fact that New Jersey actually permits some "assault" under the EWC statute. The statute criminalizes "inflicting *unnecessarily* severe corporal punishment upon a child."[29] Thus, moderate corporal punishment would not constitute a violation of the statute. Indeed, severe corporal punishment would fall outside the reach of the EWC statute as long as it could also be deemed "*necessarily* severe." And yet, such sanctioned corporal punishment would definitely satisfy the elements of federal assault. EWC is clearly focused upon the unique attributes of the parent/child relationship, and the district court clearly recognized that and struggled with that concept in determining whether there was a sufficiently analogous guideline offense for this state crime. The statute's nuanced treatment of corporal punishment makes a finding that federal assault is sufficiently analogous to the EWC statute even more unsatisfactory.

Finally, even if the district court were to look at the actual conduct in this case—which it properly refrained from doing under step one of an elements-based approach—it would still be unable to conclude that every count of EWC *in this case* constituted assault. According to both the indictment and the jury verdict sheet, I agree that the jury found that the defendants endangered the welfare of their three adopted children by "assaulting [them] with various objects and with their hands,"[30] though I must note that the jury was given no

---

[29] *Id.* (emphasis added).
[30] A34–53, 6054–61.

guidance as to the definition of "assault."[31] But none of the other EWC elements in this case would constitute assault. The defendants were convicted of withholding sufficient food and water, forcing the children to ingest hot sauce and red pepper flakes, and withholding prompt and proper medical care.[32] Though these descriptions are appalling, they simply do not constitute assault. I readily concede that the helplessness of these young children, the brutality that was alleged, and the extraordinarily unsympathetic nature of these "parents," all combine to make it very tempting to simply conclude that these kids were assaulted and to conclude that the guideline for assault should have guided the court's sentencing inquiry. However, although assault *is* one of many ways one can endanger the welfare of a child under New Jersey law, **the defendants here were never convicted of assault** (though that crime was included in the indictment), and the evidence of numerous other types of cruelty clearly satisfy the elements of the crimes the defendants were convicted of.

For the foregoing reasons, I conclude that the crime of EWC is simply not sufficiently analogous to the crimes corresponding to the federal assault guidelines, and the gruesome nature of the charges does not alter that fact.

## II. Other Concerns

Though my main concern in writing separately is to express my agreement with the district court's conclusion that there is no sufficiently analogous guideline to apply in this case, I would be remiss if I did not also mention other

---

[31] See Section II.A for a further discussion of the jury instructions in this case.

[32] *See* Appendix, Table of Charges Against Carolyn & John Jackson.

14

concerns: first, the role that acquitted conduct plays here; second, the appropriateness of the district court's refusal to find facts after determining that there was no sufficiently analogous guideline in this case; and finally, the irony of the government's opposition to allowing the jury to characterize the degree of the victims' harm.[33]

A. <u>Acquitted Conduct & Unproven Harm</u>

There is an unspoken argument here that, even though defendants were acquitted of federal assault, the court could consider the allegations of assault in imposing a sentence under the doctrine of acquitted conduct, and that evidence should have been considered by the district court when determining whether the assault guideline was sufficiently analogous.[34] Not only would the examination of particular conduct in step one of the sufficiently analogous analysis have been improper, given the conduct the defendants were

---

[33] Because, as the Majority explains, "[o]ur preferred course of action upon finding procedural error is to remand the case for resentencing, without considering the substantive reasonableness of the sentence imposed," I refrain from reaching the substantive unreasonableness of the sentence here, where the Majority's finding of procedural error alone provides basis for remanding. Maj. Slip Op. at 53.

[34] Almost as an aside the government suggests that the district court should have sanctioned the defendants for conduct they were not convicted of under the doctrine of acquitted conduct. *See* Gov't Br. at 44–5 ("Indeed, courts may even include facts that might have formed the basis for acquitted counts, as well as entirely separate uncharged offenses." (citing *United States v. Watts*, 519 U.S. 148, 149 (1997) (per curiam); *United States v. Grier*, 475 F.3d 556, 565–68 (3d Cir. 2007) (en banc))).

15

acquitted of, the district court correctly concluded that attempts to retroactively shoehorn their conduct into the assault guideline is akin to "fitting a square peg into a round hole."[35]

As established in *United States v. Watts*—a decision that included review of two cases: *Watts* and *Putra*—a sentencing court may consider conduct a defendant has been acquitted of, so long as that conduct has been proven by a preponderance of the evidence.[36] In *Watts*, police discovered cocaine base and two loaded guns in Watts's house. A jury convicted Watts of possession with intent to distribute,[37] but acquitted him of using a firearm in relation to a drug offense.[38] During sentencing, the district court found by a preponderance of the evidence that Watts had possessed the guns in connection with the drug offense and accordingly applied a guideline for that conduct that added two points to his base offense level.[39] In *Putra*, authorities had videotaped two instances of Putra and her codefendant selling cocaine to a government informant. The jury convicted Putra of aiding and abetting with intent to distribute one ounce of cocaine on May 8, 1992, but acquitted her on a second count of the same crime on May 9, 1992. At sentencing, the district court found by a preponderance of the evidence that Putra had been involved in the May 9th transaction and calculated her base offense level by aggregating the amounts of both sales.[40] The

---

[35] A6588.

[36] 519 U.S. 148, 157 (1997); *see also U.S. v. Grier*, 475 F.3d 556, 561 (3d Cir. 2011).

[37] 21 U.S.C. § 841(a)(1).

[38] 18 U.S.C. § 924(c).

[39] 519 U.S. at 150.

[40] *Id.* at 150–51.

16

Supreme Court later upheld these sentencing decisions.[41]

Here, as my colleagues explain, the crimes alleged in the fifteen-count superseding indictment that was filed against the defendants "can be organized into three different categories: an assimilated state conspiracy charge [for which they were both convicted], assimilated state substantive offenses [of endangering the welfare of a child, for which John was convicted of ten counts and Carolyn of twelve counts], and substantive charges under federal law."[42] The third category includes only one kind of charge: assault as defined under federal law in 18 U.S.C. § 113(a)(3) (prohibiting assault with a dangerous weapon, with intent to do bodily harm) and § 113(a)(6) (assault resulting in serious bodily injury). As noted at the outset, the assault charges were dismissed when the district court granted judgments of acquittal on Counts 13–14 at the close of the government's case.[43]

Accordingly, the only conduct that was submitted to the jury for proof beyond a reasonable doubt was the conduct alleged in counts charging endangering the welfare of a child under New Jersey law, N.J.S.A. §§ 2C:24-4A and 9:6-1, and Count 1, charging conspiracy to do so. Importantly, the jury

---

[41] *Id.* at 157 (reversing circuit court judgments and remanding for further proceedings consistent with the opinion).

[42] Maj. Slip Op. at 4.

[43] The defendants were also acquitted of additional counts of child endangerment—John was acquitted of Counts 2, 10 and renumbered 13, while Carolyn Jackson was also acquitted of renumbered Count 13. After the district court entered a judgment of acquittal on Counts 13 and 14 at the close of the government's case, the original Count 15 was renumbered Count 13 on the verdict sheet.

17

was neither instructed on, nor required to find, the elements of any kind of assault. Moreover, both defendants were affirmatively acquitted of assault resulting in substantial bodily injury, one of the offenses the government points to as sufficiently analogous to the EWC convictions.

It goes without saying that "[o]nly if a jury of an individual's peers concludes beyond a reasonable doubt that he or she committed each element of the charged offense, as defined by the legislature, may the court impose punishment."[44] Therefore, jury instructions must contain all the essential elements of the crimes charged.[45] And yet, despite the absence of any pertinent jury instructions, and despite the acquittals on federal assault offenses, the government now asks us to force the district court to sentence these defendants as if the jury had found them guilty of assault. The district court quite correctly resisted that invitation, and so should we.

Unlike the issue in *Watts* regarding the calculation of the proper base offense level, the district court's task in

---

[44] *Grier*, 475 F.3d at 562 (citing *U.S. v. Booker*, 543 U.S. 220, 230 (2005))

[45] *See, e.g., Chambers v. McDaniel*, 549 F.3d 1191, 1201 (9th Cir. 2008) (holding defendant's federal constitutional due process right was violated because jury instructions permitted jury to convict him of first-degree murder without finding separately all three elements of the crime: willfulness, deliberation, and premeditation); *United States v. Thornton*, 539 F.3d 741, 748-51 (7th Cir. 2008) (reversing convictions for attempted bank robbery and possessing a firearm in furtherance of a crime of violence because jury instruction on the bank-robbery charge failed to include essential element of actual intimidation).

18

sentencing under the ACA occurs much earlier in the sentencing process. The real question a sentencing judge is attempting to answer at step one of the sufficiently analogous guideline analysis is, "Which federal crime—if any—has analogous elements to the state crime of conviction?" In the cases consolidated in *Watts*, there was no question as to which guideline to use, as the defendants were convicted of federal crimes that had already been assigned specific guidelines. In this case, however, the defendants were convicted of state crimes that did not have a corresponding federal guideline. Thus, as discussed above, the court had to determine if the elements of New Jersey's EWC statute were so similar to the elements of the federal assault statute that, for sentencing purposes, a violation of one could fairly guide sentencing a violation of the other. For all the reasons explained in Section I, the district court was correct in concluding that sentencing discretion under one should not be guided by guidelines established for elements of the largely dissimilar other.

B. Fact-Finding

Because there was no sufficiently analogous guideline in this case, the district court was not required to conduct the kind of fact-finding necessary to determine the applicability of guideline adjustments. I agree that this second claim of error is "moot if this Court finds that the [district court] correctly determined that there was *no* sufficiently analogous guideline,"[46] which I believe it did. Both the government's argument and the Majority's conclusion regarding the necessity of fact-finding here disregards the fact that this case was not a guidelines case, and that the district court "properly followed §2X5.1's explicit instructions by sentencing

---

[46] John Br. at 30.

19

according to § 3553."[47]

I also take issue with the government's cited support for its argument that the district court erred in refusing to find facts. The government notes that the district court disregarded "all the [Pre-Sentence Report] paragraphs discussing the offenses."[48] But the district court had sound reason for doing that, which the government fails to mention. The government conceded that the statement of facts section of the PSR was drafted by the prosecution.[49] The district court found it was "a description of the offense conduct taken from the government's narrative without any investigation by presentence," and it "wasn't helpful" because "[i]t was argument."[50] The court's actions were appropriate given its conclusion that there was "a real problem with saying that this is what was proven without judicial factfinding nailing it

---

[47] *Id.* at 32 (citing A6589 (excerpt from sentencing transcript where district court explains decision to sentence according to §3553 and states this was "not some kind of *United States versus Koon* [situation] where I'm saying this is just so unfair, I'm going to make up this mechanism and then we'll make it stick . . . . This is in the guidelines. The guidelines in 2X5.1 anticipated there would be a time, under the ACA or some other assimilative statute where we might have to do this.")). *See Koon v. United States*, 518 U.S. 81 (1996).

[48] Gov't Br. at 43 n.19.

[49] A6072 (prosecution admitting to writing statement of facts during motion hearing), A6740 (same during sentencing hearing). Though the government stated that its composition of the PSR's statement of facts is "what is done in almost every PSR in this District," the district court disagreed. A6740–41.

[50] A6738–39.

20

down because that's not what a jury found."[51] The court had every right to refuse to rely on a document that it believed was more the result of the government's advocacy than an objective effort to assist the court at sentencing. It is clear from the sentencing hearing that the district court was not convinced by a preponderance of the evidence of all of the conduct that the government had alleged and relied on for sentencing purposes. Thus, after discovering that "Probation did no independent investigation at all regarding those facts," the district court was correct to ignore the PSR's statement of facts and base a sentence on the elements of the offenses that were proven at trial.[52]

## C. A Final Irony

Before concluding, I think it is important to emphasize something about the government's argument here. It is a position that is ironic at best, and disingenuous at worst. During the trial, the defense asked the court to have the jury return a verdict with interrogatories that would have shown the specific harm the jury was convinced had been proven. [53]

---

[51] A6739.

[52] A6740.

[53] A5468–70. This discussion included reference to N.J.S.A. § 9:6-8.21(c), which defines "abused or neglected child," in relevant part, as:

> [A] child less than 18 years of age whose parent or guardian, as herein defined, (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional

21

In the end, the government successfully opposed the
defendants' request that the jury make specific findings as to
the degree of harm allegedly caused by the defendants.[54] The
government later explained that "certain things, such as
degree of harm or danger are historically elements of assault,

---

health or protracted loss or impairment of the
function of any bodily organ; (2) creates or
allows to be created a substantial or ongoing
risk of physical injury to such child by other
than accidental means which would be likely to
cause death or serious or protracted
disfigurement, or protracted loss or impairment
of the function of any bodily organ; . . . . (4) or
a child whose physical, mental, or emotional
condition has been impaired or is in imminent
danger of becoming impaired as the result of the
failure of his parent or guardian, as herein
defined, to exercise a minimum degree of care
(a) in supplying the child with adequate food,
clothing, shelter, education, medical or surgical
care though financially able to do so or though
offered financial or other reasonable means to
do so, or (b) in providing the child with proper
supervision or guardianship, by unreasonably   .
inflicting or allowing to be inflicted harm, or
substantial risk thereof, including the infliction
of excessive corporal punishment; or by any
other acts of a similarly serious nature requiring
the aid of the court . . . .

[54] *See* A5457–72 (government's argument), A5477–78,
5485–88 (court rejecting defendants' request).

22

they are not elements of the crimes for which these defendants were convicted."[55] Yet, the government now complains because the court refused to sentence the defendants for assault. Moreover, the government's objection prevented any additional fact-finding by the jury that would have established the harm that was actually proven. Whether the government was motivated by a concern about having to prove conduct that was not an element of the crimes charged, or whether the objection was a tactic to allow it to later have the court sentence the defendant for conduct without bearing the burden of proving it beyond a reasonable doubt, it cannot be disputed that the objection created the possibility that the district court may not have been sufficiently convinced of the degree of harm caused by defendants to analogize the elements of EWC under New Jersey law to the elements of the federal assault statute. That, in fact, is what happened.

On appeal, it is no less difficult to determine the precise harm that was proven. As the Majority notes, "[g]iven the expansive nature of the child endangerment instructions as well as the allegations against [d]efendants (involving numerous acts of abuse committed over the course of a five-year conspiracy), we recognize the difficulty in connecting each count with a specific incident or a particular injury or condition."[56] This difficulty is due, in part, to an unresolved dispute regarding the causation of the children's injuries and medical conditions.[57] Additionally, the government again contributes to the difficulty by repeatedly citing in its brief the very sections of the PSR that the court refused to rely on

---

[55] A6460.
[56] Maj. Slip Op. at 56.
[57] *See* Maj. Slip Op. at 57 (acknowledging that "the parties . . . contest causation").

23

during sentencing.[58] As the defendants point out, the brief reiterates much of the harm that defendants allegedly caused, but we are left with no way of knowing what was actually proven; especially since the counts charging assault were dismissed and never even submitted to the jury.

One of the more egregious examples of the government's exaggeration of the harm found by the jury is its treatment of Joshua's death. At trial, the court excluded all references to Joshua's death—a fact that is not noted in the Majority opinion—as the government did not charge the defendants with causing his death. In fact, the first trial in this case ended in a mistrial, when the government "inadvertently asked a question suggesting Joshua was no longer alive."[59] During sentencing here, the district court admonished the government for arguing that the court should consider Joshua's death when calculating the sentence:

I do not believe that the government has a right to ask me to sentence as if the parents contributed to the death of Joshua. . . . [T]he government walked away from proving a death case and couldn't get an expert to opine that they caused his death and rather backdoor that into this case.[60]

And yet, the government now argues on appeal that the defendants "contributed to [Joshua's] death."[61] Indeed, even the Majority concedes that "[t]he government admittedly does read too much into the jury's verdict."[62] The government's continued refusal to accept the limitations of the jury's

---

[58] Gov't Br. at 6–8, 72 n.34.
[59] Gov't Br. at 17 n.8.
[60] A6695.
[61] Gov't Br. at 45; *see also id.* at 54, 75.
[62] Maj. Slip Op. at 56.

24

findings is one of the main reasons sentencing was so challenging in this case. The district court very carefully sorted through all of this in a ten-and-a-half-hour sentencing hearing. Given the complexities and ambiguities of this case, I cannot conclude the court erred or abused its discretion. To the contrary, the court recognized the disconnect between the endangering the welfare of a child statute that the defendants were convicted of and the counts charging federal assault that were all dismissed. The court then tried to fashion a sentence that was consistent with the principles set forth in 18 U.S.C. § 3553(a), the general federal sentencing statute. I certainly do not agree with everything the court said during that ten-and-a-half-hour inquiry, but I do not think the court erred or abused its discretion in fashioning these sentences.

Indeed, the district court did the best it could in this situation. The government charged the defendants with federal assault; the district court granted judgments of acquittal on the two federal assault charges. The district court's rationale for granting acquittal on the assault charges parallels the reasoning that an elements-based approach does not permit a finding that the federal assault guideline is sufficiently analogous to the crime of EWC. The court explained:

I find that the activity is not of an ilk to constitute . . . an assault as that activity or conduct as contemplated in the statute. I find that the combination of events, withholding or activities withholding water, administering hot sauce, watching [the child] decline and not doing anything about it does not constitute battery, or would put a victim in the apprehension of immediate bodily harm.[63]

---

[63] A5444.

25

Despite the district court's ruling, the government requests that we now require the district court to resentence defendants according to guidelines intended to guide sentences imposed for the very offense defendants were acquitted of. I am unwilling to do so.[64]

As I conceded at the outset, this is a horrendous case in which the most innocent among us had to endure atrocious neglect and cruelty. As Justice Holmes stated over 100 years ago, "hard cases . . . make bad law."[65] Because of the ambiguities in the jury's verdict and the breadth of harm included in the state offense the defendants were convicted of, this case is as hard as it is tragic. But I cannot agree with my colleagues' conclusion that the district court erred in imposing these sentences. Accordingly,

I must respectfully dissent from the opinion of my colleagues.

---

[64] The district court explained its similar finding "that trying to push findings that would comfortably make the conduct aggravated assault and going from there under the guidelines offends fairness to allow the government to charge one thing and a lower standard of proof to prove something much harsher and come away with a sentence much greater than the jury verdict necessarily leads to with the Judge leading the charge saying oh, yes, it does, because I'm making these findings." A6588.

[65] *Northern Sec. Co. v. United States*, 193 U.S. 197, 364 (1904) (Holmes, J., dissenting).

26

**APPENDIX**

**Charges Against Carolyn & John Jackson**

| Count | Charged Crime | Superseding Indictment Description[66] | Carolyn's Outcome | John's Outcome |
|---|---|---|---|---|
| 1 | Conspiracy to Endanger the Welfare of a Child N.J.S.A. § 2C:5-2 | | Guilty | Guilty |
| 2 | Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a | "[W]ithholding sufficient nourishment and food from J.J.#2" | Guilty | Not Guilty |
| 3 | Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a | "[P]hysically assaulting J.J.#2 with various objects and with their hands" | Guilty | Guilty |
| 4 | Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a | "[W]ithholding adequate water . . . and prohibiting J.J.#3 from drinking water" | Guilty | Guilty |
| 5 | Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a | "[F]orcing J.J.#3 to ingest hot sauce, red pepper flakes, and raw onion" | Guilty | Guilty |
| 6 | Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a | "[P]hysically assaulting J.J.#3 with various objects and with their hands" | Guilty | Guilty |
| 7 | Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a | "[W]ithholding sufficient nourishment and food from C.J.#3" | Guilty | Guilty |
| 8 | Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a | "[W]ithholding adequate water . . . and prohibiting C.J.#3 from drinking water" | Guilty | Guilty |
| 9 | Endangering the Welfare of a Child N.J.S.A. § 2C:24-4a | "[F]orcing C.J.#3 to ingest hot sauce and red pepper flakes" | Guilty | Guilty |

---

[66] A34–52.

27

| 10 | **Endangering the Welfare of a Child** N.J.S.A. § 2C:24-4a | "[C]ausing C.J.#3 to ingest excessive sodium and a sodium-laden substance while restricting [her] fluid intake, causing [her] to suffer hypernatremia and dehydration, a life-threatening condition" | Guilty | Not Guilty |
|----|----|----|----|----|
| 11 | **Endangering the Welfare of a Child** N.J.S.A. § 2C:24-4a | "[W]ithholding prompt and proper medical care for C.J.#3's dehydration and elevated sodium levels" | Guilty | Guilty |
| 12 | **Endangering the Welfare of a Child** N.J.S.A. § 2C:24-4a | "[P]hysically assaulting C.J.#3 with various objects and with their hands" | Guilty | Guilty |
| 13 | **Assault** 18 U.S.C. § 113(a)(3) | "[W]ith intent to do bodily harm assaulted C.J.#3 with a dangerous weapon" | Judgement of Acquittal | Judgment of Acquittal |
| 14 | **Assault** 18 U.S.C. § 113(a)(6) | "[I]ntentionally assaulted C.J.#3, resulting in serious bodily injury" | Judgement of Acquittal | Judgement of Acquittal |
| 15[67] | **Endangering the Welfare of a Child** N.J.S.A. § 2C:24-4a | "[W]ithholding prompt and proper medical care for C.J.#3's fractured humerus" | Not Guilty | Not Guilty |

---

[67] After the district court entered a judgment of acquittal on Counts 13 and 14, the original Count 15 was renumbered Count 13 on the verdict sheet.

# NIRENBERG & VARANO, LLP
## ATTORNEYS AT LAW

HOWARD M. NIRENBERG
SANDRA N. VARANO*

* MEMBER OF NJ & NY BARS

32 MERCER STREET
HACKENSACK, NJ 07601
201-996-1121
FAX – 201-996-9114
NIRENBERGVARANO@AOL.COM

August 16, 2017

*via Lawyers Service Same Day Delivery*

Javerbaum Wurgaft Hicks Kahn
 Wikstrom & Sinins
505 Morris Avenue
Springfield, New Jersey 07081
Attn: Gary E. Roth, Esq.

Re:    Johnson-Henry v. Teaneck Community Charter School, *et al*
         Docket No.: BER-L-4400-17
         Our File No.: 2689

Dear Mr. Roth:

On behalf of defendants Teaneck Community Charter School, Ralph Gallo and Sonia Torres, enclosed please find certified answers to interrogatories and response to request for production of documents. Please confirm that you will withdraw your motion presently returnable on August 18th.

Very truly yours,

Sandra N. Varano, Esq.

SNV:lv
enc.